# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FARM SANCTUARY; ANIMAL LEGAL DEFENSE FUND; ANIMAL OUTLOOK; ANIMAL WELFARE INSTITUTE; COMPASSION IN WORLD FARMING; FARM FORWARD; and MERCY FOR ANIMALS, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 6:20-cv-06081 |
| v. | ) ) | **FIRST AMENDED COMPLAINT** |
| SONNY PERDUE, in his official capacity as Secretary of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE; FOOD SAFETY AND INSPECTION SERVICE; and PAUL KIECKER, in his official capacity as Food Safety and Inspection Service Administrator,[1] | ) ) ) ) ) ) ) ) | **Complaint Filed: February 6, 2020**<br><br>*Hon.* Frank P. Geraci, Jr. |
| Defendants. | ) ) ) | |

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiffs challenge Defendant federal agencies' and officials' unlawful failure to protect the more than half million pigs who arrive annually at slaughterhouses in the United States unable to rise or walk, as well as additional pigs who become unable to rise or walk after arriving at the slaughterhouse. These animals are referred to as "nonambulatory," "nonambulatory disabled" (NAD), or "downed" pigs.

2.      Nearly two decades ago, in 2002, Congress directed the Secretary of Agriculture to investigate and report on nonambulatory livestock, including pigs, and, based on those

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), former Food Safety and Inspection Service Administrator Carmen Rottenberg is automatically substituted by her successor, Paul Kiecker.

findings, promulgate regulations as needed to ensure the humane treatment, handling, and disposition of those animals. Farm Security and Rural Investment Act of 2002, Pub. L. 107–171, title X, § 10815, 116 Stat. 532 (codified at 7 U.S.C. § 1907 (2002)).

3.      Defendants subsequently promulgated regulations to prohibit the slaughter of nonambulatory cattle and calves, underscoring that doing so was needed to ensure humane handling, including by removing incentives to send weakened animals to slaughter, to inhumanely force them to rise, and to hold them for prolonged periods.

4.      On information and belief, Defendants have not complied with the statutory mandates that they investigate, report to Congress on, and regulate the humane treatment, handling, and disposition of nonambulatory pigs.

5.      After Defendants had disregarded Congress's mandates as to nonambulatory pigs for well over a decade, in 2014, Plaintiff animal protection organizations petitioned for a regulation to prohibit the slaughter of these animals.

6.      As detailed in the petition and supporting materials, by allowing the slaughter of nonambulatory pigs, Defendants incentivize producers to send weakened animals to slaughter, including breeding sows and pigs who have been fed the growth-promoting drug ractopamine, which significantly increases the chances that they will become nonambulatory.

7.      As further documented by the petition and supporting materials, downed pigs suffer significantly at slaughterhouses across the United States, including being trampled by other animals and being excessively shocked, prodded, kicked, shoved, and dragged by workers attempting to force them to move.

8.      Recent U.S. Department of Agriculture (USDA) documentation of dozens of incidents involving downed pigs at slaughterhouses across the country reads like a horror story

and includes: a downed pig at a slaughterhouse in Kentucky with a large bloody abscess on her knee that another pig was eating; a downed pig who squealed out in pain when a worker at a slaughterhouse in Indiana closed a grapple fork around her snout and hydraulically squeezed her head; a downed pig who was panting excessively falling backwards and landing on her back after being kneed by a worker at a slaughterhouse in Iowa in an attempt to get her to move; a downed pig whose leg became caught while workers at another Iowa slaughterhouse were trying to move him, causing part of his hoof to become detached from the bone and tissue; and a downed pig who was kicked in the stomach and then electro-shocked in an attempt to get her to move at yet another Iowa slaughterhouse.

9.      Downed pigs are also routinely held in pens in the hopes that they might later be able to rise, because the flesh of pigs who can be forced to walk to their deaths is worth more money than that of those who remain nonambulatory. USDA records document numerous incidents of neglect in these pens, including animals being overcrowded, denied access to water, and inadequately protected from the elements. For example, downed pigs were left in a pen at a slaughterhouse in Indiana when the temperature was negative six degrees Fahrenheit. They had hard, stiff, frostbitten ears; appeared to be stressed and adversely affected by the cold; and one them was shivering and squealing. In another incident, five downed pigs were penned in direct sunlight without access to shade when the temperature exceeded one hundred degrees Fahrenheit at a slaughterhouse in Texas. In yet another incident, downed pigs who had been trampled were found dead in a pen at a slaughterhouse in upstate New York after having been left there overnight.

10.      As also detailed in the petition and supporting exhibits, downed pigs—in part because they are often held in pens for prolonged periods, unable to rise from feces-ridden

floors—are significantly more likely to harbor and transmit a host of food-borne diseases, including *Salmonella* spp., *Yersinia enterocolitica*, swine flu, *Listeria monocytogenes*, and antibiotic resistant *Campylobacter*.

11. Despite being presented with voluminous evidence documenting the need to prohibit the slaughter of downed pigs in order to fulfill their statutory mandates, and after more than five years of delay, Defendants denied Plaintiffs' petition. In doing so, Defendants entirely failed to consider the well-documented incentives for producers to send weakened pigs to slaughter and unreasonably treated downed pigs differently from downed cattle, despite uncontroverted evidence of the food-safety and humane handling risks inherent in allowing the slaughter of downed pigs.

12. Defendants' nearly two-decades–long delay in investigating, reporting to Congress on, and regulating nonambulatory pigs constitutes agency action unlawfully withheld and unreasonably delayed.

13. Defendants' denial of Plaintiffs' petition for rulemaking is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

14. Accordingly, Plaintiffs seek an order compelling Defendants to investigate, report on, and regulate the treatment, handling, and disposition of nonambulatory pigs, and setting aside Defendants' denial of Plaintiffs' petition to ban the slaughter of nonambulatory pigs.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because one or more of the Plaintiffs resides in this judicial district.

## PARTIES

### A. Plaintiffs

### *Farm Sanctuary*

17.     Plaintiff Farm Sanctuary is a nonprofit, tax-exempt 501(c)(3) membership organization headquartered in Watkins Glen, New York, where it operates a 275-acre shelter that provides a home to more than 800 rescued farm animals and offers educational tours to the public. Farm Sanctuary's mission is to protect farm animals from cruelty, to inspire change in the way society views and treats farm animals, and to promote compassionate vegan living. Farm Sanctuary works to accomplish this mission through public education, animal rescue efforts, and legal and legislative work. With approximately 1.2 million members and supporters, Farm Sanctuary is one of the leading farm animal protection organizations in the United States.

18.     Farm Sanctuary brings this action on its own behalf and on behalf of its adversely affected members.

19.     Since its founding in 1986, Farm Sanctuary has advocated on behalf of downed animals. Farm Sanctuary has rescued, rehabilitated, and provided lifelong care to numerous animals who were left for dead at stockyards, including pigs. In addition to assisting these individual animals, Farm Sanctuary has led campaigns on behalf of downed animals, including investigations to expose downed animal abuse and campaigns focused on state and federal legislation and on stockyard policies. Farm Sanctuary has also been involved in numerous petitions for rulemaking, civil litigation, and criminal prosecutions aimed at protecting downed animals, as well as educational efforts to inform its members and the broader public about downed pigs and to mobilize efforts on behalf of these animals.

20.     Defendants' failure to comply with Congress's 2002 mandates and its arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs directly conflict with, frustrate, and impair Farm Sanctuary's mission.

21.     As a result of Defendants' unlawful inaction and action, Farm Sanctuary has been forced to redirect its limited time and resources away from other work, including by publishing numerous materials to educate its members about and mobilize support for measures to protect downed pigs. Among other things, Farm Sanctuary has had to, and will continue to have to, divert time and resources toward requesting information about incidents of inhumane handling and food safety violations involving nonambulatory pigs; fighting to obtain that information in a timely manner, in some cases through litigation; reviewing, analyzing, and digesting that information; and publicizing it to educate its members and the public.

22.     These activities are ongoing and injure Farm Sanctuary by consuming organizational resources that could otherwise be spent on its other work on behalf of farmed animals. But for Defendants' unlawful action and inaction regarding downed pigs, Farm Sanctuary would not have to undertake these efforts and would not have had to expend these resources, at least not to such a significant extent.

23.     Farm Sanctuary's members include individuals who consume pork products and are concerned about the health risks they face from their potential exposure to meat from downed pigs contaminated with pathogens, including *Campylobacter*, *Listeria*, Salmonella, and *Yersinia enterocolitica*. Because of Defendants' failure to investigate, report on, and regulate the humane treatment, handling, and disposition of downed pigs, Farm Sanctuary's members are at a significantly increased risk for exposure to these pathogens.

24.     These injuries to Farm Sanctuary and its members are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.

### *Animal Legal Defense Fund*

25.     Plaintiff Animal Legal Defense Fund (ALDF) is a nonprofit, tax-exempt 501(c)(3) membership organization that works to protect the lives and advance the interests of animals through the legal system. ALDF accomplishes this mission by engaging in litigation, providing legal assistance and training to prosecutors, supporting tough animal protection legislation and combating legislation harmful to animals, and providing resources and opportunities to law students and professionals to advance the emerging field of animal law.

26.     ALDF has more than 200,000 members and supporters, and brings this lawsuit on behalf of itself and its adversely affected members.

27.     Defendants' failure to comply with Congress's 2002 mandates and arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs directly conflict with, frustrate, and impair ALDF's organizational mission, and force the organization to divert significant time and resources.

28.     Among other things, ALDF is forced to expend time and resources routinely submitting Freedom of Information Act requests seeking enforcement records involving downed pigs and using those records in advocacy and educational efforts.

29.     ALDF has also diverted resources to prepare for, travel to, and participate in meetings with Defendant FSIS to address its unlawful failure to protect downed pigs, and will continue to push for such opportunities to address these issues with the agency and to participate in them when they are made available.

30.     ALDF further diverts significant resources to seek other means of protecting downed pigs at slaughter that would not be necessary, or necessary to the same extent, but for Defendants' unlawful inaction and action. For example, ALDF petitions Defendant FSIS to improve humane handling requirements and enforcement schemes to protect pigs and other animals at slaughterhouses and opposes regulatory proposals that would further harm downed pigs. ALDF further engages in regulatory advocacy and litigation to combat the allowance and rampant use of ractopamine to raise pigs, which exacerbates both the likelihood that pigs will become nonambulatory and the suffering of these downed pigs at slaughter. And ALDF further engages in outreach and educational efforts about these issues pertaining to nonambulatory pigs to inform its audiences about the welfare problems and regulatory failures.

31.     These activities are ongoing and injure ALDF by consuming organizational resources that could be spent on its other work to protect animals and gain greater legal protections for them.

32.     But for Defendants' unlawful failure to protect downed pigs, ALDF would not have to undertake these efforts and would not have had to expend these resources, at least not to such a significant extent.

33.     ALDF's members include individuals who regularly consume pork products and are worried about the increased health risks associated with consuming meat that is potentially contaminated with pathogens and the increased likelihood of consuming meat from animals who were inhumanely handled. Both of these increased risks result from Defendants' unlawful failure to investigate, report on, and regulate the humane treatment and handling of nonambulatory pigs.

34.     These injuries to ALDF and its members are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.

*Animal Outlook*

35.     Plaintiff Animal Outlook, previously known as Compassion Over Killing, is a nonprofit, tax-exempt 501(c)(3) organization whose mission is to change the world for animals. Animal Outlook works to challenge the status quo of animal agribusiness, expose the truth, deliver justice, revolutionize food systems, and empower others to stand up for animals by leaving them off of their plates.

36.     In furtherance of its mission, Animal Outlook advocates against government policies that encourage or allow cruelty to farmed animals, conducts public education on the realities of industrialized animal agriculture, coordinates public campaigns to encourage the adoption of vegan diets, and conducts undercover investigations to expose cruelty at industrialized factory farms.

37.     Defendants' failure to comply with Congress's 2002 mandates and arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs directly conflict with, frustrate, and impair Animal Outlook's organizational mission, and force it to divert resources.

38.     Among other things, Animal Outlook has had to, and will continue to have to, divert resources to focus a substantial part of its investigations on the treatment of downed animals. Because the slaughter of downed pigs is allowed and incentivized by Defendants, Animal Outlook has been forced to expend significantly more investigative resources documenting downed pigs. Animal Outlook will continue to have to divert more resources to document downed pigs and publicize this documentation unless and until Plaintiffs prevail in this matter.

/ / /

/ / /

39.     Animal Outlook also has to divert significant resources to educate the public about the treatment and slaughter of downed pigs through blogs, emails, and petitions, and is forced to continue doing so as long as Defendants' challenged action and inaction persist.

40.     Animal Outlook's diversion of resources to address Defendants' unlawful failure to protect downed pigs is ongoing and injures the organization by consuming resources that could be spent on other projects to advance the organization's mission, such as investigations and public education campaigns focused on animal cruelty in other areas of industrialized agribusiness.

41.     These injuries are traceable to Defendants' challenged action and inaction because, but for this failure, Animal Outlook would not have to undertake such significant efforts, and would not have to expend such significant resources.

42.     These injuries to Animal Outlook are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.

### *Animal Welfare Institute*

43.     Plaintiff Animal Welfare Institute (AWI) is a nonprofit, tax-exempt 501(c)(3) organization whose mission is to reduce animal suffering caused by people. AWI seeks better treatment of animals everywhere—in the laboratory, on the farm, in commerce, at home, and in the wild. With respect to farm animals, AWI seeks to reduce suffering by identifying and promoting policy efforts that improve the welfare of animals on farms, during transport, and at slaughter.

44.     Defendants' failure to comply with Congress's 2002 mandates and arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs has forced AWI to divert extensive resources.

45.     Defendants' inaction and action directly conflict with, frustrate, and impair AWI's mission.

46.     As a direct result of Defendants' denial of Plaintiffs' petition for rulemaking and failure to comply with Congress's 2002 amendments, AWI has had to, and will continue to have to, divert thousands of dollars and hundreds of hours to addressing harm caused by Defendants.

47.     Because of Defendants' failure to address nonambulatory pigs, AWI expends resources educating the public and reporting on the problem, including by preparing and regularly updating its report, *Legal Protections for Non-ambulatory (or "Downed") Farm Animals*. This report details and analyzes federal and state laws relating to downed animals, as well as industry and international standards, and makes policy recommendations for reducing instances of inhumane handling of nonambulatory animals, including pigs.

48.     AWI further diverts resources to prepare and regularly update its report, *Federal and State Oversight of the Welfare of Farm Animals at Slaughter*, which makes detailed findings about humane handling violations, including those involving downed pigs. This report also proposes policy recommendations for reducing instances of inhumane handling of animals, including those who become nonambulatory.

49.     To monitor the status of downed pigs, AWI is forced to divert significant resources to submit Freedom of Information Act requests for humane handling records involving pigs. AWI has also been forced to further divert significant resources to litigate in an effort to access that information in a timely manner.

50.     AWI also diverts resources by routinely submitting state public records requests to monitor and report on enforcement of the Humane Methods of Slaughter Act at slaughter plants under state inspection. Because of the FSIS's failure to investigate, report on, and regulate

the treatment of nonambulatory pigs, AWI must use the information from these public records requests to encourage government inspection personnel and slaughter establishments to improve the treatment of vulnerable animals.

51.     AWI further has to divert resources to monitor the occurrence and handling of nonambulatory pigs at livestock auctions.

52.     AWI further diverts significant resources to seek other means of reducing the inhumane handling of nonambulatory pigs that would not be necessary, or necessary to the same extent, but for Defendants' unlawful inaction and action. For example, in 2013, AWI petitioned the USDA to improve handling requirements for pigs and other farm animals at slaughter. This petition requested mandatory humane handling training for slaughterhouse personnel, and a requirement for slaughterhouses to develop humane handling plans, which have the potential to reduce the incidence of and improve the treatment of nonambulatory pigs at slaughter. AWI also requested that the federal government condition purchasing contracts on requiring the humane euthanasia of nonambulatory pigs. AWI further has actively opposed regulatory proposals that would further imperil nonambulatory pigs, for example, by opposing recent regulatory changes to increase slaughter line speeds.

53.     AWI has had to, and will continue to have to, further divert resources because Defendants' unlawful denial of Plaintiffs' petition for rulemaking incentivizes the transport of pigs who are likely to become nonambulatory. For example, AWI published, and now regularly updates, its report, *Legal Protections for Farm Animals During Transport*, which contains information relevant to the transport of nonambulatory pigs. AWI also actively monitors transport incidents involving nonambulatory pigs through routine public records requests and

describes these incidents in its reports, which it would not have to do but for Defendants' denial of the petition for rulemaking and failure to comply with Congress's 2002 mandates.

54.     As a direct result of Defendants' unlawful failure to protect downed pigs, AWI has also had to divert resources to engage with industry organizations to urge them to adopt voluntary standards to protect these animals.

55.     These activities are ongoing and injure AWI by consuming organizational resources that could otherwise be spent on other projects. These injuries are traceable to Defendants' denial of Plaintiffs' petition for rulemaking and failure to comply with Congress's 2002 mandates because, but for this unlawful action and inaction, AWI would not have to undertake these efforts or expend these resources to the extent it now does.

56.     These injuries to AWI are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.

### *Compassion in World Farming*

57.     Plaintiff Compassion in World Farming USA (CIWF) is a 501(c)(3) nonprofit membership organization. CIWF's mission is to end all factory-farming practices. CIWF works to accomplish this mission through campaigns, public education, corporate engagement, and legal advocacy.

58.     Defendants' failure to comply with Congress's 2002 mandates and arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs directly conflict with, frustrate, and impair CIWF's mission and force it to divert resources. Among other things, CIWF has had to, and will continue to have to, divert time and resources to assembling information necessary to circulate action alerts to raise awareness about and mobilize action regarding the slaughter of downed pigs.

59.     These activities are ongoing and injure CIWF by consuming organizational resources that could otherwise be spent on other projects.

60.     These injuries are traceable to Defendants' challenged action and inaction because, but for this failure, CIWF would not have to undertake, at least not to this extent, these efforts, and would not have to expend, at least not to this extent, these resources.

61.     CIWF's members include individuals who regularly consume pork products and are worried about the increased health risks associated with consuming meat that is potentially contaminated with pathogens and the increased likelihood of consuming meat from animals who were inhumanely handled. Both of these increased risks result from Defendants' unlawful failure to investigate, report on, and prohibit the slaughter of nonambulatory pigs.

62.     These injuries to CIWF and its members are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.

### *Farm Forward*

63.     Plaintiff Farm Forward was founded as the nation's first nonprofit devoted exclusively to end factory farming and implements innovative strategies to promote conscientious food choices, reduce farmed animal suffering, and advance sustainable agriculture. Farm Forward's work improves the lives of more than 400,000,000 animals annually by eliminating the worst practices in factory farming, advocating for acute reduction in the consumption of factory farmed pigs, supporting interdisciplinary research and undergraduate teaching about the cultural significance of animals and animal agriculture, and producing educational materials that raise awareness about the problems in animal agriculture. Farm Forward and its members are committed to ending cruel practices inflicted on animals used for food.

64.     Farm Forward brings this action on its own behalf and on behalf of its adversely affected members.

65.     Defendants' failure to comply with Congress's 2002 mandates and arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs directly conflict with, frustrate, and impair Farm Forward's mission, and force it to divert resources.

66.     Among other things, Farm Forward has had to, and will continue to have to, divert significant resources to consult with and advise partner organizations, companies, and members on the federal regulatory framework surrounding downed pig slaughter and its adverse impacts on animal welfare. But for Defendants' unlawful inaction and action, Farm Forward would be able to expend these resources on other efforts, including advising companies on setting new and improved animal welfare standards and internal protocols.

67.     Farm Forward has to further divert significant time and resources to advise concerned members and consumers about which suppliers and slaughterhouses continue to allow the slaughter of downed pigs.

68.     These activities are ongoing and injure Farm Forward by consuming organizational resources that could otherwise be spent on other projects. These injuries are traceable to Defendants' challenged action and inaction.

69.     Farm Forward's members also include individuals who regularly consume pork products and are concerned about the welfare of the animals they are consuming, specifically whether these products are sourced from slaughterhouses where pigs are humanely handled. Because of Defendants' challenged action and inaction, Farm Forward's members are unable to purchase pork that they can be assured comes from an animal who was ambulatory and who was handled humanely at the slaughterhouse.

70.     These injuries to Farm Forward and its members are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.

*Mercy For Animals*

71.     Plaintiff Mercy For Animals, Inc. (MFA), is a nonprofit, tax-exempt 501(c)(3) corporation whose mission is to construct a compassionate food system by reducing suffering and ending exploitation of animals for food.

72.     MFA utilizes a variety of approaches to achieve this mission including undercover exposés, legal advocacy, corporate engagement, capacity building, and public engagement.

73.     Defendants' failure to comply with Congress's 2002 mandates and arbitrary and capricious denial of Plaintiffs' petition to ban the slaughter of downed pigs directly conflict with, frustrate, and impair MFA's mission, and force it to divert resources away from its core activities.

74.     Among other things, MFA has had to, and will continue to have to, divert resources by focusing a substantial part of its investigations on the treatment of downed animals. MFA has documented downed pigs on camera, in writing, or both in nearly every investigation that it has conducted on pig facilities, which it would not have had to do, or would not have had to do to the same extent, but for Defendants' unlawful actions and inactions.

75.     MFA has also had to divert organizational resources to publish materials that educate the public about animal welfare concerns that result from Defendants' failure to prohibit the slaughter of downed pigs, including inhumane handling and the administration of ractopamine.

76. These activities are ongoing and consume organizational resources that could be spent on other projects but for Defendants' disregard of its statutory responsibilities for downed pigs.

77. These injuries are traceable to Defendants' challenged action and inaction, and will be redressed if Plaintiffs prevail in this action.

**B. Defendants**

78. Defendant Sonny Perdue is the Secretary of Agriculture and has been directed by Congress to promulgate regulations to implement the Federal Meat Inspection Act (FMIA), 21 U.S.C. § 621, which incorporates the Humane Methods of Slaughter Act (HMSA), *id.* § 603(b); to investigate and report on nonambulatory animals; and to regulate as needed to provide for the humane treatment, handling, and disposition on nonambulatory livestock, 7 U.S.C. § 1907(a)-(b).

79. Defendant USDA is the federal agency responsible for implementing the Humane Methods of Slaughter Act and the Federal Meat Inspection Act.

80. Defendant Food Safety and Inspection Service (FSIS) is the agency of the USDA that is responsible for implementing the HMSA and FMIA, including the mandates to investigate, report on, and regulate nonambulatory livestock. 7 C.F.R. § 2.18(a)(1)(ii)(B), (E). It is also the agency that denied Plaintiffs' petition for rulemaking.

81. Defendant Paul Kiecker is the Administrator of the FSIS, to whom the USDA's functions under the HMSA and FMIA have been delegated. 7 C.F.R. § 2.53(a)(2)(ii), (v).

/ / /

/ / /

/ / /

<center>**LEGAL FRAMEWORK**</center>

### A. Humane Methods of Slaughter Act

82.     The Humane Methods of Slaughter Act (HMSA), 7 U.S.C. §§ 1901-1907,

governs "cattle, calves, horses, mules, sheep, swine, and other livestock," *id.* § 1902(a).

83.     Pigs comprise by far the majority of animals that the USDA regulates under the

HMSA.

84.     Based on Congress's determination that

> the use of humane methods in the slaughter of livestock prevents needless
> suffering; results in safer and better working conditions for persons engaged in the
> slaughtering industry; brings about improvement of products and economies in
> slaughtering operations; and produces other benefits for producers, processors,
> and consumers which tend to expedite an orderly flow of livestock and livestock
> products in interstate and foreign commerce,

the HMSA "declare[s]" it to be "the policy of the United States that the slaughtering of livestock

and the handling of livestock in connection with slaughter shall be carried out only by humane

methods." *Id.* § 1901.

85.     Accordingly, "[n]o method of slaughtering or handling in connection with

slaughtering shall be deemed to comply with the public policy of the United States unless it is

humane." *Id.* § 1902.

86.     To achieve these goals, the HMSA "direct[s]" the Secretary of Agriculture to

investigate and determine humane methods of slaughter and handling, and to designate

permissible methods of slaughter and handling of livestock that are humane. *Id.* § 1904.

87.     The HMSA further authorizes and directs the Secretary

> to conduct, assist, and foster research, investigation, and experimentation to
> develop and determine methods of slaughter and the handling of livestock in
> connection with slaughter which are practicable with reference to the speed and

<center>18</center>

scope of slaughtering operations and humane with reference to other existing methods and then current scientific knowledge . . . .

*Id.* § 1904(a).

88.     In addition, the HMSA directs the Secretary "to designate methods of slaughter and of handling in connection with slaughter which, with respect to each species of livestock, conform to the policy stated in" the statute or, alternatively, to designate "methods which are not in conformity with such policy." *Id.* § 1904(b).

89.     In 2002, Congress amended the HMSA specifically to address concerns about the humane treatment of downed animals, including pigs, mandating that:

> The Secretary of Agriculture shall investigate and submit to Congress a report on—
> (1) the scope of nonambulatory livestock;
> (2) the causes that render livestock nonambulatory;
> (3) the humane treatment of nonambulatory livestock; and
> (4) the extent to which nonambulatory livestock may present handling and disposition problems for stockyards, market agencies, and dealers.

*Id.* § 1907(a).

90.     Congress further mandated that, "Based on the findings of the report, if the Secretary determines it necessary, the Secretary shall promulgate regulations to provide for the humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers." *Id.* § 1907(b).

91.     The FSIS is responsible for implementing these mandates. 7 C.F.R. § 2.18(a)(1)(ii)(E).

/ / /

/ / /

/ / /

## B. **Federal Meat Inspection Act**

92.     The Federal Meat Inspection Act (FMIA), 21 U.S.C. §§ 601–695, incorporates the HMSA by reference, *id.* § 603(b); *see also id.* § 610(b) (making it unlawful to "handle in connection with slaughter any" pigs "in any manner not in accordance with the" HMSA).

93.     The FMIA declares:

> It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome[ and] not adulterated . . . . Unwholesome[ or] adulterated . . . meat or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce, are injurious to the public welfare . . . and result in . . . injury to consumers.

*Id.* § 602.

94.     The FMIA defines "adulterated" meat to include that which "bears or contains any poisonous or deleterious substance which may render it injurious to health . . . or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food," as well as that which "has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." *Id.* § 601(m)(1), (3), (4).

95.     The FMIA directs the USDA to examine and inspect all livestock "before they shall be allowed to enter into any slaughtering . . . establishment," and to require that animals who "show symptoms of disease" be "set apart and slaughtered separately." *Id.* § 603(a).

96.     The FMIA further provides that the "Secretary shall . . . make such rules and regulations as are necessary for [its] efficient execution." *Id.* § 621.

97.     The FSIS is responsible for implementing these mandates. 7 C.F.R. § 2.18(a)(1)(ii)(B).

## C. **Administrative Procedure Act**

98. The Administrative Procedure Act (APA) provides, "Each agency shall give an interested person the right to petition for the issuance . . . of a rule." 5 U.S.C. § 553(e).

99. The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702.

100. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* §§ 551(13), 701(b)(2).

101. Under the APA:

> The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

*Id.* § 706.

## **FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF**

### A. **Defendants' Prohibition on the Slaughter of Downed Cattle**

102. In 1998, Plaintiff Farm Sanctuary petitioned the USDA to prohibit the slaughter of downed cattle. The FSIS initially denied the petition. However, nearly a decade later, following litigation challenging the denial, the FSIS promulgated a rule prohibiting the slaughter of downed cattle for food, noting that these animals had a higher incidence of bovine spongiform encephalopathy (BSE) than ambulatory cattle. 72 Fed. Reg. 38,700 (July 13, 2007); 9 C.F.R. § 309.3(e).

/ / /

/ / /

103.     The FSIS subsequently promulgated a rule to expand this slaughter prohibition to include cattle who are ambulatory when they arrive at a slaughterhouse but subsequently become nonambulatory. 74 Fed. Reg. 11,463 (Mar. 18, 2009); 9 C.F.R. § 309.3(e).

104.     This expansion of the prohibition was based specifically on humane handling concerns, particularly concerns about incentivizing producers to send weakened animals to slaughter. 74 Fed. Reg. at 11,465. Specifically, the FSIS found that allowing the slaughter of nonambulatory cattle:

> may have provided an incentive for livestock producers to hold cattle until they were already weakened. Holding dairy cattle until they become exceptionally old or weak before sending them to slaughter allows producers to extract as much milk as possible in the hope that they are able to pass the initial ante-mortem inspection before going down. Sending such weakened cattle to slaughter increases the chances that they will go down and then be subjected to conditions that are inhumane. This revision of the rule removes the incentive to send such weakened cattle to slaughter and decreases the chances of inhumane conditions.

*Id.*

105.     Expansion of the rule was also based on concerns about animals being inhumanely forced to rise. *See, e.g.*, *id.* at 11,464 ("the rule is necessary to preclude establishments from attempting to force non-ambulatory disabled animals to rise for FSIS re-inspection"); *id.* (allowing nonambulatory cattle to be slaughtered "may have created an incentive for establishments to inhumanely attempt to force these animals to rise").

106.     In 2016, in response to a 2009 petition for rulemaking from another animal protection organization, the FSIS again expanded its prohibition on the slaughter of nonambulatory animals, this time to protect veal calves in addition to mature cattle. 81 Fed. Reg. 46,570 (July 18, 2016); 9 C.F.R. § 309.3(e).

107.     As with mature cattle, the agency explained that one of the primary reasons for the ban was to remove incentives for producers to send weakened animals to slaughter. *See, e.g.*,

81 Fed. Reg. at 46,571 (Allowing the slaughter of nonambulatory calves may "provide an incentive for livestock producers and establishments to send weakened veal calves to slaughter in the hope that the veal calves are able to sufficiently recover in time to pass ante-mortem inspection. Sending such weakened veal calves to slaughter increases the chances that they will go down and be subjected to conditions that are inhumane.").

108.     Also as with mature cattle, another primary justification for the ban was that allowing the slaughter of nonambulatory animals "may create an incentive for establishments to inhumanely force non-ambulatory disabled veal calves to rise." *Id.* at 46,572.

109.     The FSIS also found that extending the prohibition was warranted due to concerns "about the treatment of veal calves during extended hold times," giving as an example instances in which slaughterhouses had failed to provide veal calves access to water. *Id.* at 46,571.

110.     Thus, in order to comply with its statutory mandates to ensure humane handling and protect the food supply, the FSIS, through regulation, strictly prohibits the slaughter of any nonambulatory cattle. 9 C.F.R. § 309.3(e).

## B.  **Defendants' Inconsistent Treatment of Downed Pigs**

111.     Despite strictly prohibiting the slaughter of any nonambulatory cattle, the FSIS continues to allow the slaughter of nonambulatory pigs. *See* 9 C.F.R. §§ 309.2(b), (n).

112.     The National Pork Producers Council estimates that 0.44% of pigs—more than a half million animals—arrive at the slaughterhouse unable to walk. This number does not account for the numerous animals who arrive at the slaughterhouse able to walk but subsequently become nonambulatory.

/ / /

/ / /

113.    In response to a Freedom of Information Act request for any reports to Congress regarding nonambulatory livestock since the 2002 mandates, the FSIS, the agency responsible for fulfilling the mandates, responded that it did not locate any responsive documents.

114.    On information and belief, since Congress' 2002 mandates, the Secretary of Agriculture has never investigated or submitted a report to Congress on the scope of nonambulatory pigs; the causes that render these animals nonambulatory; the humane treatment of these animals; or the extent to which these animals may present handling and disposition problems.

115.    On information and belief, because no such report was ever prepared, the Secretary has never promulgated regulations based on report findings to provide for the humane treatment, handling, and disposition of nonambulatory pigs.

116.    The FSIS has repeatedly "stated that it planned to evaluate measures that may be necessary to ensure the humane handling of" "non-ambulatory disabled livestock other than cattle," including pigs. 76 Fed. Reg. 6572, 6573 (Feb. 7, 2011) (citing 74 Fed. Reg. 11464 (Mar. 18, 2009); 72 Fed. Reg. 38722 (July 13, 2007)).

117.    On information and belief, the agency has never followed through with these purported plans.

## C.  <u>Inhumane Handling of Downed Pigs</u>

118.    According to an FSIS official, before the prohibition on slaughtering nonambulatory calves was promulgated, a review of HMSA noncompliance records found eighteen times as many instances of inhumane handling involving nonambulatory pigs as those involving calves. The official further noted that although more pigs are slaughtered than other species, downed pigs are also inhumanely handled at a disproportionately higher rate.

***Incentives to Send Weakened Pigs to Slaughter***

119.     As was previously the case with cattle, without regulations to prohibit the slaughter of nonambulatory animals, pig producers are incentivized to send weakened animals to slaughter.

120.     Voluminous evidence exhaustively shows that pigs are frequently too weak to walk when they are sent to slaughter.

121.     As professor of animal science Dr. Temple Grandin has explained with regard to female breeding pigs, "old, weak, emaciated sows" are "allowed to deteriorate into a weakened condition," making them "likely to become downers." Dr. Temple Grandin, *Handling of Crippled and Nonambulatory Livestock*, Animal Welfare Information Bulletin Vol. 9, No. 1-2 (Fall 1998). Dr. Grandin further notes that "[s]ow condition is declining especially on the largest farms," and that slaughterhouses have reported on these declining conditions. Dr. Temple Grandin, Preventing Crippled and Non-Ambulatory Animals (2000).

122.     According to Dr. Grandin, production practices of breeding pigs for "rapid growth, high leanness and extreme muscularity" makes the animals "often prone to stress that causes [them] to become nonambulatory." Temple Grandin, Effect of Transport on Meat Quality and Animal Welfare of Cattle, Pigs, Sheep, Horses, Deer, and Poultry (2004).

123.     Further, overcrowding of pigs in trucks and other inhumane transport practices cause pigs to become nonambulatory.

124.     In addition, many pigs sent to slaughter in the United States have been treated with ractopamine, a growth-promoting drug that makes them more susceptible to stress and disease and significantly increases the chances that they will become nonambulatory.

125.     Indeed, the Food and Drug Administration mandates that ractopamine carry a warning label stating, "CAUTION: Ractopamine may increase the number of injured and/or fatigued pigs during marketing."

126.     Although it has been approved for use in pigs only since 1999, ractopamine has reportedly caused more adverse events in pigs than any other animal drug on the market.

127.     Common adverse events in pigs caused by ractopamine include lameness, broken limbs, reluctance or inability to move, stiffness, collapse, and death.

128.     Pigs given ractopamine additionally suffer a significantly greater number of hoof lesions, which further contributes to them becoming nonambulatory.

129.     Ractopamine also increases stress hormones, which can impair immune function, increase the growth and production of virulence factors in food-borne pathogens, and facilitate infection by allowing pathogens to attach to the intestinal lining. Such infections, in turn, make it more likely that pigs will become nonambulatory.

130.     Ractopamine is also linked to cardiovascular stress, tremors, acute toxicity, and genotoxicity, which also increase the likelihood of becoming nonambulatory.

131.     Ractopamine further makes pigs more aggressive and excitable, thus making them more difficult to handle and more likely to be subjected to aggressive handling, which in turn has been documented to increase the likelihood that they will become nonambulatory.

132.     As Dr. Grandin has noted, the "problem" of "downed" pigs "can be solved" by producers. Dr. Temple Grandin, Reducing Fatigue and Non-Ambulatory Pigs in Slaughter Plants to Improve Welfare and Pork Quality (Aug. 2009). The problem is, however, likely to persist so long as there is an incentive to send these weakened animals to slaughter.

*Incentives to Cruelly Force Downed Pigs to Rise*

133.     As Dr. Grandin has explained, "Maintaining an adequate level of animal welfare at the plant level is impossible if pigs are too weak to walk through the yards." Dr. Temple Grandin, *Fixing the Downer Pig Problem*, Meat & Poultry (May 2006).

134.     As with cattle, allowing the slaughter of nonambulatory pigs "create[s] an incentive for establishments to inhumanely force these animals to rise," 74 Fed. Reg. 11,464.

135.     The flesh from a nonambulatory pig who is forced to rise is worth an estimated $38 to $126 more than one who does not rise. Thus, as was the case with adult cattle and veal calves until the FSIS banned their slaughter, there are strong incentives "for establishments to inhumanely attempt to force these animals to rise," *id.*

136.     Such inhumane handling of nonambulatory pigs has been repeatedly documented by the FSIS, despite the agency's own acknowledgement that "many . . . occurrences" of inhumane handling "happen outside the view of inspection personnel," 81 Fed. Reg. 46,570, 46,572, and despite longstanding criticisms of the FSIS's implementation of humane handling requirements by the USDA's own Office of Inspector General (OIG) and the Government Accountability Office (GAO).

137.     For example, in the OIG's recent *Food Safety and Inspection Service Followup on the 2007 and 2008 Audit Initiatives*, the watchdog agency found that the "FSIS lacks assurance that inspectors working at slaughter establishments are ensuring that animals are humanely treated." Audit Report 24016-0001-23, at 23 (June 2017), https://www.usda.gov/oig/webdocs/ 24016-0001-23.pdf. The OIG further found that 30% of deficiencies identified in its two prior audits regarding humane handling persisted. *Id.* at 12-51.

138.     Similarly, in the 2013 *Audit Report on FSIS Inspection and Enforcement Activities at Swine Slaughter Plants*, the OIG found the FSIS's "enforcement policies do not deter swine slaughter plants from becoming repeat violators of the" FMIA and HMSA and, "[a]s a result, plants have repeatedly violated the same regulations with little or no consequence" and that the "FSIS could not ensure humane handling of swine." Audit Report No. 24601-0001-41, at 4 (May 2013), https://www.usda.gov/oig/webdocs/24601-0001-41.pdf.

139.     This report noted the FSIS's chronic failure to take appropriate enforcement action at pig slaughterhouses, including numerous cases involving egregious violations in which inspectors failed to issue suspensions, such as an incident in which a slaughterhouse worker repeatedly drove a vehicle into a downed pig, then lifted the animal with a loader and dropped him onto the concrete floor. *Id.* at 24–25.

140.     This 2013 report also summarizes five prior audits related to FSIS enforcement of food safety and humane handling that "identified continuing problems with FSIS' inspections and enforcement." *Id.* at 2–3.

141.     Similarly, in the report *Humane Methods of Slaughter Act: Actions Are Needed to Strengthen Enforcement*, the GAO found that FSIS "inspectors have not taken consistent actions to enforce HMSA once they have identified a violation" and the "FSIS cannot ensure that it is preventing the abuse of livestock at slaughter plants or that it is meeting its responsibility to fully enforce HMSA." GAO-10-203 at 12 (Feb. 2010), https://www.gao.gov/new.items/d10203.pdf. The report further noted previous reports "on weaknesses in FSIS's management of HMSA." *Id.*

142.     All available evidence indicates that the humane handling violations documented by the FSIS are just the tip of the iceberg.

143.     Despite these serious limitations, the FSIS has documented incidents of inhumane efforts to force downed pigs to move at dozens of slaughterhouses across the United States in recent years, including:

a)   numerous incidents of downed pigs being trampled by other animals while crying out in pain and distress;

b)   a downed pig who squealed out in pain when a worker closed a grapple fork around her snout and hydraulically squeezed her head;

c)   a downed pig whose leg became caught while workers were trying to move him, causing part of his hoof to become detached from the bone and tissue;

d)   a downed pig who was kicked in the stomach and then electro-shocked in an attempt to get her to move;

e)   a worker striking a nonresponsive, downed pig at least twelve times;

f)   a downed pig who was panting excessively, falling backwards, and landing on her back after being kneed by a worker in an attempt to get her to move;

g)   a downed pig who was vocalizing in pain as she was pushed across the floor;

h)   a downed pig who was dragged over a concrete floor by her hind legs;

i)   a downed pig who was squealing as she was dragged by a chain that was tied around her front legs;

j)   a downed pig who was shocked with an electric prod and paddled in an attempt to force her to move, and then dragged twenty feet;

k)   a downed pig who was repeatedly paddled, electro-shocked in the head, and pushed;

l)   a downed pig who was found underneath other pigs, vocalizing in distress;

m)  a worker attempting to electro-shock a downed pig who was panting;

n)  a downed pig who was trampled by numerous pigs and then struck several times by a worker, causing her to flail;

o)  a downed pig who was pinched between a loader and a wall, causing her to vocalize loudly;

p)  a downed pig who had an electric prod run over her back repeatedly, as she flinched and vocalized each time the prod made contact;

q)  a downed pig who was repeatedly struck in attempts to get her to rise;

r)  a worker repeatedly prodding and paddling a downed pig in an attempt to get her to move, forcing the animal to drag herself along the ground;

s)  a worker lifting up a downed pig by her ear;

t)  a worker raising a ramp that a downed pig was on, causing the animal flip backwards and fall over; and

u)  a worker forcing a downed pig to drag herself into a pen.

### *Inhumane Holding of Nonambulatory Pigs*

144.    Because the FSIS allows nonambulatory pigs to be slaughtered and does not limit how long they can be set aside and held, and because the flesh of pigs who can be forced to rise sells for more money than the flesh of those who remain downed and are condemned, there is an incentive to hold downed pigs for prolonged periods in the hopes that they might rise and pass inspection. Downed pigs who can eventually be forced to rise and pass inspection can enter the human food supply, whereas others may be disposed of or rendered for other, less profitable uses, such as pet food or livestock feed.

145.     Nonambulatory pigs are often held for many hours, unsupervised despite their weak state, without veterinary care, analgesics, or food.

146.     Despite the well-documented and acknowledged limitations of the FSIS's HMSA enforcement regime, recent examples of documented regulatory noncompliance nevertheless paint a bleak picture of downed pigs held at slaughterhouses, including:

a)  a downed pig with a large bloody abscess on her knee that another pig was eating;

b)  downed pigs who were left in a pen when the temperature was negative six degrees Fahrenheit, had frost bitten ears that were hard and stiff, and appeared to be stressed and adversely affected by the cold; one of the animals was shivering and squealing;

c)  five downed pigs penned in direct sunlight with no shade when the temperature exceeded one hundred degrees;

d)  downed pigs without access to water who were overcrowded in a pen that had space for thirty to forty animals but held one hundred;

e)  a downed pig in an overcrowded pen being shoved up against the wall and breathing through her mouth in apparent distress;

f)  a downed pig with a broken leg who was left overnight without access to water;

g)  downed pigs being left in a hallway because no pen was available;

h)  and downed pigs who were trampled and then left in a pen overnight, where they were found dead the next morning.

**D.  <u>Downed Pigs and Food Safety</u>**

147.     The USDA has long recognized that downed animals are "the bellwethers of contagion in the herd."

148.     As the FSIS has noted, "the underlying reason for an animal's non-ambulatory condition cannot always be accurately ascertained when those animals are presented for slaughter." 72 Fed. Reg. at 38,703.

149.     A leading farm animal veterinarian at the University of California, Davis, underscored that even trained veterinarians find it nearly impossible to determine why a nonambulatory animal is unable to rise.

150.     Voluminous evidence documents that downed pigs are far more likely to harbor disease than ambulatory pigs, regardless of whether they show other signs of disease or might eventually rise.

151.     Additionally, even when they do not show obvious signs of disease, nonambulatory pigs usually display more subtle symptoms, including skin discoloration, muscle tremors, and lameness, all of which can indicate severe illness.

152.     Because they are unable to rise from the floors of the dirty pens in which they are held for long periods in the hopes that they may eventually rise, downed pigs have prolonged exposure to fecal matter.

153.     Pig fecal matter has been found to include a host of bacterial pathogens, including *Bacillus anthracis*, *Brucella* spp., *Campylobacter* spp., *Chlamydia* spp., *E. coli*, *Leptospira* spp., *Listeria monocytogenes*, *Mycobacterium* spp., *Salmonella* spp., and *Yersinia* spp. Cherie J. Ziemer, *Fate and Transport of Zoonotic, Bacterial, Viral, and Parasitic Pathogens During Swine Manure Treatment, Storage, and Land Application*, 88 J. Anima. Sci. E84-94 (2010).

154.     Nonambulatory pigs are especially susceptible to being carriers of pathogens such as *Salmonella* spp. and *Yersinia enterocolitica*, both of which are linked to long holding times and fecal contamination at pig slaughterhouses. *See, e.g.*, European Food Safety Authority,

*Scientific Opinion on the Public Health Hazards to Be Covered by Inspection of Meat (Swine)*, 9 EFSA J. 1 (2011); Pierre-Alexandre Beloeil et al., *Impact of the Salmonella Status of Market-Age Pigs and the Pre-Slaughter Process on Salmonella Caecal Contamination at Slaughter*, 35 Vet. Res. 513 (2004).

155.     Studies have confirmed that pre-slaughter contamination is the primary source of *Salmonella* spp.—approximately 70% of carcass contamination results from animals themselves being carriers. European Food Safety Authority, *supra*.

156.     The FSIS itself has noted that the pre-slaughter holding area, referred to as lairage, "is the most cost-effective stage to prevent cross-contamination that leads to rapid infection." FSIS, Compliance Guideline for Controlling *Salmonella* in Market Hogs (Dec. 2013).

157.     Nonambulatory pigs are also more susceptible to carrying swine influenza subtypes H1N1 and H3N2 than other pigs. For example, a Pork Industry Institute-funded study found that 53.8% of nonambulatory pigs were actively infected with H1N1 and 51.9% were actively infected with H3N2. Mhairi A. Sutherland, *Health of Non-ambulatory, Non-injured Pigs at Processing*, 116 Livestock Sci. 237 (2008). H1N1 is transmissible between pigs and humans, and the 2009 H1N1 pandemic sickened 60.8 million Americans, killing 12,469 people. Sundar S. Shrestha et al., *Estimating the Burden of 2009 Pandemic Influenza A (H1N1) in the United States (April 2009-April 2010)*, 52 Clin. Inf. Dis. S75-82 (2011).

158.     Lameness, which is common in nonambulatory pigs, is a clinical symptom of numerous bacterial, prion, and viral diseases, including *Listeria monocytogenes*, which is responsible for an estimated 28% of U.S. foodborne illness deaths. *See* H. Scott Hurd et al., *Swine Health Impact on Carcass Contamination and Human Foodborne Risk*, 143 Pub. Health Reports 343 (2008).

159.     Nonambulatory pigs have also been documented to be sixteen times more likely than ambulatory pigs to harbor antibiotic-resistant *Campylobacter*. M.E. Schuppers, *Clinical Herd Health, Farm Management and Antimicrobial Resistance in Campylobacter Coli on Finishing Pig Farms in Switzerland*, 69 Prev. Vet. Med. 189 (2005).

**E.   Plaintiffs' Petition for Rulemaking**

160.     On June 3, 2014, Plaintiffs submitted a petition for rulemaking requesting that the FSIS prohibit the slaughter of nonambulatory pigs, just as it has banned the slaughter of nonambulatory cattle and calves. Plaintiffs supplemented this petition on November 1, 2016. The petition and supplement, which totaled thirty-seven pages and were accompanied by thousands of pages of supporting exhibits, detailed why a rule prohibiting the slaughter of nonambulatory pigs is needed for all of the same reasons that warranted the prohibition on slaughtering nonambulatory cattle.

161.     The FSIS also received at least twenty letters urging it to grant Plaintiffs' petition for rulemaking.

162.     The agency did not receive any letters opposing Plaintiffs' petition for rulemaking, which was posted on its website and open to comments pursuant to agency regulation. *See* 9 C.F.R. §§ 392.6, 392.7.

**F.   Defendants' Denial of Plaintiffs' Petition for Rulemaking**

163.     On September 16, 2019, more than five years after Plaintiffs submitted their petition for rulemaking, the FSIS denied it, based on the agency's conclusion that "its existing regulations and inspection procedures are sufficient and effective in ensuring that [nonambulatory] pigs are handled humanely at slaughter and in preventing diseased animals from entering the human food supply."

164.    In denying the petition, the FSIS acknowledged that "[a]vailable research indicates that the stress of transportation and the holding of animals in lairage may increase the prevalence of certain pathogens and may be potential sources of pathogen cross-contamination," and that "longer holding times may be associated with pathogen cross-contamination," yet concluded that there was no need to address these public health risks.

165.    In denying the petition, the FSIS did not respond at all to the voluminous evidence submitted by Plaintiffs regarding pigs weakened by breeding, transport, and the extensive use of ractopamine. Instead, in direct contradiction to and without even engaging the evidence before it, the agency falsely stated that pigs "do not arrive at slaughter under conditions that increase the risk that they will become non-ambulatory or be inhumanely handled."

166.    In denying the petition, despite the fact that the agency had relied on inhumane handling violations involving nonambulatory calves as a key basis for its prohibition on their slaughter, and despite the fact that the agency found that its own records document a higher rate of humane handling violations involving nonambulatory pigs, the agency unreasonably disregarded this evidence.

167.    In addition, despite having expressly rejected industry assertions that self-regulation was adequate to protect nonambulatory cattle, the FSIS took the contrary position. The agency claimed—based entirely on industry assertions without independent verification and contrary to the evidence before it—that because the industry considers "poor animal handling or abuse . . . to be ethically wrong and unacceptable" the incidence of nonambulatory pigs is already being minimized.

168.    Defendants also based their denial on the assertion that "an establishment that mistreats pigs is more likely to be subject to FSIS regulatory control action and further

enforcement," an assertion that is unfounded and directly contradicts the voluminous evidence in the record from the USDA's own OIG and the GAO that the "FSIS lacks assurance that inspectors working at slaughter establishments are ensuring that animals are humanely treated," the agency is failing to "deter swine slaughter plants from becoming repeat violators," and that, "[a]s a result, plants have repeatedly violated the same regulations with little or no consequence."

169.     Thus, Defendants' denial of Plaintiffs' petition for rulemaking entirely failed to consider important aspects of the problem of the slaughter of nonambulatory pigs that were presented in the petition, offered explanations for its decision that run directly counter to the evidence before the agency, and unreasonably treated nonambulatory pigs differently from nonambulatory cattle.

## PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Failure to Investigate and Report to Congress on Downed Pigs)

170.     Plaintiffs incorporate by reference all preceding paragraphs as if those allegations were set out explicitly herein.

171.     In 2002, Congress amended the HMSA to mandate that, "The Secretary of Agriculture shall investigate and submit to Congress a report on" the scope of nonambulatory livestock, including pigs; the causes that render these animals nonambulatory; the humane treatment of these animals; and the extent to which these animals present handling and disposition problems. 7 U.S.C. § 1907(a).

172.     Despite the passage of nearly two decades since this directive was codified, on information and belief, Defendants have not investigated or reported to Congress on the scope of nonambulatory pigs, the causes that render these animals nonambulatory, the humane treatment of these animals, or the extent to which these animals present handling and disposition problems.

173. Defendants' failure to investigate and report to Congress on nonambulatory pigs in defiance of this directive violates the HMSA and constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1).

174. Defendants' unlawful withholding and unreasonable delay have injured and continue to injure Plaintiffs as described herein.

## SECOND CAUSE OF ACTION
**(Failure to Regulate the Humane Treatment, Handling, and Disposition of Downed Pigs)**

175. Plaintiffs incorporate by reference all preceding paragraphs as if those allegations were set out explicitly herein.

176. In 2002, Congress directed the Secretary of Agriculture to determine, based on the findings of his report on nonambulatory livestock, including nonambulatory pigs, whether regulations to ensure humane treatment, handling, and disposition, are necessary, and, if so, to promulgate such regulations. 7 U.S.C. § 1907(b).

177. Defendants have failed to assess the need for regulations to ensure the humane treatment, handling, and disposition of downed pigs based on such findings, and to promulgate such regulations as needed.

178. This failure violates the HMSA and constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1).

179. Defendants' unlawful withholding and unreasonable delay have injured and continue to injure Plaintiffs as described herein.

## THIRD CAUSE OF ACTION
**(Arbitrary and Capricious Denial of Plaintiffs' Petition for Rulemaking)**

180. Plaintiffs incorporate by reference all preceding paragraphs as if those allegations were set out explicitly herein.

181.     Because Defendants' denial of Plaintiffs' petition for rulemaking to prohibit the slaughter of nonambulatory pigs entirely failed to consider important aspects of the problem that were presented in the petition, offered explanations that run directly counter to the evidence before the agency, and unreasonably treated nonambulatory pigs differently from nonambulatory cattle, it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

182.     Defendants' denial of Plaintiffs petition for rulemaking has injured and continues to injure Plaintiffs as described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court issue an order:

1.     Declaring that Defendants' failure to investigate and report on nonambulatory pigs violates the HMSA, 7 U.S.C. § 1907(a), and constitutes agency action unlawfully withheld and/or unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1);

2.     Declaring that Defendants' failure to assess the need for regulations to ensure the humane treatment, handling, and disposition of downed pigs based on such findings, and to promulgate such regulations as needed, violates the HMSA, 7 U.S.C. § 1907(b), and constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1);

3.     Declaring Defendants' denial of Plaintiffs' petition for rulemaking to be arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. 706(2)(A);

4.     Compelling Defendants to, by Court-ordered deadlines: (a) investigate and report to Congress the scope of nonambulatory pigs, the causes that render these animals

nonambulatory, the humane treatment of these animals, and the extent to which these animals may present handling and disposition problems; and (b) based on the findings of this investigation and report, determine whether regulations to ensure the humane treatment, handling, and disposition of nonambulatory pigs are necessary, and, if so, promulgate such regulations;

5.      Ordering Defendants to set aside their denial of the Plaintiffs' rulemaking petition;

6.      Ordering Defendants to render a new decision on Plaintiffs' petition for rulemaking consistent with the Court's opinion by a Court-ordered deadline;

7.      Retaining jurisdiction of this matter until Defendants have fulfilled all statutory and Court-ordered obligations;

8.      Awarding Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action; and

9.      Granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Dated: April 20, 2020          /s/ Delcianna J. Winders

<div style="margin-left:40%">

Delcianna J. Winders, *Supervising Attorney*
Irene Au-Young, *Student Attorney*
Hira Jaleel, *Student Attorney*
Animal Law Litigation Clinic
Lewis & Clark Law School
10015 S.W. Terwilliger Blvd., MSC 51
Portland, OR 97219
(503) 768-6858
dwinders@lclark.edu
au-young@lclark.edu
hirajaleel@lclark.edu

*Attorneys for Plaintiffs*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2020, I electronically filed the foregoing First Amended

Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of

this filing to the attorneys of record and all registered participants.


/s/ Delcianna J. Winders

Delcianna J. Winders