**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FARM SANCTUARY**; **ANIMAL LEGAL DEFENSE FUND**; **ANIMAL OUTLOOK**; **ANIMAL WELFARE INSTITUTE**; **COMPASSION IN WORLD FARMING**; **FARM FORWARD**; and **MERCY FOR ANIMALS, INC.**, | |
| Plaintiffs, | Civil Action No.: 6:20-cv-06081 |
| | The Honorable Frank P. Geraci, Jr. |
| v. | **ORAL ARGUMENT REQUESTED**[1] |
| **SONNY PERDUE**, in his official capacity as Secretary of Agriculture; and **UNITED STATES DEPARTMENT OF AGRICULTURE**; **FOOD SAFETY AND INSPECTION SERVICE**; and **PAUL KIECKER**, in his official capacity as Food Safety and Inspection Service Administrator, | |
| Defendants. | |

---

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

[1] Plaintiffs respectfully request oral argument, by video or telephonic conference as necessary in light of the COVID-19 pandemic. Plaintiffs are represented by Lewis & Clark Law School's Animal Law Litigation Clinic, and oral argument would provide an important substantive opportunity for a student attorney.

## <u>TABLE OF CONTENTS</u>

Introduction...................................................................................................................1

Legal and Factual Background ......................................................................................3

I.      Legal Background ................................................................................................3

      A.  The Humane Methods of Slaughter Act and the Federal Meat Inspection Act.......3

      B.  The Administrative Procedure Act ...............................................................4

II.     Factual Background ..............................................................................................5

      A.  Inhumane Treatment of Downed Pigs at Slaughterhouses ...............................5

      B.  Disease Risks Posed by Downed Pigs .........................................................6

      C.  The Government's Abdication of the 2002 Mandates.........................................10

      D.  Plaintiffs' Petition for Rulemaking..............................................................10

III.    Procedural History .............................................................................................10

Legal Standard ...........................................................................................................11

Argument ...................................................................................................................12

I.      Plaintiffs Adequately Allege Injury ....................................................................12

      A.  Plaintiffs Adequately Allege Organizational Injuries...........................................12

      B.  Plaintiffs Also Adequately Allege Associational Injuries .....................................19

II.     Plaintiffs Adequately Allege Causation ...............................................................22

III.    Plaintiffs Adequately Allege Redressability ........................................................23

Conclusion .................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Am. Civil Liberties Union v. Clapper,*
  785 F.3d 787 (2d Cir. 2015)........................................................................... 15

*Am. Soc'y for Prevention of Cruelty to Animals (ASPCA) v. Feld Entm't, Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) ......................................................................... 17

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003).................................................................*passim*

*Carter v. HealthPort Techs., LLC,*
  822 F.3d 47 (2d Cir. 2016).................................................. 2, 11, 22, 23

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017)................................................. 12, 13, 14, 17

*Citizens for Responsibility & Ethics in Wash. (CREW) v. Trump,*
  276 F. Supp. 3d 174 (S.D.N.Y. 2017), *vacated and remanded,*
  953 F.3d 178 (2d Cir. 2019), *as amended* (Mar. 20, 2020) ....................... 18

*CREW v. Trump,*
  953 F.3d 178 (2d Cir. 2019), *as amended* (Mar. 3, 2020) ........................ 23

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)....................................................................................... 15

*Craten v. Foster Poultry Farms Inc.,*
  305 F. Supp. 3d 1051 (D. Ariz. 2018) ........................................................... 8

*Ctr. for Food Safety v. Price,*
  No. 17-CV-3833, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018)............... 19

*Ctr. for Law & Educ. v. Dep't of Educ.,*
  396 F.3d 1152 (D.C.Cir.2005)...................................................................... 17

*Envtl. Working Grp. v. FDA,*
  301 F. Supp. 3d 165 (D.D.C. 2018) .............................................................. 19

*Fed. Election Comm'n v. Akins,*
  524 US 11 (1998) .......................................................................................... 25

*Food & Water Watch v. Vilsack,*
  79 F. Supp. 3d 174 (D.D.C.), *aff'd,* 808 F.3d 905 (D.C. Cir. 2015).......... 18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ..................................................................................... 11, 13, 15, 17

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................................... 20

*In re Pub. Emps. for Envtl. Responsibility*, --- F.3d ----, No. 19-1044,
   2020 WL 2090085 (D.C. Cir. May 1, 2020) ......................................................... 24

*Kern v. Wal-Mart Stores, Inc.*,
   804 F. Supp. 2d 119 (W.D.N.Y. 2011) ................................................................. 20

*Larson v. Valente*,
   456 U.S. 228 (1982) ............................................................................................... 23

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 23, 24

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000) ................................................................................. 11

*Massachusetts v. Envtl. Prot. Agency (EPA)*,
   549 U.S. 497 (2007) .............................................................................. 12, 23, 24, 25

*Mental Disability Law Clinic v. Hogan*,
   519 F. App'x 714 (2d Cir. 2013) ..................................................................... 13, 17

*Murray Energy Corp. v. McCarthy*,
   No. 5:14-CV-39, 2015 WL 1438036 (N.D.W. Va. Mar. 27, 2015) ...................... 25

*N.Y. Civil Liberties Union (NYCLU) v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012) ........................................................................... 11, 12

*N.Y. Public Interest Research Group (NYPIRG) v. Whitman*,
   321 F.3d 316 (2d Cir. 2003) ........................................................................... 23, 24

*N.Y. State Citizens' Coalition for Children v. Velez*,
   No. 10-CV-3485, 2016 WL 11263164 (E.D.N.Y. Nov. 7, 2016) ......................... 13

*Nat. Res. Def. Council (NRDC) v. FDA.*,
   710 F.3d 71 (2d Cir. 2013) *as amended* (Mar. 21, 2013) ................................... 15

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
   894 F.3d 95 (2d Cir. 2018) ................................................................................... 23

*NRDC v. U.S. Dep't of the Interior*,
   397 F. Supp. 3d 430 (S.D.N.Y. 2019) ................................................. 12

*NRDC v. Dep't of Interior*,
   410 F. Supp. 3d 582 (S.D.N.Y. 2019)................................................. 14

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995)............................................................ 19

*Nat'l Treasury Emps. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996).......................................................... 17

*Nat'l Women's Law Ctr. v. Office of Mgmt. & Budget*,
   358 F. Supp. 3d 66 (D.D.C. 2019) ..................................................... 16

*Nava v. Dep't of Homeland Sec.*,
   No. 18 C 3757, 2020 WL 405634 (N.D. Ill. Jan. 24, 2020) ................... 18

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y), *aff'd in part, rev'd on*
   *other grounds in part and remanded sub nom.*,
   *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)*, and appeal dismissed*,
   No. 19-212, 2019 WL 7668098 (2d Cir. Aug. 7, 2019) ......................... 20

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011)......................................................... 13, 17

*NTCH, Inc. v. Fed. Commc'ns Comm'n*,
   841 F.3d 497 (D.C. Cir. 2016)............................................................ 24

*Olsen v. Stark Homes, Inc.*,
   759 F.3d 140 (2d Cir. 2014)................................................... 13, 14, 17

*People for the Ethical Treatment of Animals (PETA) v. USDA*,
   7 F. Supp. 3d 1 (D.D.C. 2013), *aff'd on other grounds*,
   797 F.3d 1087 (D.C. Cir. 2015) ........................................ 14, 15, 16, 19

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993)....................................................... 14, 17

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................ 20

*Tex. Food Indus. Ass'n v. Espy*,
   870 F. Supp. 143 (W.D. Tex. 1994)..................................................... 8

iv

*Vullo v. Office of Comptroller of Currency*,
    378 F. Supp. 3d 271 (S.D.N.Y. 2019) ................................................................. 12, 23

*Young Advocates for Fair Educ. v. Cuomo*,
    359 F. Supp. 3d 215 (E.D.N.Y. 2019) ...................................................................... 19

## Statutes

5 U.S.C. § 551 ..................................................................................................................... 4

5 U.S.C. § 701 ..................................................................................................................... 4

5 U.S.C. § 702 ..................................................................................................................... 4

5 U.S.C. § 706 ..................................................................................................................... 5

7 U.S.C. § 1901 ................................................................................................................... 3

7 U.S.C. § 1904 ................................................................................................................... 3

7 U.S.C. § 1907 ............................................................................................................... 3, 10

21 U.S.C. § 601 ................................................................................................................... 4

21 U.S.C. § 602 ................................................................................................................... 4

21 U.S.C. § 603 ................................................................................................................... 4

21 U.S.C. § 604 ................................................................................................................... 4

21 U.S.C. § 606 ................................................................................................................... 4

21 U.S.C. § 610 ................................................................................................................... 4

Farm Security and Rural Investment Act of 2002,
Pub. L. 107–171, title X, § 10815, 116 Stat. 532,
(codified at 7 U.S.C. § 1907) ............................................................................................. 3

## Regulations

7 C.F.R. § 2.18 ................................................................................................................... 4

/ / /

/ / /

**<u>Other Authorities</u>**

Food Safety and Inspection Serv.,
    *Compliance Guideline for Controlling Salmonella in Market Hogs* (Dec. 2013),
    https://www.fsis.usda.gov/wps/wcm/connect/f970603e-96ce-4476-9dfd-
    5f768298bef7/Controlling-Salmonella-in-Market-Hogs.pdf?MOD=AJPERES ................... 7, 8

U.S. Dep't of Agric., Office of Inspector General, Food Safety and Inspection Serv.,
    *Inspection and Enforcement Activities at Swine Slaughter Plants,*
    Audit Report No. 24601-0001-41 (May 2013),
    https://www.usda.gov/oig/webdocs/24601-0001-41.pdf ........................................................ 9

## INTRODUCTION

Plaintiffs challenge Defendants' abdication of federal law regarding downed, or nonambulatory, pigs—pigs who are too sick or injured to stand or walk. This abdication harms Plaintiffs' ability to fulfill their animal-protection missions, impairs their mission-critical work, and forces them to divert resources to counteract these harms. The Government's abdication also harms Plaintiffs' members who face increased risks of contracting numerous potentially fatal and drug-resistant diseases. An order from this Court requiring Defendants to come into compliance with federal law can redress these harms.

According to industry estimates, well over half a million downed pigs arrive at U.S. slaughterhouses annually. They are often violently forced to their deaths, including through beating, punching, kicking, and electroshocking. They are also frequently held for long periods in pens where they cannot rise from the feces-covered floors. Pigs' feces carry a host of human-transmissible diseases, and allowing downed pigs to be slaughtered for human consumption increases the risk of exposure to potentially fatal and drug-resistant diseases.

Eighteen years ago today, President George W. Bush signed into law an amendment to the Humane Methods of Slaughter Act (HMSA) requiring Defendants, the Secretary of Agriculture, U.S. Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS), and the FSIS Administrator (collectively, the Government) to: (1) investigate and report to Congress on nonambulatory livestock, including their scope, causes, humane treatment, and handling and disposition problems; and (2) based on the findings of that report, promulgate any regulations needed to ensure the humane treatment, handling, and disposition of such livestock (collectively, the 2002 Mandates).

Despite the passage of nearly two decades, the Government has yet to investigate or report to Congress on downed livestock. Because it has abdicated this mandate, the Government has also failed to make an informed decision regarding what regulations are needed to ensure the humane treatment, handling, and disposition of downed livestock. The Government also recently denied Plaintiffs' petition for rulemaking seeking a prohibition on the slaughter of downed pigs for human consumption (Petition Denial).

The Government's abdication of the 2002 Mandates constitutes agency action unlawfully withheld and unreasonably delayed under the Administrative Procedure Act (APA), and its Petition Denial was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, Federal Meat Inspection Act (FMIA), and HMSA.

Having long evaded compliance with unequivocal legislative mandates, the Government now seeks to also evade judicial review, arguing that Plaintiffs lack standing. However, the harms to Plaintiffs and their members alleged in the First Amended Complaint (FAC) fall squarely within Supreme Court and Second Circuit precedent on cognizable injuries for purposes of standing. They are also fairly traceable to the Government's unlawful conduct and can be redressed by this Court. Because Plaintiffs "allege[] facts that affirmatively and plausibly suggest that [they] ha[ve] standing to sue," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016), they have met the "lenient" "standard for reviewing standing at the pleading stage," *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003). Accordingly, the Court should deny the Government's motion to dismiss.

/ / /

/ / /

/ / /

2

## LEGAL AND FACTUAL BACKGROUND

### I.    Legal Background

### A.    The Humane Methods of Slaughter Act and the Federal Meat Inspection Act

To protect pigs and other livestock from "needless suffering," and to benefit consumers, 7 U.S.C. § 1901, the HMSA, *id.* §§ 1901-1907, requires that "the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods," *id.* § 1901. Accordingly, the HMSA directs the Government to investigate and determine humane methods of slaughter and handling, consistent with current scientific knowledge, and, based on such investigation, to designate specific methods of slaughter and handling that are or are not humane and permissible. *Id.* § 1904.

Eighteen years ago today, the HMSA was amended to add two mandates specific to downed livestock. Farm Security and Rural Investment Act of 2002, Pub. L. 107–171, title X, § 10815, 116 Stat. 532 (codified at 7 U.S.C. § 1907 (May 13, 2002)). The amendment first requires:

> The Secretary of Agriculture shall investigate and submit to Congress a report on—
> (1) the scope of nonambulatory livestock;
> (2) the causes that render livestock nonambulatory;
> (3) the humane treatment of nonambulatory livestock; and
> (4) the extent to which nonambulatory livestock may present handling and disposition problems for stockyards, market agencies, and dealers.

7 U.S.C. § 1907(a). Second, it directs: "Based on the findings of the report, if the Secretary determines it necessary, the Secretary shall promulgate regulations to provide for the humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers." *Id.* § 1907(b).

The FMIA, 21 U.S.C. §§ 601–695, protects "the health and welfare of consumers . . . by assuring that meat and meat food products . . . are wholesome[ and] not adulterated," and

recognizes that "[u]nwholesome [or] adulterated . . . meat or meat food products . . . are injurious to the public welfare . . . and result in . . . injury to consumers," *id.* § 602.

The FMIA incorporates the HMSA by reference, prohibits any method of slaughter or handling in connection with slaughter that is not consistent with the HMSA, and requires that USDA-appointed inspectors ensure that pigs and other livestock are humanely slaughtered and humanely handled in connection with slaughter. *Id.* §§ 603(b), 610(b).

The FMIA also requires the Government to ensure that adulterated meat does not enter the food supply. *Id.* §§ 603(a), 604, 606(a). The FMIA deems a meat product "adulterated" if it: "bears or contains any poisonous or deleterious substance which may render it injurious to health" or "unfit for human food"; "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food;" or "has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." *Id.* § 601(m)(1), (2)(A), (3), (4).

The FSIS is responsible for exercising the Secretary of Agriculture's duties under the HMSA and the FMIA. 7 C.F.R. § 2.18(a)(1)(ii)(B), (E).

**B.      The Administrative Procedure Act**

The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §§ 551(13), 701(b)(2), 702.

The APA directs a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed," and to "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id.* § 706(1), (2)(A).

## II.      Factual Background

Pigs comprise the majority—about seventy-five percent—of all livestock that the Government regulates under the HMSA and FMIA, FAC ¶ 83; Baur Decl. ¶ 20. According to pork industry estimates, well over half a million pigs arrive at U.S. slaughterhouses unable to walk annually. FAC ¶ 112; Baur Decl. ¶ 21. Plaintiffs compiled and submitted to the Government voluminous evidence demonstrating that these animals are at high risk of inhumane handling and pose serious disease hazards. FAC ¶¶ 6-7, 10-11, 160.

### A.  Inhumane Treatment of Downed Pigs at Slaughterhouses

The Government acknowledges that "many" occurrences of inhumane handling "happen outside the view of inspection personnel," suggesting that the incidents it has documented are just the tip of the iceberg. FAC ¶¶ 136, 142; Seber Decl. ¶ 25. Indeed, the Government's failure to meaningfully protect pigs under the HMSA and FMIA is well documented, including by the USDA's own Office of Inspector General (OIG), which has repeatedly found that the Government is not ensuring that pigs are treated in accordance with the law. FAC ¶¶ 137-41.

Nevertheless, recent incidents involving downed pigs at slaughterhouses across the country documented by the USDA are horrific and include: a downed pig with a large bloody abscess that another pig was eating; a downed pig who squealed out in pain when a worker closed a grapple fork around her snout and hydraulically squeezed her head; a downed pig who was panting excessively and was kneed by a worker, causing her to fall backwards and land on her back; a downed pig whose leg became caught while workers were trying to move him, causing part of his hoof to become detached from the bone and tissue; and a downed pig who a

worker kicked in the stomach and then electro-shocked. *Id*. ¶ 8; *see also id.* ¶ 143 (additional incidents); Seber Decl. ¶ 24 (more incidents); Jones Decl. ¶ 34 (yet more).

Slaughterhouses also routinely hold downed pigs in pens in the hopes that they might later rise, because the flesh of each pig who can be forced to walk to their death yields $38 to $126 more profit. FAC ¶¶ 135, 144; Baur Decl. ¶ 28. Slaughterhouses often hold these animals for many hours, unsupervised despite their weak state, without veterinary care, analgesics, or food. *Id.* ¶ 145; Jones Decl. ¶ 25. USDA records further document additional neglect in these pens, including overcrowding, lack of access to water, and inadequate protection from the elements. FAC ¶¶ 9, 146. For example, an Indiana slaughterhouse left downed pigs in a pen when the temperature was negative six degrees Fahrenheit. *Id.* They had hard, stiff, frostbitten ears, and one them was shivering and squealing. *Id.* A Texas slaughterhouse penned five downed pigs in direct sunlight without access to shade when the temperature exceeded 100 degrees Fahrenheit. *Id.* And trampled downed pigs were found dead in a pen at an upstate New York slaughterhouse after being left overnight. *Id.*; *see also id.* (summarizing additional incidents).

## B. Disease Risks Posed by Downed Pigs

In part because they are often held in pens for prolonged periods, unable to rise from feces-ridden floors, downed pigs are significantly more likely to harbor and transmit a host of potentially fatal and drug-resistant diseases, including *Salmonella* spp., *Yersinia enterocolitica*, *Listeria monocytogenes*, and *Campylobacter*. FAC ¶ 10. Pigs' feces contain a host of bacterial pathogens. *Id.* ¶ 153; Washburn Decl. ¶ 13. A study based on a comprehensive risk assessment of the public health hazards associated with pig slaughter determined that the presence of pathogens such as *Salmonella* spp. and *Yersinia enterocolitica* in meat is linked to long holding

6

times and fecal contamination at slaughterhouses, and that that pre-slaughter contamination is by far the primary source of *Salmonella* spp. FAC ¶¶ 154-55.

Indeed, the Government acknowledges that the pre-slaughter holding area, referred to as lairage, "is the most cost-effective stage to prevent cross-contamination that leads to rapid infection." *Id.* ¶ 156 (citing FSIS, Compliance Guideline for Controlling *Salmonella* in Market Hogs (Dec. 2013), https://www.fsis.usda.gov/wps/wcm/connect/f970603e-96ce-4476-9dfd-5f768298bef7/Controlling-Salmonella-in-Market-Hogs.pdf?MOD=AJPERES (hereinafter FSIS Compliance Guideline)). According to the FSIS, "lairage is a significant factor in the spread of *Salmonella*," "[p]rolonged . . . holding in the lairage may induce *Salmonella* shedding," and "[t]here is rapid [salmonella] infection during holding" at pig slaughterhouses. FSIS Compliance Guideline at 4, 12; *see also* FAC ¶ 164. The FSIS further recognizes that *Salmonella* "is the most common cause of bacterial food borne illness, accounting for 11% of food borne illnesses (about 1 million illnesses), 35% of hospitalizations and 28% of deaths" annually. FSIS Compliance Guideline at 7. According to the FSIS, "Outbreaks resulting in human *Salmonella* illnesses involving pork have been consistently identified on an annual basis, suggesting pork as a vehicle for salmonellosis." *Id.* The FSIS specifies that "approximately four outbreaks and one hundred and two illnesses per year, on average, have been associated with pork. These estimates were calculated for outbreaks where pork was the sole implicated food vehicle or identified as the sole contaminated ingredient." *Id.* The Centers for Disease Control and Prevention (CDC) classifies *Salmonella* as a serious threat because it is drug-resistant. Washburn Decl. ¶ 22.

The FSIS further acknowledges that pigs can harbor and transmit *Campylobacter*, which "accounts for approximately 9% of food borne illnesses (about 845,000 illnesses) and 15% of hospitalizations." FSIS Compliance Guideline at 7. Nonambulatory pigs are sixteen times more

likely than ambulatory pigs to harbor antibiotic-resistant *Campylobacter*. FAC ¶ 159 (citation

omitted). Like *Salmonella*, the CDC classifies *Campylobacter* as a serious threat because it is

drug-resistant. Washburn Decl. ¶ 22. Alarmingly, the FSIS suggests that *Campylobacter* testing

is lacking. *See* FSIS Compliance Guideline at 7; *see also* Washburn Decl. ¶ 21.

Downed pigs are also significantly more likely to harbor and transmit additional

foodborne diseases, including: *Yersinia enterocolitica*, which is almost exclusively associated

with pork consumption, is often drug-resistant, and causes dozens of deaths annually in the

United States, FAC ¶ 154; Washburn Decl. ¶¶ 15, 18; *Listeria monocytogenes*, which is

responsible for an estimated 28% of U.S. foodborne illness deaths, FAC ¶¶ 10, 153, 158;

Washburn Decl. ¶ 19; *E. coli*, which can be fatal, FAC ¶ 153; Washburn Decl. ¶¶ 13, 20; and

others, FAC ¶¶ 10, 153; Washburn Decl. ¶ 13.

Although cooking can reduce some of these risks, it often does not. Washburn Decl. ¶ 23;

*see also id.* ¶¶ 12, 18, 19, 21; FAC ¶ 158; *Craten v. Foster Poultry Farms Inc.*, 305 F. Supp. 3d

1051, 1053 (D. Ariz. 2018) (*Salmonella* is "killed by proper cooking. Nonetheless, the . . . CDC .

. . estimates that approximately one million Salmonella infections occur in the United States

annually."). Pork products must be cooked to well-done temperatures to mitigate disease risks,

but often are cooked instead to rare temperatures. Washburn Decl. ¶ 23. To ensure that bacteria

in pork products is killed by cooking requires specifically measuring the internal core

temperature of the meat over a period of time—something most people do not do. *Id.*; *see also*

*Tex. Food Indus. Ass'n v. Espy*, 870 F. Supp. 143, 149 (W.D. Tex. 1994) ("unlike other

pathogens, it is not 'proper' cooking but 'thorough' cooking that is necessary to protect

consumers from *E. Coli*"). Moreover, even if cooking kills most pathogens, just a few surviving

pathogens can multiply after cooking. Washburn Decl. ¶ 23.

Downed pigs are also more likely to carry swine flu subtypes H1N1 and H3N2. FAC ¶ 157. H1N1 is transmissible between pigs and humans, and the 2009 H1N1 pandemic sickened 60.8 million Americans, killing 12,469 people. *Id.* (citation omitted). A study found that 53.8% of nonambulatory pigs were actively infected with H1N1. *Id.* (citations omitted).

In short, downed pigs are more likely than their ambulatory counterparts to carry and transmit a host of potentially fatal and drug-resistant diseases.

Moreover, numerous factors make it unlikely that the Government will detect these diseases, including the Government's own acknowledgement that "the underlying reason for an animal's non-ambulatory condition cannot always be accurately ascertained when those animals are presented for slaughter." FAC ¶ 148; *see also id.* ¶ 149 (even trained veterinarians find it impossible to determine why a nonambulatory animal is unable to rise).

In addition, the USDA OIG has repeatedly determined that the Government fails to deter pig slaughterhouses from becoming repeat violators of the FMIA and HMSA, resulting in chronic, unchecked violations. *Id.* ¶ 138 (citing USDA OIG Audit Report on FSIS Inspection and Enforcement Activities at Swine Slaughter Plants, Audit Report No. 24601-0001-41, at 4 (May 2013), https://www.usda.gov/oig/webdocs/24601-0001-41.pdf (hereinafter 2013 OIG Audit)). Indeed, in concluding that the "FSIS' enforcement policies do not deter swine slaughter plants from becoming repeat violators of food safety regulations," the OIG specifically noted incidents of fecal contamination, and underscored that such contamination is a longstanding issue, 2013 OIG Audit at 4, 8; *see also id.* at 12 ("we found that inspectors did not always identify contaminated meat or cite plants for sanitation violations"). The OIG further noted that these "recurring, severe violations may jeopardize public health," *id.* at 9, and concluded that

"there is reduced assurance that inspectors will effectively identify pork that should not enter the food supply," *id.* at 12; *see also* Washburn Decl. ¶ 25.

### C.  The Government's Abdication of the 2002 Mandates

For eighteen years, the Government has abdicated the mandate that it investigate and report to Congress on downed livestock, 7 U.S.C. § 1907(a). FAC ¶¶ 4, 113, 114; *see also* Baur Decl. ¶¶ 14-19 (detailing Congressional statement, Congressional Research Service report, and Government responses documenting abdication of this mandate). Because the Government never investigated or reported on these issues, it also abdicated the mandate that, "[b]ased on the findings of the report," it promulgate any regulations necessary to ensure the "humane treatment, handling, and disposition of nonambulatory livestock," 7 U.S.C. § 1907(b). FAC ¶¶ 4, 115, 177.

### D.  Plaintiffs' Petition for Rulemaking

After waiting more than twelve years for the Government to comply with the 2002 Mandates, on June 3, 2014, Plaintiffs submitted a petition for rulemaking seeking a prohibition on the slaughter of nonambulatory pigs. FAC ¶ 160. Plaintiffs supplemented this petition on November 1, 2016. *Id.* The petition and supplement, which totaled thirty-seven pages and were accompanied by thousands of pages of supporting exhibits, detailed why a rule prohibiting the slaughter of nonambulatory pigs is necessary to protect both animals and consumers. *Id*. On September 16, 2019, the Government denied Plaintiffs' petition. *Id.* ¶ 163.

## III.  Procedural History

On February 6, 2020, Plaintiffs filed suit, challenging the Government's abdication of the 2002 Mandates and Petition Denial. ECF No. 1. On April 10, 2020, the Government moved to dismiss Plaintiffs' Complaint for lack of standing. ECF Nos. 9, 10. On April 20, 2020, Plaintiffs amended their Complaint to include all seven plaintiffs on all three causes of action. ECF No. 13.

On May 4, 2020, the Government moved to dismiss Plaintiffs' First Amendment Complaint for the same reasons asserted in its original motion to dismiss. ECF Nos. 14, 15.

## LEGAL STANDARD

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (cleaned up). This standard is "lenient." *Baur v. Veneman*, 352 F.3d 625, 637 (2d. Cir. 2003). "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury. . . . It bears emphasis that under federal pleading rules, 'complaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally.'" *Baur*, 352 F.3d at 631 (citation omitted).

As is undisputed, "a district court 'may refer to evidence outside of the pleadings' in resolving a Rule 12(b)(1)" motion to dismiss for lack of standing. Defs.' Br., ECF No. 15, at 6 (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

Standing comprises three elements: (1) a "threat of a concrete and particularized injury in fact," (2) "that is fairly traceable to the challenged action of the defendant," and (3) "that a favorable judicial decision will likely prevent or redress." *N.Y. Civil Liberties Union (NYCLU) v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (cleaned up).

An organization can have standing to sue two ways: First, it "can have standing in its own right to seek judicial relief from injury to itself," *NYCLU*, 684 F.3d at 294 (cleaned up), including an impairment of its ability to fulfill its mission, *Havens Realty Corp. v. Coleman*, 455

11

U.S. 363, 379 (1982). Second, "[i]t may sue on behalf of its members." *NYCLU*, 684 F.3d at 294 (citations omitted).

"It is well settled that where multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citations omitted).

## ARGUMENT

Plaintiffs' standing falls squarely within Second Circuit and Supreme Court precedent. They adequately allege both organizational and associational injuries for all claims,[2] these injuries are fairly traceable to the Government's abdication of the 2002 Mandates and Petition Denial, and this Court can redress these injuries.

## I.    Plaintiffs Adequately Allege Injury

### A. Plaintiffs Adequately Allege Organizational Injuries

The Government's abdication of the 2002 Mandates and Petition Denial harm Plaintiffs' ability to fulfill their animal-protection missions, burden their day-to-day work, and force them to divert resources to counteract these harms. *See* FAC ¶¶ 20-22, 27-32, 37-40, 45-55, 58-59, 65-68, 73-76; Baur Decl. ¶¶ 25-35; Walden Decl. ¶¶ 12-24; Leahy Decl. ¶¶ 25-29; Jones Decl. ¶¶

---

[2] Plaintiffs also allege procedural injuries. *See Massachusetts v. Envtl. Prot. Agency (EPA)*, 549 U.S. 497, 517, 520 (2007) (discussing injuries to procedural rights to challenge agency action unlawfully withheld and denials of rulemaking petitions); *Vullo v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271, 285 (S.D.N.Y. 2019) ("Numerous cases have identified challenges to agency action under the . . . APA . . . to be analogous to the procedural claim in *Massachusetts v. E.P.A.*" (citations omitted)); *NRDC v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 445 (S.D.N.Y. 2019) (recognizing procedural injury in context of an APA claim); *see, e.g.*, Leahy Decl. ¶ 30; Seber Decl. ¶ 28.

16, 18-33, 35-46; Dreskin Decl. ¶¶ 13-16, 18-21, 23-27; deCoriolis Decl. ¶¶ 13, 15-23; Seber Decl. ¶¶ 13-14, 16-23, 26-27.

It is well established that when a defendant "perceptibly impair[s]" an organization's ability to fulfill its mission, "there can be no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379. This standard is not demanding. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* "Furthermore, the Supreme Court has stated that so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is the organization's noneconomic interest in encouraging a particular policy preference." *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (cleaned up).

Applying this precedent, "[t]he Second Circuit has consistently found injury where an organization expends time and effort responding to the defendant's actions." *N.Y. State Citizens' Coalition for Children v. Velez*, No. 10-CV-3485, 2016 WL 11263164, at *3 (E.D.N.Y. Nov. 7, 2016) (citations omitted); *see, e.g.*, *Centro de la Comunidad*, 868 F.3d at 110 (organization had standing to challenge ordinance because it had to "divert resources from other of its activities to combat the effects of the Ordinance"); *Olsen v. Stark Homes*, *Inc.,* 759 F.3d 140, 158 (2d Cir. 2014) (organization had standing to where it diverted resources to investigate and challenge discrimination); *Mental Disability Law Clinic v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (law clinic had standing because it "ha[d] diverted resources from education and training in order to contest the" challenged agency policy); *Nnebe*, 644 F.3d at 156 (organization had standing to challenge agency policy where it "infrequently" counseled individuals impacted by the policy);

*Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (organization had standing to challenge discriminatory advertisements based on the time its staff spent "investigating and attempting to remedy" those advertisements).

Plaintiffs' injuries here not only fall within this precedent, they are more extensive than many injuries the Second Circuit has recognized as sufficient for standing. Plaintiffs allege that they are "'spen[ding] money to combat' activity that harms [their] core activities" as a result of the Government's abdication of the 2002 Mandates and Petition Denial. *Centro de la Comunidad*, 868 F.3d at 111 (citation omitted); *see* FAC ¶¶ 20-22, 27-32, 37-40, 45-55, 58-59, 65-68, 73-76; *see also, e.g.*, Baur Decl. ¶ 29 ("To counteract these myriad harms to its mission and mission-critical activities, Farm Sanctuary has been forced to divert hundreds of staff hours and thousands of dollars away from other activities, including away from its work providing care, shelter, and placement for rescued farm animals and its public education work."); Jones Decl. ¶¶ 27, 32, 44 (noting diversion of hundreds of staff hours and tens of thousands of dollars).

Like plaintiffs in numerous cases where the Second Circuit recognized standing, Plaintiffs here have to devote considerable time and resources towards "investigating and attempting to remedy" the harms resulting from the Government's abdication of the 2002 Mandates and Petition Denial, and these diversions of resources "prevent them from devoting their time and energies to other [organizational] matters," *Ragin*, 6 F.3d at 905; *see also Olsen*, 759 F.3d at 158; *People for the Ethical Treatment of Animals (PETA) v. USDA*, 797 F.3d 1087, 1095-96 (D.C. Cir. 2015) (organization had standing where challenged USDA inaction resulted in a lack of information and organization had to expend resources to seek out that information through other means, including investigations and public records requests); *Nat. Res. Def. Council (NRDC) v. Dep't of Interior*, 410 F. Supp. 3d 582, 594 (S.D.N.Y. 2019) (organizations

14

had standing where government body's "lack of transparency has caused them to devote greater 'attention, time, and personnel'" to stay informed). *See* FAC ¶¶ 20-22, 27-32, 37-40, 46-45 58-59, 65-68, 73-76; Jones Decl. ¶¶ 26-45; Baur Decl. ¶¶ 23-24, 29-34; Seber Decl. ¶¶ 13-14, 23, 26-27; Walden Decl. ¶¶ 12-24; Leahy Decl. ¶¶ 26-29; Dreskin Decl. ¶¶ 14-16, 18-19, 24, 26-27; deCoriolis Decl. ¶¶ 15, 19, 21-23. Because Plaintiffs have diverted these resources to counteract the impacts of the Government's abdication of the 2002 Mandates and Petition Denial on their missions and activities, they have standing under *Havens* and its progeny.

Accordingly, Plaintiffs' injuries are not, as the Government suggests, "self-inflicted." Defs.' Br. at 13. As the Second Circuit has explained, "an injury is self-inflicted so as to defeat the causation necessary to establish standing . . . only if the injury is so completely due to the plaintiff's own fault as to break the causal chain." *NRDC v. Food & Drug Admin. (FDA)*, 710 F.3d 71, 85 (2d Cir. 2013), as amended (Mar. 21, 2013) (cleaned up). Thus, "[t]hat an organization voluntarily or willfully diverts its resources . . . does not automatically mean that it cannot suffer an injury sufficient to confer standing." *PETA*, 797 F.3d at 1096-97 (cleaned up). Rather, if "the organization undertook the expenditure in response to, and to counteract, the effects of the defendants' alleged unlawful acts," it suffers an injury sufficient for standing purposes. *Id.* at 1097. This is precisely what Plaintiffs allege.

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), relied upon by the Government, Defs.' Br. at 13, does not alter this analysis. There, in holding that the plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," the Court distinguished such a situation from one where, as here, the alleged harms are "ongoing." *Id.* at 416-19; *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 801 (2d Cir. 2015) (distinguishing *Amnesty International* from a case such as this one

where plaintiffs' "alleged injury requires no speculation whatsoever"). As detailed above, Plaintiffs here allege actual, ongoing harms resulting from the Government's abdication of the 2002 Mandates and Petition Denial. *Clapper* is thus inapposite.

The Government is also wrong that Plaintiffs cannot be injured as a result diversions of resources "used to prepare for litigation or other advocacy activities"—including Freedom of Information Act (FOIA) requests, Defs.' Br. at 13—when undertaken to counteract the harms inflicted by the Government. Indeed, in *PETA*, the D.C. Circuit recognized that the plaintiff suffered harm sufficient for standing as a result of its diversion of resources to obtain information, including through public records requests. 797 F.3d at 1096;[3] *see also, e.g.*, *Nat'l Women's Law Ctr. v. Office of Mgmt. & Budget*, 358 F. Supp. 3d 66, 79–80 (D.D.C. 2019) (finding standing where plaintiffs had to expend resources counteract lack of access to information that they used in advocacy campaigns).

Regardless, Plaintiffs allege diversions of resources beyond those "used to prepare for litigation or other advocacy activities," Defs.' Br. at 13. *See, e.g.*, FAC ¶¶ 21, 28, 30, 39, 47, 75 (discussing diversions for educational activities).

Moreover, unlike the D.C. Circuit and other jurisdictions, the Second Circuit "has explicitly rejected the argument that litigation expenses are insufficient to demonstrate an injury in fact for the purposes of Article III standing," and has "held that an organization is not deprived of standing solely because some of the expenses that provide a basis for standing were dedicated to litigating the very action in which the defendant challenges the organization's standing."

---

[3] The D.C. Circuit recognized this injury even though there was "no suggestion" that the plaintiff had "any legal *right* to" the information that it was deprived of as a result of the USDA's inaction. 797 F.3d at 1103 (Millet, J., dubitante). Thus, that "Plaintiffs do not allege that they have a statutory right to see the report" at issue, Defs.' Br. at 13, is irrelevant. Moreover, there is no reason to believe that Plaintiffs here would *not* be entitled to obtain a copy of the report.

16

*Mental Disability Law Clinic v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (citing *Nnebe*, 644 F.3d at 157; *Ragin*, 6 F.3d at 905); *see also Nnebe*, 644 F.3d at 157 ("We recognize that some circuits have read *Havens Realty* differently . . . .").

If such expenditures suffice for standing, it follows *a fortiori* that Plaintiffs' expenditures here—which do *not* include those spent on the instant litigation—suffice, regardless of whether some of them might be classified as "advocacy." The Government's contention that "an advocacy organization does not suffer an Article III injury when it uses its resources to advocate," Defs.' Br. at 8, is contrary to precedent. The Second Circuit has repeatedly recognized that advocacy organizations *can* suffer an Article III injury when they use their resources to advocate. *See, e.g.*, *Olsen*, 759 F.3d at 158 (organization "devoted to fair-housing advocacy" had standing where it "diverted resources . . . from its other advocacy" toward "investigating and advocating"); *Centro de la Comunidad*, 868 F.3d at 111 (finding standing where organization's "advocacy activities" were impaired). As the D.C. Circuit has explained, "many . . . cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are." *Am. Soc'y for Prevention of Cruelty to Animals (ASPCA) v. Feld Entm't, Inc.*, 659 F.3d 13, 27 (D.C. Cir. 2011) (citations omitted).[4]

---

[4] Thus, the Government's reliance on *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005), Defs.' Br. at 11, is misplaced. *See ASPCA*, 659 F.3d at 26 (Though *Ctr. for Law & Educ.* contains "broad language, it relies on . . . *National Treasury Employees Union v. United State*s, which held only that an effect on an organization's lobbying efforts, absent direct conflict with the organization's mission, was insufficient to establish standing. Much like the plaintiff in *National Treasury Employees Union*, the plaintiffs in *Center for Law & Education* never challenged the substance of the federal regulations at issue, arguing instead that the regulations injured them by forcing them to change their lobbying strategies to a more expensive, state-by-state approach. In other words, in *Center for Law & Education*, as in *National Treasury Employees Union* on which it relies, standing failed for lack of a conflict between the challenged conduct and the plaintiffs' stated mission." (cleaned up)).

Of course, this does not mean, as the Government suggests, that every time an organization submits a FOIA request it has organizational standing, Defs.' Br. at 13. Rather, the question is whether, in doing so, the organization has diverted resources to counteract harms to its mission and mission-related activities. Here Plaintiffs plainly allege that they have.

The Government's repeated invocation of *Citizens for Responsibility & Ethics in Wash. (CREW) v. Trump*, 276 F. Supp. 3d 174, 191-92 (S.D.N.Y. 2017), *vacated and remanded*, 953 F.3d 178 (2d Cir. 2019), as amended (Mar. 20, 2020), *see* Defs.' Br. at 9, 10, 11-12, 13, is unavailing. In addition to being without precedential force, that decision is wholly distinguishable. The crux of the *CREW* court's determination that standing was lacking was the plaintiff's failure "to allege either that Defendant's actions have impeded its ability to perform a particular mission-related activity, or that it was forced to expend resources to counteract and remedy the adverse consequences of harmful effects of Defendant's conduct." 276 F. Supp. 3d at 190; *see also id.* (the conduct that CREW diverted resources to address "caused no legally cognizable adverse consequences, tangible or otherwise"). Here, as discussed above, Plaintiffs allege that the Government's abdication of the 2002 Mandates and Petition Denial *both* impede their ability to perform numerous mission-related activities *and* force them to expend resources to counteract and remedy the harms caused by the Governments' conduct. *See, e.g.*, Baur Decl. ¶¶ 25-35; Jones Decl. ¶¶ 16, 18-33, 35-46; Walden Decl. ¶¶ 12-24; Seber Decl. ¶¶ 12-14, 16-23, 26-27; *see also Nava v. Dep't of Homeland Sec.*, No. 18 C 3757, 2020 WL 405634, at *11 (N.D. Ill. Jan. 24, 2020) (distinguishing *CREW* on this basis).

The Government's reliance on other nonbinding decisions, *Defs.' Br.* at 10-11, is misplaced for the same reason. *See Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 201 (D.D.C.), aff'd, 808 F.3d 905 (D.C. Cir. 2015) (organization lacked standing where it

alleged no harm to its mission or its programs); *see also* 808 F.3d at 919-21 (affirming this holding, and underscoring that where a challenged agency action deprives an organization of information that it uses to educate its members and the public, such impairment does occur); *Envtl. Working Grp. v. FDA*, 301 F. Supp. 3d 165, 173 (D.D.C. 2018) (holding that organization lacked standing where it failed to allege a harm to its activities, and underscoring lack of any allegation that access to information was restricted); *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 236 (E.D.N.Y. 2019) (finding standing lacking where organization did not allege that the challenged conduct impacted its ability to conduct core activities); *Ctr. for Food Safety v. Price*, No. 17-CV-3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (no standing where plaintiffs failed to allege that they diverted resources from activities or that they diverted resources "to counteract or remedy some harm imposed by Defendants' conduct"); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (finding no "perceptible impairment" of plaintiff's activities); *see also PETA v. USDA*, 7 F. Supp. 3d 1, 9 (D.D.C. 2013), aff'd on other grounds 797 F.3d 1087 (D.C. Cir. 2015) (distinguishing *Nat'l Taxpayers Union*).

There is nothing novel about Plaintiffs' organizational standing. The Government's abdication of the 2002 Mandates and Petition Denial impair Plaintiffs' ability to fulfill their animal-protection missions, burden their work, and force them to divert resources to counteract these harms. These are classic injuries under Supreme Court and Second Circuit precedent.

### B. Plaintiffs Also Adequately Allege Associational Injuries

Plaintiffs Farm Sanctuary, ALDF, and Farm Forward also allege standing to sue on behalf of their members who are exposed to increased disease risks as a result of the Government's abdication of the 2002 Mandates and Petition Denial. FAC ¶¶ 23, 33, 69. To

assert associational standing on behalf of its members, an organization must show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The members' interests here are germane to the Plaintiffs' organizational purposes, *see* FAC ¶¶ 17, 25, 63, and the Government does not contend otherwise. Likewise, the Government appears to concede, as it must, that neither the claims asserted nor the relief requested requires individual members' participation in the lawsuit.

Relying on *Summers v. Earth Island Inst.*, which was resolved on the merits, not the pleadings, 555 U.S. 488, 498 (2009), the Government wrongly contends that Plaintiffs lack associational "standing because they have not named a member who eats pork." Defs.' Br. at 14. "[I]dentifying members of associations is not necessary for an FRCP 12 motion." *Kern v. Wal-Mart Stores, Inc.*, 804 F. Supp. 2d 119, 130 n.5 (W.D.N.Y. 2011) (citation omitted).[5]

---

[5] Although district court decisions in this Circuit on this issue are inconsistent, as one judge recently explained:

> It would overread the word 'identified' in [*Summers*] to require an organization to name the member who might have standing in his or her own right. In the first place, such specific identifying information is often unnecessary to determine whether a person would have Article III standing. . . . Moreover, to hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous.

*New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.), aff'd in part, rev'd on other grounds part and remanded sub nom. *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), and appeal dismissed, No. 19-212, 2019 WL 7668098 (2d Cir. Aug. 7, 2019) (citations omitted).

Nevertheless, Plaintiffs provide declarations of six members who are concerned about the increased disease risks that they face as a result of the Government's abdication of the 2002 Mandates and Petition Denial. *See* Rudloff Decl. ¶¶ 9-11 (detailing eighty-two-year old retired magistrate and administrative law judge's concerns about exposure to potentially fatal and drug-resistant foodborne diseases from eating pork as well as to swine flu from nearby pig farms and slaughterhouses); Fortino Decl. ¶¶ 8-9 (similar); Washburn Decl. ¶¶ 7-9, 23-25, 28, 30 (detailing professional chef's concerns about foodborne disease risks posed by the presence of downed pigs in the food supply); Lederer Decl. ¶¶ 8-13 (detailing ALDF member with pre-existing health conditions' concerns about exposure to diseases from consuming pork from downed pigs); Cochran Decl. ¶¶ 8-13 (similar); Guimarais Decl. ¶¶ 8-13 (similar).

It is settled in the Second Circuit that an "increased risk of contracting a food-borne illness from the consumption of downed livestock constitutes a cognizable injury-in-fact for Article III standing purposes." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003).

The Government attempts to evade this controlling precedent by interpolating its own factual allegations that are fundamentally at odds with Plaintiffs' allegations. *Compare* Defs.' Br. at 15-20, *with supra* pages 6-10. This is wholly inappropriate on a motion to dismiss. "[T]o the degree that defendants challenge the factual underpinnings of [plaintiffs'] standing, the argument is premature," and the Court must avoid adopting "an interpretation of the injury-in-fact requirement that would conflate standing with an evaluation of the underlying soundness of the USDA's action." *Baur*, 352 F.3d at 637, 642-43; *see also id.* at 643 ("[T]he evaluation of the amount of tolerable risk is better analyzed as an administrative decision governed by the relevant statutes rather than a constitutional question governed by Article III."). Contrary to the Governments' assertions, Defs.' Br. at 15-20, Plaintiffs plainly allege that downed pigs are more

21

likely to carry numerous deadly and potentially untreatable foodborne diseases that the current

inspection system may not detect. *See supra* pages 6-10.

Because Plaintiffs allege exposure to severe harm—potentially fatal and drug-resistant

diseases—"even a moderate increase in the risk of disease may be sufficient to confer standing."

*Baur*, 353 F.3d at 637. Moreover, at the pleadings stage, "allegation of a credible risk" can

suffice, "without further factual confirmation or quantification of the precise risk at issue." *Id.* at

642; *see also id.* ("To survive a motion to dismiss, [Plaintiff] need not present more specific

scientific evidence or statistical verification to prove that the risk actually exists.").

Moreover, here as in *Baur*, "there are two critical factors that weigh in favor of

concluding that standing exists in this case: (1) the fact that government studies and statements

confirm several of [Plaintiffs'] key allegations, and (2) that [Plaintiffs'] alleged risk of harm

arises from an established government policy," *id.* at 637 (citations omitted). *See supra* pages 6-

10, 19-22.

Thus, Plaintiffs adequately allege that their members are exposed to an enhanced risk of

disease transmission. Under *Baur*, this is a cognizable injury-in-fact. 353 F.3d at 631.

## II.      Plaintiffs Adequately Allege Causation

Plaintiffs have "plausibly alleged" that their injuries are "fairly traceable" to the

Government's abdication of the 2002 Mandates and Petition Denial. *Carter v. HealthPort Techs.,*

*LLC*, 822 F.3d 47, 59 (2d Cir. 2016); *see* FAC ¶¶ 22-23, 32-33, 41, 55, 60, 68-69, 76; *see also,*

*e.g.*, Jones Decl. ¶ 46; Baur Decl. ¶ 35; Lederer Decl. ¶¶ 12-13. The Government does not

contend otherwise.

"As the case law recognizes, it is well-settled that '[f]or standing purposes, petitioners

need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of

the alleged causality meets the test.'" *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018) (citation omitted). The causation requirement "does not create an onerous standard," and "a plaintiff's injury need not be 'directly' attributable to a defendant in order to show the causation element of standing to sue that defendant." *Carter,* 822 F.3d at 55, 59. Thus, it is "clear that if the alleged risk of disease transmission from downed livestock qualifies as a cognizable injury-in-fact then [a consumer's] injury is fairly traceable to the USDA's decision to permit the use of such livestock for human consumption . . . ." *Baur*, 352 F.3d at 632 n.6.

Moreover, where, as here, Plaintiffs allege procedural injuries, *see supra* note 2, this already non-onerous standard is relaxed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992); *accord NYPIRG v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003). Thus, Plaintiffs' "standing is further bolstered by the fact that [their] statutory claim[s] under the APA [are] predicated upon [] procedural injur[ies], lessening the 'normal standards for . . . immediacy.'" *Vullo v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271, 288 (S.D.N.Y. 2019) (quoting *Massachusetts v. EPA*, 549 U.S. at 517-18).

## III.   Plaintiffs Adequately Allege Redressability

"Redressability . . . is closely related to the question of causation. When the injury alleged is caused by the illegal conduct, in many instances (at least where continuation of the illegal conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury." *CREW v. Trump*, 953 F.3d 178, 194 (2d Cir. 2019), as amended (Mar. 20, 2020). Because Plaintiffs have "alleged a plausible likelihood that [the Defendants'] conduct caused their injuries, and the injury is ongoing, it logically follows that relief would redress their injury—at least to some extent, which is all that Article III requires." *Id.* (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Thus, as the Second

Circuit has explained, "it seems clear that if the alleged risk of disease transmission from downed livestock qualifies as a cognizable injury-in-fact," that injury "could be redressed" by equitable relief. *Baur*, 352 F.3d at 632 n.6.

Moreover, as with causation, the redressability requirements here are relaxed because Plaintiffs also allege procedural injuries. *Lujan*, 504 U.S. at n.7; *NYPIRG*, 321 F.3d at 326. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. at 518 (citations omitted).

The Government's contention that Plaintiffs' challenges to the Government's abdication of the 2002 Mandates are not redressable "because it is speculative whether the Agency would ever ban the slaughter of nonambulatory hogs," Defs.' Br. at 21-22, is wrong for at least two reasons. As a preliminary matter, Plaintiffs' harms arising from the Government's abdication of the mandate that it investigate and report on nonambulatory livestock can be redressed without a ban on the slaughter of downed pigs. An order requiring the Government to comply with this mandate would relieve Plaintiffs from having to continue diverting resources to seek out such information through alternate means. *See, e.g.*, Baur Decl. ¶¶ 31, 36; Seber Decl. ¶¶ 13, 30; Jones Decl. ¶¶ 19, 27, 32; Walden Decl. ¶ 17, 25.

Moreover, the Government's discretion does not defeat Plaintiffs' standing to challenge the abdication of the mandate that, based on report findings, the Government promulgate any regulations needed to protect downed pigs. "[S]tanding is not defeated by the possibility that an agency might ultimately wield its discretion in a way that does not fix a party's alleged injury." *NTCH, Inc. v. Fed. Commc'ns Comm'n,* 841 F.3d 497, 506 (D.C. Cir. 2016)); *see also In re Pub.*

*Emps. for Envtl. Responsibility*, --- F.3d ----, No. 19-1044, 2020 WL 2090085, at \*4 (D.C. Cir.

May 1, 2020) (this argument "confuses standing with the merits"); *Murray Energy Corp. v.*

*McCarthy*, No. 5:14-CV-39, 2015 WL 1438036, at \*7 (N.D. W. Va. Mar. 27, 2015) ("[A]rguing

the omitted procedure would not have affected the agency's decision . . . is precisely the

argument a defendant cannot make in a procedural rights challenge.").

> As the Supreme Court has explained:

> Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency . . . might later, in the exercise of its lawful discretion, reach the same result for a different reason.

*Fed. Election Comm'n v. Akins*, 524 US 11, 25 (1998) (citations omitted); *see also*

*Massachusetts v. EPA*, 549 U.S. at 518 ("A litigant who alleges a deprivation of a procedural

protection to which he is entitled never has to prove that if he had received the procedure the

substantive result would have been altered. All that is necessary is to show that the procedural

step was connected to the substantive result." (cleaned up)).

> Thus, Plaintiffs are not required to allege that the Government would definitively

promulgate regulations to prohibit the slaughter of downed pigs. Rather, it suffices that there is

"some possibility" that it might do so. *Massachusetts v. EPA*, 549 U.S. at 518.

## CONCLUSION

> Because they have adequately alleged standing, Plaintiffs respectfully request that the

Court deny the Government's motion to dismiss this case.

Respectfully submitted,

Dated May 13, 2020                          /s/ Delcianna J. Winders

Delcianna J. Winders, *Supervising Attorney*
Hira Jaleel, *Student Attorney*
Irene Au-Young, *Student Attorney*
Animal Law Litigation Clinic
Lewis & Clark Law School
10101 S. Terwilliger Blvd., MSC 51
Portland, OR 97219
(503) 768-6858
dwinders@lclark.edu
hirajaleel@lclark.edu
au-young@lclark.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2020, I electronically filed the foregoing PLAINTIFFS'

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

with the Clerk of the Court using the CM/ECF system, which will send notification of this filing

to the attorneys of record and all registered participants.


/s/ Delcianna J. Winders

Delcianna J. Winders