UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FARM SANCTUARY**; **ANIMAL LEGAL DEFENSE FUND**; **ANIMAL OUTLOOK**; **ANIMAL WELFARE INSTITUTE**; **COMPASSION IN WORLD FARMING**; **FARM FORWARD**; and **MERCY FOR ANIMALS, INC.**,<br><br>Plaintiffs,<br><br>v.<br><br>**SONNY PERDUE**, in his official capacity as Secretary of Agriculture; and **UNITED STATES DEPARTMENT OF AGRICULTURE**; **FOOD SAFETY AND INSPECTION SERVICE**; and **PAUL KIECKER**, in his official capacity as Food Safety and Inspection Service Administrator,<br><br>Defendants. | Civil Action No.: 6:20-cv-06081<br><br>The Honorable Frank P. Geraci, Jr.<br><br>**DECLARATION OF GENE BAUR ON BEHALF OF FARM SANCTUARY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |

I, Gene Baur, declare as follows:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. I live in Arlington, Virginia.

3. I am submitting this declaration in support of Plaintiffs' challenge to Defendants' failure to comply with Congress's 2002 mandates regarding pigs at slaughterhouses who are unable to rise or walk (2002 Mandates), and Defendants' denial of Plaintiffs' 2014 petition for rulemaking seeking a regulation banning the slaughter of these animals for human consumption (Petition Denial). Pigs in this condition are referred to as "nonambulatory," "nonambulatory disabled" (NAD), or "downed" pigs.

4. I am President and Co-Founder of Farm Sanctuary, Inc. (Farm Sanctuary) and I have held

a leadership position with Farm Sanctuary since I co-founded the organization in 1986. I am authorized to make this declaration for and on behalf of Farm Sanctuary.

5.  Farm Sanctuary is a non-profit, tax-exempt membership organization with its principal place of business in Watkins Glen, New York, where it operates one of the largest animal sanctuaries in the United States—a 275-acre shelter that provides a home to more than 800 rescued farm animals and offers educational tours to the public. Farm Sanctuary also operates a second animal sanctuary in Southern California, which is situated on 26 acres, houses more than 100 rescued farm animals, and also offers educational tours to the public.

6.  Farm Sanctuary's mission is to protect farm animals from cruelty, inspire change in the way society views and treats farm animals, and to promote compassionate vegan living. Farm Sanctuary works to accomplish this mission through animal rescue efforts, public education, and legal and advocacy work.

7.  Farm Sanctuary has more than 40,000 members and approximately 1.2 million supporters.

8.  Farm Sanctuary's members include individuals who consume pork products and are concerned about the inhumane treatment of animals and about the potentially fatal health risks that they face from their potential exposure to meat from downed pigs contaminated with pathogens, including *Campylobacter*, *E. Coli*, *Listeria*, *Salmonella*, and *Yersinia enterocolitica*, some of which are drug-resistant.

9.  Farm Sanctuary has rescued approximately 15,000 farm animals. Every year, Farm Sanctuary receives more than 1,000 requests for assistance placing animals in need. We expend significant resources caring for farm animals at our sanctuaries, and also provide placement referrals and coordinate placement at and transportation to other sanctuaries and members of our

Farm Animal Adoption Network. If Farm Sanctuary was not required to divert resources toward counteracting the U.S. Department of Agriculture's (USDA) failure to protect downed pigs, as discussed herein, then Farm Sanctuary would be able to dedicate more of its resources to rescuing and caring for farm animals.

10. Since its founding in 1986, Farm Sanctuary has worked to protect downed animals. Farm Sanctuary has rescued, rehabilitated, and provided lifelong care to numerous downed animals, including pigs. If the USDA did not allow these animals to be slaughtered for human consumption, they likely would not have been subjected to the conditions that made them go down.

11. In addition to assisting these individual animals, Farm Sanctuary has led campaigns on behalf of downed animals, including investigations to expose downed animal abuse and campaigns focused on state and federal legislation and on stockyard policies.

12. Farm Sanctuary has been involved in legislative efforts, petitions for rulemaking, civil litigation, and criminal prosecutions aimed at protecting downed animals, as well as educational efforts to inform its members and the broader public about downed pigs and to mobilize efforts on behalf of these animals. None of these efforts would have been necessary if the USDA was not allowing downed animals to be slaughtered for human consumption.

13. After over a decade of lobbying for federal legislative protections for downed animals, Farm Sanctuary was actively involved in getting the Humane Methods of Slaughter Act (HMSA) amended in 2002 to add mandates that the Secretary of Agriculture: (a) "investigate and submit to Congress a report on—(1) the scope of nonambulatory livestock; (2) the causes that render livestock nonambulatory; (3) the humane treatment of nonambulatory livestock; and (4) the extent to which nonambulatory livestock may present handling and disposition problems for

stockyards, market agencies, and dealers," and (b) based on the findings of the report, promulgate regulations necessary to provide for the humane treatment, handling, and disposition of nonambulatory livestock. Farm Security and Rural Investment Act of 2002, Pub. L. 107–171, title X, § 10815, 116 Stat. 532 (codified at 7 U.S.C. § 1907 (2002)). President George W. Bush signed this amendment into law on May 13, 2002. I refer to these mandates as the 2002 Mandates.

14. In 2003, Congress expressed its concern about the USDA's delay in complying with the 2002 Mandates, and "direct[ed] the Secretary to work expeditiously to complete this study at the earliest possible time, and to provide copies of all interim reports as well as the final report to the Committees on Appropriations and the authorizing committees," and "to provide to the Committees on Appropriations a preliminary report no later than March 1, 2004." 149 Cong. Rec. 31,466, 31,468, https://www.govinfo.gov/content/pkg/CRECB-2003-pt23/html/CRECB-2003-pt23-Pg31466.htm.

15. However, many years later, a 2010 Congressional Research Service report noted that the study required by the 2002 Mandates still was not completed.

16. I understand that on October 28, 2019, a Freedom of Information Act (FOIA) request was submitted to the USDA's National Agricultural Statistics Service (NASS) for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, and that on November 21, 2019, FOIA staff responded that NASS does not create or maintain reports to Congress and thus would not have any responsive records.

17. I am also aware that on November 7, 2019, the USDA responded to a FOIA request submitted to the Food Safety and Inspection Service (FSIS) for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, stating that a record

search was conducted by the FSIS in the Office of Public Affairs and Consumer Education and FSIS staff did not locate any responsive documents.

18. I am also aware that on February 14, 2020, the USDA responded to a FOIA request submitted to its Agricultural Marketing Service for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, stating that a search was conducted within the Packers and Stockyards Division of the Fair Trade Practices Program and no responsive records were located.

19. I am further aware that on April 1, 2020, the USDA responded to a FOIA request submitted to its Animal and Plant Health Inspection Service and subsequently referred to the USDA Departmental FOIA Office for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandate, stating that a comprehensive search for records was conducted by the Office of Congressional Relations, the Office of the Executive Secretariat, the Enterprise Correspondence Management Module, and the FSIS, and that no responsive records were identified.

20. I am aware that USDA slaughter statistics indicate that pigs comprise about seventy-five percent of animals that the agency regulates under the HMSA.

21. I am aware that an industry study determined that 0.44% of pigs who arrive at slaughterhouses in the United States are non-ambulatory. According to the USDA, 129,900,000 pigs were killed in the United States in 2019. 0.44% of this number is 5,715,600. This does not account for the number of pigs who become downed after arriving at the slaughterhouse—a figure that is unknown, in part because of the USDA's failure to comply with the 2002 Mandates.

22. The same industry study referenced above also found that .025% of pigs sent to slaughter

are dead on arrival at the slaughterhouse. Applied to the USDA's 2019 slaughter statistics, that translates to 324,750 dead pigs arriving at slaughterhouses annually in the United States. This number would be significantly lower if the USDA did not incentivize sending weakened animals to slaughter and overcrowding them during transport by allowing downed pigs to be slaughtered for human consumption. I am reminded of an article that I read in 1990 in Lancaster Farming, in which an industry expert stated:

> If we totalled [sic] all the marketing losses nationwide, we'd find that over 250 hogs show up dead at packing plants every day. That's more than we could fit on one tractor-trailer load and amounts to about $27,000.
>
> Although most of these deaths are probably avoidable, the industry regards them as acceptable. . . .
>
> Death losses during transport are too high—amounting to more than $8 million per year. But it doesn't take a lot of imagination to figure out why we load as many hogs on a truck as we do. It's cheaper.
>
> Even with a zero death rate that might be associated with providing more space on the truck, the hogs we save would not be enough to pay for the increased transportation costs of hauling fewer hogs on a load. So it becomes a moral issue. Is it right to overload a truck and save $.25 per head in the process, while the overcrowding contributes to the deaths of 80,000 hogs each year?

Kenneth B. Kephart, Penn State Extension Swine Specialist, *Pork Prose*, Lancaster Farming at D-14 – D-16 (Oct. 27, 1990). This statement makes clear that money supersedes animal welfare concerns and that unless forced to by the government, industry will not improve conditions for animals if it costs them even a modest amount. Indeed, in the intervening three decades, as the USDA has failed to remove incentives to overcrowd pigs on farms and during transport and to send weakened pigs to slaughter, the preventable deaths caused by these inhumane conditions continue.

23. In 2010, Farm Sanctuary and two individual consumers of meat products petitioned the FSIS for a regulation prohibiting the slaughter of downed pigs and other downed livestock. Farm Sanctuary devoted significant staff time and other resources to this petition, which it would not have had to do but for the USDA's failure to comply with the 2002 Mandates. In 2013, the FSIS

denied that petition.

24. In 2014, a coalition led by Farm Sanctuary submitted a new petition for rulemaking to the FSIS seeking a regulation prohibiting the slaughter of downed pigs, and in 2016 the coalition supplemented this petition. The petition was accompanied by thousands of pages documenting the human health and animal welfare risks of allowing downed pigs to be slaughtered for human consumption. Farm Sanctuary devoted significant staff time and other resources to this petition, which it would not have had to do but for the USDA's failure to comply with the 2002 Mandates. On September 16, 2019, the FSIS denied that petition. The next day, the agency announced that it was finalizing a rule to remove slaughter line speed limits and to reduce government oversight at pig slaughterhouses.

25. The USDA's failure to comply with the 2002 Mandates and Petition Denial directly conflict with, frustrate, and impair Farm Sanctuary's mission of protecting farm animals from cruelty and burden Farm Sanctuary's ability to carry out many of its mission-critical activities, including by creating a misperception that downed pigs are treated in a humane and lawful manner.

26. The USDA's failure to comply with the 2002 Mandates and Petition Denial further frustrate Farm Sanctuary's mission of protecting farm animals from cruelty and impair its mission-critical activities by authorizing, incentivizing, and encouraging a host of cruel practices, including: breeding sows over and over again until their bodies are so weak that they often arrive at the slaughterhouse unable to stand or walk; breeding pigs for rapid growth and high muscularity, making them especially prone to stress; overcrowding pigs on industrial farms and in transport trucks; and feeding pigs the growth-promoting drug ractopamine, which makes them more susceptible to stress and disease and increases the chances that they will become non-

ambulatory. But for the USDA's unlawful actions and inactions related to downed pigs, producers would lack a financial incentive to engage in these practices because they would be unable to profit off of these weakened animals at the slaughterhouse.

27. The USDA's failure to comply with Congress's 2002 Mandates and Petition Denial also contravene Farm Sanctuary's mission of protecting farm animals by promoting all manner of cruel handling methods at slaughterhouses to attempt to force downed pigs to rise and move, including kicking, electro-shocking, striking, shoving, and dragging.

28. The USDA's failure to comply with the 2002 Mandates and Petition Denial further contravene Farm Sanctuary's mission by incentivizing slaughterhouses to set downed pigs aside in pens for prolonged periods in the hopes that they may rise and be worth more money, often without veterinary care, painkillers, or food, and sometimes without water or adequate shelter or protection from the elements. I am aware that an industry study determined that the flesh from a non-ambulatory pig who is forced to rise is worth an estimated $38 to $126 more than one who does not rise.

29. To counteract these myriad harms to its mission and mission-critical activities, Farm Sanctuary has been forced to divert hundreds of staff hours and thousands of dollars away from other activities, including away from its work providing care, shelter, and placement for rescued farm animals and its public education work.

30. The USDA's ongoing failure to investigate and report on the scope of downed pigs, the causes that render pigs downed, the humane treatment of downed pigs, and the extent to which downed pigs present handling and disposition problems further burdens Farm Sanctuary's ability to carry out its mission-critical activities because it deprives Farm Sanctuary of information on which it would rely in its work.

31. Because of the USDA's failure to complete the mandated investigation of and report on downed pigs, Farm Sanctuary has to divert significant resources to obtain information regarding downed pigs through other means, including by submitting FOIA requests for humane handling and food safety records from the USDA, fighting to obtain that information in a timely manner, in some cases through litigation; reviewing, analyzing, and digesting that information; and publicizing it to educate its members and the public. Indeed, Farm Sanctuary is currently litigating a FOIA lawsuit against the USDA seeking timely access to humane handling records.

32. Because of the USDA's failure to comply with the 2002 Mandates, Farm Sanctuary also diverted significant resources to getting state-level legislation to protect downed pigs and other animals enacted, and to defending such legislation in legal challenges.

33. Farm Sanctuary has also had to divert resources to address the USDA's New Swine Inspection System (NSIS) regulation, a rule that was announced the day after the agency denied Plaintiffs' petition for rulemaking and that further imperils the health and welfare of downed pigs by increasing the risk that these animals will be subjected to inhumane handling by increasing slaughter line speeds and reducing government oversight. Under the NSIS, downed pigs are even more likely to be dragged, beaten, kicked, shoved, electroshocked, and otherwise violently moved to keep up with ever-faster line speeds—and this abuse is less likely to be detected. Farm Sanctuary has devoted significant staff time and other resources to addressing the impacts of the NSIS on downed pigs, including through a separate ongoing lawsuit challenging the rule. But for Defendants' failure to comply with the 2002 Mandates and Petition Denial, Farm Sanctuary would not have to expend resources to counteract the effects of the NSIS on downed pigs.

34. Farm Sanctuary also has to divert resources to seek assistance for pigs who become downed as a result of the USDA's failure to comply with the 2002 Mandates and Petition Denial.

For example, we recently spent a number of hours advising and consulting with law enforcement on a case of cruelty involving a downed pig who was left at a stockyard next to a dead pig whose body was covered in mud and whose snout was partially submerged in muddy water.

35. But for the USDA's failure to comply with the 2002 Mandates and Petition Denial, Farm Sanctuary would not have to undertake the efforts described herein and could instead redirect its resources toward other mission-critical activities, including its farm animal rescue and public education work.

36. An order from the Court requiring the USDA to comply with the 2002 Mandates and overturning the Petition Denial would remedy the ongoing impairment of Farm Sanctuary's mission and mission-critical activities, and relieve Farm Sanctuary from being forced to continually divert resources to counteract this impairment.

In accordance with 28 U.S.C. § 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

Executed on May 6, 2020                    /s/ Gene Baur
                                           Gene Baur