## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FARM SANCTUARY**; **ANIMAL LEGAL DEFENSE FUND**; **ANIMAL OUTLOOK**; **ANIMAL WELFARE INSTITUTE**; **COMPASSION IN WORLD FARMING**; **FARM FORWARD**; and **MERCY FOR ANIMALS, INC.**, | Civil Action No.: 6:20-cv-06081 |
| Plaintiffs, | The Honorable Frank P. Geraci, Jr. |
| v. | **DECLARATION OF DENA JONES ON BEHALF OF ANIMAL WELFARE INSTITUTE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |
| **SONNY PERDUE**, in his official capacity as Secretary of Agriculture; and **UNITED STATES DEPARTMENT OF AGRICULTURE**; **FOOD SAFETY AND INSPECTION SERVICE**; and **PAUL KIECKER**, in his official capacity as Food Safety and Inspection Service Administrator, | |
| Defendants. | |

## DECLARATION OF DENA JONES

I, Dena Jones swear and affirm as follows:

1.      The facts set forth in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2.      I live in Arlington, Virginia.

3.      I am submitting this declaration in support of Plaintiffs' challenge to Defendants' September 16, 2019, denial of Plaintiffs' petition for rulemaking requesting that the Food Safety and Inspection Service ("FSIS") prohibit the slaughter of non-ambulatory ("downed") pigs ("Petition Denial"), in addition to Defendants' failure to investigate and report to Congress on

the scope, causes, and treatment of non-ambulatory pigs and, based on those findings, to promulgate necessary regulations, as required by the 2002 amendment to the Humane Methods of Slaughter Act ("HMSA") ("2002 Mandates").

4.      I am the Director of the Farm Animal Program of the Animal Welfare Institute ("AWI") and am responsible for overseeing this program. I have led this department since September 2009.

5.      Before I became the Director of the Farm Animal Department, I worked in farm animal protection at the World Society for the Protection of Animals, Farm Sanctuary, Humane Farming Association, and the Animal Protection Institute. Prior to that, I earned my master's in Animals in Public Policy at Tufts University, School of Veterinary Medicine

6.      Because of my position, I have a thorough understanding of AWI's mission and how AWI's work advances that mission. My position also requires that I understand potential threats to AWI's mission and its mission-focused work, including government action and inaction that impairs AWI's ability to fulfill its mission.

7.      AWI is a 501(c)(3) non-profit corporation incorporated under the laws of Delaware, with its principal place of business in Washington, D.C. AWI's mission is to reduce animal suffering caused by people and to seek better treatment for animals everywhere—in the laboratory, on the farm, in commerce, at home, and in the wild. Since its inception in 1951, AWI has advanced regulatory, legislative, and judicial initiatives to improve the welfare of farm animals on farms, during transport, and at slaughter. To further its mission, AWI expends resources on domestic farm animal matters through advocacy, research, education, litigation, and grassroots activities.

8.      AWI's farm animal program consists of three full-time staff who work to reduce the suffering of animals raised for human consumption. AWI also employs government affairs staff

who work on legislative matters relating to farm animal welfare. In addition, AWI hires outside attorneys and consultants to support its farm animal welfare work. To help AWI achieve its goal of reducing farm animal suffering, AWI's farm animal program monitors the handling and treatment of farm animals, advocates for improved standards for farm animals through state and federal regulatory and legislative matters, researches the effects of current farm animal policies on the welfare of animals, advocates for increased transparency in the humane slaughter of animals and in the labeling of animal food products, and educates and rallies its members and the public about farm animal welfare matters, including how to choose higher-welfare products and promote truth and consistency in advertising.

9.      I am familiar with Congress's 2002 amendment to the HMSA mandating that "[t]he Secretary of Agriculture shall investigate and submit to Congress a report on" the scope of non-ambulatory livestock, including pigs; the causes that render these animals non-ambulatory; the humane treatment of these animals; and the extent to which these animals present handling and disposition problems and, based on the findings of this report, promulgate any regulations necessary to ensure the humane treatment, handling, and disposition of non-ambulatory livestock. 7 U.S.C. § 1907(a)-(b). I refer to these mandates here as the "2002 Mandates."

10.     I understand that on October 28, 2019, a Freedom of Information Act ("FOIA") request was submitted to the U.S. Department of Agriculture's ("USDA") National Agricultural Statistics Service ("NASS") for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, and that on November 21, 2019, FOIA staff responded that NASS does not create or maintain reports to Congress and thus would not have any responsive records.

11.    I am also aware that on November 7, 2019, the USDA responded to a FOIA request submitted to the FSIS for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, stating that a record search was conducted by the FSIS in the Office of Public Affairs and Consumer Education and FSIS staff did not locate any responsive documents.

12.    I am also aware that on February 14, 2020, the USDA responded to a FOIA request submitted to its Agricultural Marketing Service for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, stating that a search was conducted within the Packers and Stockyards Division of the Fair Trade Practices Program and no responsive records were located.

13.    I am further aware that on April 1, 2020, the USDA responded to a FOIA request submitted to its Animal and Plant Health Inspection Service and subsequently referred to the USDA Departmental FOIA Office for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Mandates, stating that a comprehensive search for records was conducted by the Office of Congressional Relations, the Office of the Executive Secretariat, the Enterprise Correspondence Management Module, and the FSIS, and that no responsive records were identified.

14.    I am aware that USDA slaughter statistics indicate that pigs comprise about seventy-five percent of animals that the agency regulates under the HMSA.

15.    I am aware that an industry study determined that 0.44% of pigs who arrive at slaughterhouses in the United States are non-ambulatory. According to the USDA, 129,900,000 pigs were killed in the United States in 2019. 0.44% of this number is 5,715,600. This does not account for the number of pigs who become downed after arriving at the slaughterhouse—a

figure that is unknown, in part because of the USDA's failure to comply with the 2002
Mandates.

16.     In 2014, AWI, along with a coalition of other organizations, petitioned the USDA to
prohibit the slaughter of downed pigs to protect animal welfare and food safety. This petition
included thousands of pages of scientific studies and other supporting exhibits detailing the dire
impacts to food safety and animal welfare from allowing downed pigs to be slaughtered for
human consumption. In 2016, AWI and the coalition supplemented this petition with extensive
additional information. AWI devoted significant staff time and other resources to this effort,
which would not have been necessary but for the USDA's failure to comply with the 2002
Mandates.

17.     On September 16, 2019, the USDA denied this petition for rulemaking, claiming that its
existing regulations and inspection procedures are sufficient to ensure the humane handling of
downed pigs and the safety of the food supply ("Petition Denial").

18.     The USDA's failure to comply with the 2002 Mandates to the HMSA and Petition Denial
directly conflict with, frustrate, and impair AWI's mission of reducing animal suffering caused
by people and burden AWI's ability to carry out many of its mission-critical activities, including
educating and rallying its members and the public about farm animal welfare matters, especially
its work educating its members and the public on how to choose higher-welfare products and
promoting truth and consistency in advertising.

19.     The USDA's ongoing failure to investigate and report on the scope of downed pigs, the
causes that render pigs downed, the humane treatment of downed pigs, and the extent to which
downed pigs present handling and disposition problems burdens AWI's ability to carry out its
mission-related activities because it deprives AWI of information on which it would rely in its

work monitoring the handling and treatment of downed farm animals, advocating for improved standards for farm animals through state and federal regulatory and legislative matters, researching the effects of current farm animal policies on the welfare of animals, advocating for increased transparency in the humane slaughter of animals and in the labeling of animal food products, and educating and rallying its members and the public about farm animal welfare matters, including how to choose higher-welfare products and promote truth and consistency in advertising.

20.    The USDA's failure to determine, based on specific findings, what regulations are necessary to ensure the humane treatment, handling, and disposition of downed pigs, and to promulgate such regulations, further burdens AWI's ability to carry out these mission-critical activities, including by creating a misperception that downed pigs are treated in a humane and lawful manner and making it harder to guide consumers in choosing higher welfare products, since inhumane handling of downed pigs at slaughter renders products from even the most well-cared for animals inhumane.

21.    The USDA's Petition Denial also burdens AWI's ability to carry out these mission-critical activities, including by creating a misperception that downed pigs are treated in a humane and lawful manner and making it harder to guide consumers in choosing higher welfare products, since inhumane handling of downed pigs at slaughter renders products from even the most well-cared for animals inhumane.

22.    The fact that the USDA allows the continued slaughter of downed pigs means that AWI is unable to achieve its goal of achieving humane slaughter for animals raised for food. Downed pigs are more likely to experience incidents of inhumane handling during transport and at slaughter, not to mention the needless pain and suffering associated with these incidents.

Because the system put in place by the USDA incentivizes the slaughter of these animals (by not requiring their prompt euthanasia), transporters and plant personnel are more likely to use excessive force to drive these animals through the transport and slaughter process.

23.     The USDA's failure to comply with the 2002 Mandates and Petition Denial further frustrate AWI's mission by authorizing, incentivizing, and encouraging a host of cruel and dangerous factory-farming practices, including: breeding sows over and over again until their bodies are so weak that they often arrive at the slaughterhouse unable to stand or walk; breeding pigs for rapid growth and high muscularity, making them especially prone to stress; overcrowding pigs in transport trucks; and feeding pigs the growth-promoting drug ractopamine, which makes them more susceptible to stress and disease and significantly increases the chances that they will become non-ambulatory. But for the USDA's unlawful actions and inactions related to downed pigs, producers would lack a financial incentive to engage in these practices because they would be unable to profit from these weakened animals at the slaughterhouse.

24.     The USDA's failure to comply with the 2002 Mandates and Petition Denial also contravene AWI's mission by promoting all manner of cruel handling methods at slaughterhouses to attempt to force downed pigs to rise and move, including kicking, electro-shocking, striking, shoving, and dragging.

25.     The USDA's failure to comply with the 2002 Mandates and Petition Denial further contravene AWI's mission by incentivizing slaughterhouses to set downed pigs aside in pens for prolonged periods in the hopes that they may rise and be worth more money, often without veterinary care, painkillers, or food, and sometimes without water or adequate shelter or protection from the elements. I am aware that an industry study determined that the flesh from a non-ambulatory pig who is forced to rise is worth an estimated $38 to $126 more than one who

does not rise.

26.    The USDA's failure to comply with the 2002 Mandates and Petition Denial force AWI to divert significant resources toward work counteracting the USDA's failure to investigate, report on, and protect downed pigs. Because of the USDA's failure to address downed pigs, AWI expends significant resources on efforts to monitor and reduce incidents of downed pigs suffering on farms, during transport, at stockyards, and at slaughter.

27.    These efforts include gathering information for and continually updating AWI's report *Legal Protections for Nonambulatory (or "Downed") Farm Animals*. This report analyzes the state laws and regulations that govern the treatment of downed animals, industry and international standards, and makes policy recommendations for reducing instances of inhumane handling of downed animals, including pigs. AWI spent an estimated 80 hours of staff time in the research, writing, editing, and design of the original report and continues to expend additional resources to update the report. AWI updated this report in November 2019 and continually expends resources monitoring for updates and intends to continue updating the report annually or biannually. But for the USDA's failure to comply with the 2002 Mandates and Petition Denial, such extensive efforts would not be necessary.

28.    To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI also has to divert resources to monitor for transport incidents involving downed pigs by routinely submitting FOIA requests for records related to the enforcement of the federal Twenty-Eight Hour Law.

29.    To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI also has to divert resources to monitor enforcement of animal export regulations by

Declaration of Dena Jones                                                                                           8
Civil Action No.: 6:20-cv-06081

requesting operator reports that describe morbidity and mortality events involving downed pigs on shipments of live animals on sea vessels.

30.     To counteract the USDA's failure to protect downed pigs, AWI also diverted resources to petition the USDA's Animal and Plant Health Inspection Service to add "fitness to travel" requirements to its live animal export regulations, including a specific requirements for non-ambulatory animals, and to comment on the agency's subsequent proposed rule.

31.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI additionally diverts resources to prepare and regularly update its report, *Humane Slaughter Update: Federal and State Oversight of the Welfare of Farm Animals at Slaughter*, which makes specific findings about humane handling violations involving downed pigs. This report also proposes policy recommendations for reducing instances of inhumane handling of animals, including of pigs who become non-ambulatory. AWI just published an update version of this report, and will continue to divert resources to monitor for developments and to update the report every two to three years.

32.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI is also forced to divert significant resources to regularly submit FOIA requests for humane handling records from the USDA. AWI has submitted dozens of such FOIA requests, and continues to submit such requests. AWI has been forced to further divert significant resources to litigate (wholly apart from the instant lawsuit) in an effort to access this information in a timely manner. To date, AWI has had to dedicate more than 100 staff hours to such efforts as well as tens of thousands of dollars. These efforts are ongoing and continue to require AWI to divert resources from other efforts that AWI had planned to engage in. These efforts would not be necessary, or at least not necessary to such an extent, but for the USDA's failure to comply with

the 2002 Mandates and Petition Denial.

33.     AWI also monitors the treatment of downed pigs by routinely submitting state public records requests. To date, AWI has diverted resources to submit more than 100 state and federal records requests to monitor the treatment of downed pigs. These ongoing efforts further divert resources and would not be necessary, or at least not necessary to such an extent, but for the USDA's failure to comply with the 2002 Mandates and Petition Denial.

34.     The incidents of inhumane handling of downed pigs that are detailed in the First Amended Complaint at paragraphs 8, 143, and 146 were all uncovered by AWI through FOIA requests. Additional records recently obtained by AWI in response to further FOIA requests document further incidents of inhumane handling of downed pigs at various slaughterhouses across the United States, including:

a.      a downed pig who was struck with a paddle first on the back and then between the eyes three times with great force by a worker;

b.      a downed pig who was left in a trailer of pigs being unloaded and was trampled by other pigs;

c.      a downed pig who was dragged by a hydraulic gate while a worker tapped the animal's back;

d.      a worker attempt to move a downed pig by the head; and

e.      a worker who forcibly pushed and let go of a cart carrying a downed pig into a concrete wall, resulting in the front end of the cart being dropped hard to the floor and causing the pig to be jostled back and forth.

35.     Because of the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI must continue to seek out and use this information to encourage government inspection

personnel and slaughter establishments to improve the treatment of vulnerable non-ambulatory animals.

36.     Recently, AWI has also had to divert resources to monitor the finalization and implementation of the USDA's New Swine Inspection System ("NSIS") regulation, a rule that further imperils the health and welfare of downed pigs by increasing the risk that these animals will be subjected to inhumane handling by increasing slaughter line speeds. AWI submitted detailed comments on the proposed rule, underscoring that increased line speeds would cause workers to drive animals too quickly, thus increasing the likelihood of negative welfare outcomes for pigs, especially downed pigs. To inform these comments, AWI analyzed thousands of FSIS enforcement records from NSIS pilot slaughterhouses to determine what effect the rule's implementation would have on the welfare of pigs. Since the rule has been implemented, AWI is further forced to divert resources to seek out, analyze, and publicize records from slaughterhouses that adopt the NSIS to monitor and raise awareness about the impacts on downed pigs. Notably, four of the five incidents of inhumane handling of downed pigs recently discovered by AWI and summarized in paragraph 34 were at slaughterhouses that the USDA has determined will convert to high-speed slaughter under the NSIS. But for Defendants' failure to comply with the 2002 Mandates and Petition Denial, AWI would not have to expend resources to counteract the effects of the NSIS on downed pigs.

37.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI also has to divert resources to regularly communicate with FSIS policy and field operations staff regarding downed pigs, including through letters, phone calls, in-person meetings, and online communications.

38.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial,

AWI is also forced to advocate for legislative and regulatory reforms that reduce the occurrence of downed pigs. AWI has diverted resources to draft and submit comments to the agricultural departments of Alaska, Indiana, Kentucky, and Ohio on the development of their state farm animal care standards to address the treatment of downed animals. For example, AWI submitted comments to Ohio's Livestock Care Standards Board recommending that standards be established for the treatment of downed animals. AWI also had to divert resources to draft a resolution on the handling of downed animals at livestock markets and slaughterhouses for introduction in the Tennessee legislature. AWI is forced to continue to divert resources to advocate for such reforms to protect downed pigs, to counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial.

39.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI is also forced to divert resources to push for the enforcement of existing state farm animal care provisions related to downed pigs.

40.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI also has to divert resources to visit livestock auctions to monitor, document, and report on the occurrence and treatment of downed pigs.

41.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI has also been forced to divert resources to urge the USDA's Agricultural Marketing Service to revise its "Federal Purchase Program Specification for Animal Handling and Welfare" to require that all pork suppliers humanely euthanize non-ambulatory or disabled animals.

42.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI has also had to divert resources to submit comments to the American Veterinary Medical Association on its draft guidelines for the humane slaughter of animals, including

recommendations regarding the dragging of non-ambulatory animals and the association between ractopamine use and the number of downed pigs at slaughter.

43.     To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI has also had to divert resources to urge the Global Animal Partnership's Animal Welfare Certification Program to revise its slaughter standards for pigs.

44.     To counteract the USDA's failure to investigate, report on, and protect downed pigs, AWI has also had to expend substantial resources on litigation related to the treatment of animals in United States slaughterhouses. For example, in 2016, AWI filed a lawsuit against the USDA for its delay in responding to an AWI petition filed in May 2013 to amend its regulations to prevent incidents of inhumane handling and needless suffering of animals at slaughter, including downed pigs. This petition requested mandatory humane handling training for slaughterhouse personnel and a requirement for slaughterhouses to develop humane handling plans, which could reduce the incidence of and improve the treatment of non-ambulatory pigs at slaughter. AWI diverted approximately fifty hours of staff time toward this litigation and at least another 200 hours toward developing the original petition. AWI also diverted approximately $10,000 in financial resources towards the petition and litigation.

45.     Many of AWI's members include individuals who regularly consume pork products and are concerned about the well-being of downed pigs slaughtered for human consumption. AWI's members are interested in efforts to improve the living conditions of downed pigs and rely on AWI to represent their interests in animal welfare and consumer protection and to educate them on the issue of downed animals. To counteract the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI diverts resources to educate consumers and the public about the treatment of downed pigs. For example, AWI has reported on the issue of downed animals in

AWI Quarterly, a magazine for its members, on at least four occasions and will continue to do so in the future.

46.     But for the USDA's failure to comply with the 2002 Mandates and Petition Denial, AWI would not have to continue to divert, at least not to this extent, these resources and they could instead be devoted to other AWI mission-critical activities.

47.     An order from the Court requiring the agency to comply with the 2002 Mandates  and overturning the Petition Denial would remedy AWI's ongoing injuries.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  May 5, 2020                                   Dena Jones

Declaration of Dena Jones                                                            14
Civil Action No.: 6:20-cv-06081