UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FARM SANCTUARY**; **ANIMAL LEGAL DEFENSE FUND**; **ANIMAL OUTLOOK**; **ANIMAL WELFARE INSTITUTE**; **COMPASSION IN WORLD FARMING**; **FARM FORWARD**; and **MERCY FOR ANIMALS, INC.**, | Civil Action No.: 6:20-cv-06081 |
| Plaintiffs, | The Honorable Frank P. Geraci, Jr. |
| v. | **DECLARATION OF CHERYL LEAHY ON BEHALF OF ANIMAL OUTLOOK** |
| **SONNY PERDUE**, in his official capacity as Secretary of Agriculture; and **UNITED STATES DEPARTMENT OF AGRICULTURE**; **FOOD SAFETY AND INSPECTION SERVICE**; and **PAUL KIECKER**, in his official capacity as Food Safety and Inspection Service Administrator, | |
| Defendants. | |

I, CHERYL LEAHY, declare as follows:

1. The facts set forth are based on my personal knowledge and are true to the best of my knowledge and recollection. If called, I could and would testify to these facts in a court of law.

2. I am submitting this declaration in support of Plaintiffs' challenge to Defendants' September 16, 2019, denial of Plaintiff's petition for rulemaking requesting that the Food Safety and Inspection Service ("FSIS") prohibit the slaughter of non-ambulatory ("downed") pigs in addition to Defendants' failure to investigate and report to Congress on the scope, causes, and treatment of non-ambulatory pigs and, based on those findings, to promulgate necessary regulations, as required by the 2002 amendment to the Humane

Methods of Slaughter Act ("HMSA").

3.      I am the Executive Vice President for Animal Outlook ("AO"). I have been employed at Animal Outlook (formerly Compassion Over Killing) since 2006 and previously served as General Counsel for the organization.

4.      AO is a 501(c)(3) nonprofit organization incorporated in Delaware with its principal place of business in the District of Columbia.

5.      Established in 1995, AO's mission is to change the world for animals. AO works to challenge the status quo of animal agribusiness, expose the truth, deliver justice, revolutionize food systems, and empower others to stand up for animals by leaving them off of their plates.

6.      In furtherance of its mission, AO conducts undercover investigations of factory farms and industrialized slaughterhouses; advocates against and works to counteract government policies that encourage or allow cruelty to farm animals; and coordinates public campaigns to encourage the adoption of vegan diets.

7.      As part of my role as Executive Vice President, I develop strategy and establish priorities for AO to maximize the impact of our limited organizational resources on our core mission.

8.      A core component of AO's mission is exposing the public to the systematic cruelty endemic to industrialized animal agriculture through undercover investigations. AO regularly conducts investigations across all areas of industrialized animal agriculture, including factory farms and slaughterhouses for cows, pigs, sheep, chickens, fish, and turkeys.

9.      An additional core component of AO's mission is proactively educating the

public on the animal welfare consequences of industrialized animal agriculture. AO performs this education through a variety of channels, including blog posts, petitions, campaigns, email alerts, social media posts, media engagement, and literature.

10. AO also works to advance its mission through strategic litigation. AO actively litigates against government and private entities to remedy violations of existing laws — including, among others, the HMSA, relevant here.

11. AO and seven other animal protection organizations submitted a petition for rulemaking on June 3, 2014, requesting that the FSIS prohibit the slaughter of non-ambulatory pigs just as it had previously banned the slaughter of non-ambulatory cattle and calves. 72 Fed. Reg. 38,700; 74 Fed. Reg. 11,463.

12. I am familiar with the Defendants' September 16, 2019, denial of this petition for rulemaking based on their conclusion that "existing regulations and inspection procedures are sufficient and effective in ensuring that [non-ambulatory] pigs are handled humanely at slaughter and in preventing diseased animals from entering the human food supply."

13. I am familiar with Congress' 2002 amendment to the HMSA mandating that "[t]he Secretary of Agriculture shall investigate and submit to Congress a report on" the scope of non-ambulatory livestock, including pigs; the causes that render these animals non-ambulatory; the humane treatment of these animals; and the extent to which these animals present handling and disposition problems and, based on the findings of this report, promulgate any necessary regulations. 7 U.S.C. § 1907(a)-(b). I am aware that U.S. Department of Agriculture ("USDA") slaughter statistics indicate that pigs comprise about seventy-five percent of animals that it regulates under the HMSA.

14. I understand that, on April 1, 2020, the USDA responded to a Freedom of

Information Act request seeking this report and advised that a "comprehensive search" was conducted by the Office of Congressional Relations, the Office of the Executive Secretariat, the Enterprise Correspondence Management Module, and the FSIS and "no responsive records were identified."

15. I also understand that on February 14, 2020, the USDA responded to a FOIA request submitted to the Agricultural Marketing Service for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Congressional mandate, stating that a search was conducted within the Packers and Stockyards Division of the Fair Trade Practices Program and no responsive records were located.

16. I also understand that on November 7, 2019 the USDA responded to a FOIA request submitted to the FSIS for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Congressional mandate, stating that a record search was conducted by the FSIS in the Office of Public Affairs and Consumer Education and FSIS staff did not locate any responsive documents.

17. I also understand that on October 28, 2019, a FOIA request was submitted to the National Agricultural Statistics Service ("NASS") for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Congressional mandate. On November 21, 2019, FOIA staff determined NASS does not create or maintain reports to Congress, and as a result of this determination, FOIA staff decided not to open a request for reports on non-ambulatory livestock with NASS.

18. I am familiar with an FSIS official's statement that, prior to the prohibition on slaughtering non-ambulatory calves, non-ambulatory pigs suffered eighteen times as many humane handling instances under the HMSA as those involving calves.

19. I am familiar that the flesh from a non-ambulatory pig forced to rise is worth an estimated $38 to $126 more than one who does not rise.

20. AO has firsthand experience witnessing and documenting the heightened cruelty inflicted on non-ambulatory pigs as a result of these factors. In 2015, AO conducted a five-month undercover investigation of the Quality Pork Processors ("QPP") industrial pig slaughterhouse in Minnesota, one of five slaughter plants operating at the time under a USDA pilot program allowing the plant to operate without maximum slaughter line speeds ("high-speed slaughter") and fewer agency inspectors.

21. AO's investigation of QPP revealed egregious acts of cruelty inflicted on non-ambulatory pigs. AO's investigator documented (a) fully-conscious, non-ambulatory pigs being dragged to slaughter with metal hooks; (b) non-ambulatory pigs being improperly stunned, sometimes displaying signs of sensibility prior to having their throats slit; (c) non-ambulatory pigs being electrically prodded to drive them to slaughter; and (d) non-ambulatory pigs left in pens during staff breaks.

22. AO's investigation also revealed apparent food safety concerns resulting from deficient inspections and plant procedures. The slaughterhouse appeared to lack any procedure to designate and separate animals who became non-ambulatory once they were in the livestock area and consequently, these "downer" animals were slaughtered alongside ambulatory pigs, despite well-documented links between non-ambulatory animals and food safety risks.

23. Video footage from this investigation is available at https://youtu.be/XPGIMCmpfxU and was submitted to the USDA as well as local law enforcement.

24. I am aware that the USDA admitted after reviewing AO's video evidence that "Had these actions been observed by the inspectors, they would have resulted in immediate regulatory action against the plant."[1] I am further aware that the agency decided not to suspend the plant's operations because the inspections did not occur in front of USDA inspectors.

25. Defendants' denial of Plaintiffs' petition for rulemaking and failure to investigate and report to Congress and to promulgate necessary regulations frustrates and impedes AO's mission by sanctioning the heightened cruelty to which non-ambulatory pigs are exposed, thus allowing industrial pig slaughterhouses to maximize profits through inhumane handling.

26. In addition to frustrating and impeding AO's mission, Defendants' actions divert AO's limited organizational resources by forcing AO to evaluate and consider additional investigations into industrial pig slaughter plants in order to expose the public to the heightened cruelty inflicted on non-ambulatory pigs. AO's evaluation and consideration of future investigations of industrial pig slaughter plants diverts Legal and Investigations resources from other potential investigations. Moreover, should AO decide to conduct future investigations into industrial pig slaughter plants based on the heightened cruelty to which non-ambulatory pigs are subjected, AO will be forced to divert human and financial resources to these investigations and away from other investigations.

27. In addition to frustrating and impeding AO's mission, and forcing AO to divert resources to consider additional investigations into industrial pig slaughterhouses, AO is

---

[1] M. Hughlett, STAR TRIBUNE, *USDA Investigating Hormel Supplier's Treatment of Pigs After Video Surfaces*, https://www.startribune.com/usda-investigating-hormel-supplier-s-treatment-of-pigs/346275842/ (last visited Apr. 1, 2020).

forced to expend significant resources educating the public and raising awareness of the heightened cruelty inflicted on non-ambulatory pigs. AO's investigation of QPP illuminated grave concerns with high-speed slaughter in general, but particularly emphasized the plight of non-ambulatory pigs. AO expended resources including Communications, Campaign, Legal, and Investigations staff who were forced to devote time drafting, reviewing, and editing numerous blog posts, email campaigns, and social media posts and creating and maintaining an online petition, all of which included education on cruelty to non-ambulatory pigs.

28.     Had Defendants granted Plaintiffs' petition for rulemaking; investigated and reported to Congress on the scope, causes, and treatment of non-ambulatory pigs as required by the 2002 amendment to the HMSA; and promulgated necessary regulations based on findings, AO would have allocated these resources to other areas of its core mission. Because of Defendants' failure to grant the petition, report to Congress, and promulgate necessary regulations, AO is forced to divert these resources away from core areas of its mission, including other investigations into factory farms and non-pig slaughterhouses, corporate campaigns urging the adoption of plant-based alternatives, and the development of legal theories to challenge other laws adversely impacting animals.

29.     Until the petition is granted and Defendants investigate and report on the scope, causes, and treatment of non-ambulatory pigs and promulgate necessary regulations based on its findings, AO will be forced to continue diverting scarce organizational resources to expose the heightened cruelties inflicted on non-ambulatory pigs. Instead of working on other core components of AO's mission, resources from Campaigns,

Communications, Legal, and Investigations will be forced to continue drafting, reviewing, editing, and publishing blogs, social media posts, email alerts, and online petition updates to maintain public awareness of the heightened cruelties inflicted on non-ambulatory pigs, including but not limited to continuing to broadly disseminate our firsthand documentation of these cruelties captured during the QPP investigation.

30. In addition, AO has a procedural interest in ensuring that the FSIS fully considers the information AO submits through its participation in the agency's development of regulations regarding the treatment of non-ambulatory pigs. AO further has a procedural interest in ensuring that the FSIS fully considers information submitted in the course of such public participation before finalizing and implementing any such regulations. These interests were injured by FSIS's failure to consider important aspects of the problem that was presented in the petition, offering of explanations that run directly counter to the evidence before the agency, and unreasonably treating non-ambulatory pigs different from non-ambulatory cattle.

31. An order by the Court compelling Defendants to (a) investigate and report to Congress on the scope of non-ambulatory pigs, the causes that render these animals non-ambulatory, the humane treatment of these animals, and the extent to which these animals may present handling and disposition problems; and (b) based on the findings of this investigation and report, promulgate regulations necessary to ensure the humane treatment, handling, and disposition of non-ambulatory pigs; and (c) setting aside Defendants' denial of the rulemaking petition would remedy AO's injuries by ensuring proper consideration of the severe animal welfare impacts inherent to allowing the slaughter of non-ambulatory pigs.

In accordance with 28 U.S.C. § 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

Executed on May 4, 2020.

_____
Cheryl Leahy