UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FARM SANCTUARY**; **ANIMAL LEGAL DEFENSE FUND**; **ANIMAL OUTLOOK**; **ANIMAL WELFARE INSTITUTE**; **COMPASSION IN WORLD FARMING**; **FARM FORWARD**; and **MERCY FOR ANIMALS, INC.**, | Civil Action No.: 6:20-cv-06081 |
| Plaintiffs, | The Honorable Frank P. Geraci, Jr. |
| v. | **DECLARATION OF JOHN SEBER ON BEHALF OF MERCY FOR ANIMALS, INC.** |
| **SONNY PERDUE**, in his official capacity as Secretary of Agriculture; and **UNITED STATES DEPARTMENT OF AGRICULTURE**; **FOOD SAFETY AND INSPECTION SERVICE**; and **PAUL KIECKER**, in his official capacity as Food Safety and Inspection Service Administrator, | |
| Defendants. | |

I, JOHN SEBER, declare as follows:

1. The facts set forth in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. I currently reside in Denver, Colorado.

3. I am submitting this declaration in support of Plaintiffs' challenge to Defendants' failure to comply with Congress's 2002 mandates regarding pigs at slaughterhouses who are unable to rise or walk, and Defendants' 2019 denial of Plaintiffs' 2014 petition for rulemaking seeking a regulation banning the slaughter of these animals for human consumption. Pigs in this condition are referred to as "nonambulatory," "nonambulatory disabled" (NAD), or "downed" pigs.

4. I am the Senior Vice President for Advocacy of Mercy For Animals, Inc. (MFA), a party to this action, and I am authorized to make this declaration for and on its behalf.

5. MFA is a nonprofit organization incorporated in Delaware and with its principal place of business in Los Angeles, California. Founded in 1999, MFA represents millions of supporters throughout the world.

6. MFA's mission is to construct a compassionate food system by reducing suffering and ending the exploitation of animals for food. MFA works to accomplish this mission through corporate, public, and government engagement; movement capacity building; conducting and releasing investigative exposés of industrialized animal agriculture and slaughter; and legal advocacy.

7. I am familiar with Congress's 2002 amendment to the Humane Methods of Slaughter Act (HMSA) mandating that "[t]he Secretary of Agriculture shall investigate and submit to Congress a report on" the scope of non-ambulatory livestock, including pigs; the causes that render these animals non-ambulatory; the humane treatment of these animals; and the extent to which these animals present handling and disposition problems and, based on the findings of this report, promulgate any regulations necessary to ensure the humane treatment, handling, and disposition of non-ambulatory livestock. I am aware that pigs comprise approximately seventy-five percent of all livestock that the U.S. Department of Agriculture (USDA) regulates under the HMSA.

8. I am aware that on October 28, 2019, a Freedom of Information Act (FOIA) request was submitted to the USDA's National Agricultural Statistics Service (NASS) for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 amendment to the HMSA, and that on November 21, 2019, FOIA staff responded that NASS does not create or maintain reports to Congress and thus would not have any responsive records.

9. I am also aware that on November 7, 2019, the USDA responded to a FOIA request submitted to the Food Safety and Inspection Service (FSIS) for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Congressional mandate, stating that a record search was conducted by the FSIS in the Office of Public Affairs and Consumer Education and FSIS staff did not locate any responsive documents.

10. I am also aware that on February 14, 2020, the USDA responded to a FOIA request submitted to its Agricultural Marketing Service for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Congressional mandate, stating that a search was conducted within the Packers and Stockyards Division of the Fair Trade Practices Program and no responsive records were located.

11. I am further aware that on April 1, 2020, the USDA responded to a FOIA request submitted to its Animal and Plant Health Inspection Service, and subsequently referred to the USDA Departmental FOIA Office, for any reports submitted to Congress on non-ambulatory livestock pursuant to the 2002 Congressional mandate, stating that a comprehensive search for records was conducted by the Office of Congressional Relations, the Office of the Executive Secretariat, the Enterprise Correspondence Management Module, and the FSIS, and that no responsive records were identified.

12. The information that Congress in 2002 directed the USDA to compile regarding downed livestock is precisely the sort of information that MFA relies on to further its mission, including in its public, corporate, and government engagement efforts. MFA's ability to carry out these activities is burdened by the USDA's failure to comply with the 2002 mandate.

13. Because the USDA has not complied with Congress's mandate that it investigate and report on the scope of nonambulatory livestock, the causes that render livestock nonambulatory,

the humane treatment of nonambulatory livestock, and the extent to which nonambulatory livestock present handling and disposition problems, MFA has to divert resources that it would otherwise use on its mission-critical activities to seek out this information through other means, including through records requests and investigations.

14. In 2014, MFA, along with a coalition of other organizations, petitioned the USDA to prohibit the slaughter of downed pigs for human consumption to protect animal welfare and food safety. This petition included thousands of pages of scientific studies and other supporting exhibits detailing the dire impacts to food safety and animal welfare from allowing downed pigs to be slaughtered for human consumption. In 2016, MFA and the coalition supplemented this petition with extensive additional information detailing why a ban on the slaughter of downed pigs was needed to remove incentives to send pigs weakened by the use of the growth-promoting drug ractopamine—which is known to cause lameness, broken limbs, collapse, death, and other issues in pigs—to slaughter. MFA devoted significant staff time and other resources to this effort, including taking the lead on drafting the supplement to the petition and on compiling thousands of pages of exhibits to accompany the supplement, none of which would have been necessary but for the USDA's failure to comply with the 2002 amendment to the HMSA.

15. On September 16, 2019, the USDA denied this petition for rulemaking, claiming that its existing regulations and inspection procedures are sufficient to ensure the humane handling of downed pigs and the safety of the food supply.

16. The USDA's failure to comply with Congress's 2002 mandates and denial of the petition to ban the slaughter of downed pigs conflicts with, frustrates, and impairs MFA's mission of constructing a compassionate food system by reducing suffering and ending exploitation of

animals for food, and also burdens MFA's ability to carry out many of its mission-critical activities.

17. Allowing the slaughter of downed pigs facilitates a host of cruel and dangerous factory-farming practices that cause suffering and exploit animals, including: breeding sows over and over again until their bodies are so weak that they often arrive at the slaughterhouse unable to stand or walk; breeding pigs for rapid growth and high muscularity, making them especially prone to stress; overcrowding pigs in transport trucks; and feeding pigs the growth-promoting drug ractopamine, which makes them more susceptible to stress and disease and significantly increases the chances that they will become nonambulatory. But for the USDA's unlawful actions and inactions related to downed pigs, producers would lack a financial incentive to engage in these practices because they would be unable to profit from these weakened animals at the slaughterhouse. MFA has had to divert organizational resources to counteract the USDA's actions and inactions regarding downed pigs and to counteract the resulting financial incentives.

18. The USDA's failure to comply with Congress's 2002 mandates and its denial of the petition for rulemaking also contravenes MFA's mission by causing all manner of cruel handling methods at slaughterhouses to attempt to force downed pigs to rise and move, including kicking, electro-shocking, striking, shoving, and dragging.

19. The USDA's failure to comply with Congress's 2002 mandates and the agency's denial of the petition for rulemaking further contravenes MFA's mission by incentivizing slaughterhouses to set downed pigs aside in pens for prolonged periods in the hopes that they may rise and be worth more money, often without veterinary care, painkillers, or food, and sometimes without water or adequate shelter or protection from the elements.

20. MFA's public engagement work is also impaired by the USDA's failure to address downed pigs, because it creates a misimpression that these animals are handled in a manner that is humane and lawful. MFA is forced to divert resources to counteract that misimpression and educate consumers and the public about the reality of how these animals are handled.

21. Because of the USDA's unlawful inaction and action regarding downed pigs, MFA has had to divert resources to document and publicize the condition of the downed pigs that it has discovered during its cruelty investigations, and has had to write reports urging government officials to investigate and prosecute cruelty to downed animals. MFA has documented downed pigs in approximately a dozen investigations. This work would not have been necessary, or at least not necessary to such an extent, but for the USDA's failures that are challenged in this lawsuit.

22. Because of the USDA's denial of Plaintiffs' petition for rulemaking and because the USDA has not complied with Congress's 2002 mandates, MFA will likely continue to have to divert resources to focus investigations on the treatment of downed pigs and to publicize the findings of those investigations.

23. To counteract the USDA's failure to comply with the 2002 amendment to the HMSA and denial of Plaintiffs' petition for rulemaking, MFA has also been forced to divert significant resources to submit FOIA requests for humane handling records from the USDA.

24. In addition to the incidents of inhumane handling of downed pigs that are detailed in the First Amendment Complaint at paragraphs 8, 143, and 146 that were all uncovered through FOIA requests, records recently obtained by MFA in response to FOIA requests document further incidents of inhumane handling of downed pigs at slaughterhouses, including:

a. An attempt to unload a pig from a trailer by kicking the pig, using a fiberglass board to chop at the pig's feet, wrapping a rope around the pig's rear to force the pig forward while placing his feet on the pig, and dragging the pig using the rope, resulting in the pig falling from the trailer to the ground; and

b. A worker who tied a chain around the front two legs and dragged a pig who was hurt and unable to walk.

25. I am aware that the USDA has been repeatedly criticized for its failure to enforce the HMSA and Federal Meat Inspection Act adequately, including by its own Office of Inspector General, and has acknowledged that many inhumane handling incidents occur outside the view of its inspectors. Thus, there is every reason to believe that the incidents documented in USDA records are just the tip of the iceberg.

26. To counteract the USDA's failure to comply with the 2002 mandates and Plaintiffs' petition for rulemaking, MFA is also forced to divert resources to address the impacts of the USDA's New Swine Inspection System (NSIS) regulation, a rule that was announced the day after the agency denied Plaintiffs' petition for rulemaking and that further imperils the health and welfare of downed pigs by increasing the risk that these animals will be subjected to inhumane handling by increasing slaughter line speeds and reducing government oversight. Under the NSIS, downed pigs are even more likely to be dragged, beaten, kicked, shoved, electroshocked, and otherwise violently moved to keep up with ever-faster line speeds—and this abuse is less likely to be detected. MFA has devoted significant staff time and other resources to addressing the impacts of the NSIS on downed pigs, including through comments to the USDA, a separate ongoing lawsuit challenging the rule, and publicizing the impacts of this rule on downed pigs.

But for the USDA's failure to comply with the 2002 mandates and denial of Plaintiffs' petition, MFA would not have to divert resources to counteract the effects of the NSIS on downed pigs.

27.     To counteract the USDA's failure to comply with the 2002 amendments and denial of the petition, MFA also has to divert organizational resources to publish materials that educate the public about animal welfare harms that the agency's action and inaction causes, including through inhumane handling and the administration of ractopamine.

28.     MFA has a procedural interest in ensuring that the USDA timely complies with its duties under the HMSA and fully considers the information MFA submits through its participation in the agency's development of regulations regarding the treatment of downed pigs. MFA further has a procedural interest in ensuring that the USDA fully considers information submitted in the course of such public participation before making final decisions. These interests are injured by USDA's failure to consider important aspects of the problem that was presented in the petition and supplement, offering of explanations that run directly counter to the evidence before the agency, and unreasonably treating non-ambulatory pigs different from non-ambulatory cattle.

29.     But for the USDA's disregard of Congress's 2002 mandates and the agency's denial of the petition for rulemaking to ban the slaughter of downed pigs, MFA would not have to continue to divert, at least not to this extent, resources to counteract the USDA's failures and could instead use those resources on its mission-critical activities.

30.     An order from the Court directing the USDA to comply with Congress's 2002 mandates as to downed pigs and requiring the agency to comply with the Administrative Procedure Act, Federal Meat Inspection Act, and the HMSA in responding to the petition for rulemaking to prohibit the slaughter of downed pigs would remedy MFA's ongoing injuries.

In accordance with 28 U.S.C. § 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

Executed on the 11th day of May, 2020              */s/ John Seber*
                                                   John Seber