Jessica L. Blome
Greenfire Law, PC
(California Bar #314898)
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com
*Attorneys for Plaintiffs*

Holly Bainbridge
*Admitted Pro Hac Vice*
Animal Legal Defense Fund
(California Bar #323201)
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533
hbainbridge@aldf.org
*Attorneys for Animal Legal Defense Fund*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FARM SANCTUARY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Plaintiffs' Memorandum of Law in** |
| v. | ) | **Support of Summary Judgment** |
| | ) | |
| THOMAS VILSACK, in his official capacity | ) | Case No. 6:20-cv-6081-EAW-MWP |
| as Secretary of Agriculture, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

i

**Table Of Contents**

I.  INTRODUCTION ...................................................................................................2

II.  LEGAL FRAMEWORK .......................................................................................3

  A.  Humane Methods of Slaughter Act ...................................................................3

  B.  Federal Meat Inspection Act............................................................................4

  C.  Administrative Procedures Act .........................................................................5

III.  STANDARD OF REVIEW ...................................................................................6

IV.  ARGUMENT.........................................................................................................6

  A.  Plaintiffs have standing....................................................................................6

  B.  Defendants have unlawfully withheld or unreasonably delayed required agency action under section 706(1) of the APA. ................................................8

    1.  The HMSA mandates that Defendants take discrete agency actions to investigate, report on, and regulate the slaughter of nonambulatory pigs. ...................................9

    2.  Defendants have unlawfully withheld the discrete agency actions required by the HMSA.........................................................................................................11

    3.  Defendants unreasonably delayed action on Congress's mandate by failing to act for twenty years. .......................................................................................13

  C.  Defendants arbitrarily and capriciously denied the Petition under section 706(2) of the APA. ........................................................................................18

    1.  Defendants' conclusion that the slaughter of nonambulatory pigs has no impact on public health or food safety was arbitrary and capricious. ......................20

    2.  Defendants arbitrarily and capriciously ignored an important aspect of the problem—that widespread producer practices lead to nonambulatory disability in pigs.........................................................................................................22

    3.  Defendants arbitrarily and capriciously discounted evidence documenting producer incentives to handle nonambulatory pigs inhumanely...............................24

    4.  Defendants abused their discretion by failing to consider evidence of the high rate of inhumane treatment suffered by nonambulatory pigs under existing regulations................................................................................................28

V.  CONCLUSION....................................................................................................32

# Table Of Authorities

## Cases

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)........................................ 30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................................................ 5

*Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008) ........................................................................... 7

*Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003)............................................. 15

*Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222 (3d Cir. 2003)........................................ 18

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ....................................................................................................... 6

*Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999)....................................................... 18

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................................................. 18, 21, 31

*Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535 (S.D.N.Y. 2009) ...................................... 14

*Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43 (S.D.N.Y. 2020).......................................................... 8, 13

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ......................................................... 8, 10

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986)................................................ 31

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020), *cert. granted*, 141 S. Ct. 890 (2020).................... 21, 29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)....................................................................... 5

*Heublein, Inc. v. United States*, 996 F.2d 1455 (2d Cir. 1993) ........................................................... 5

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ....................................................... 7

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017)......................................................................... 7, 13

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) ...................................... 13, 15

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000) ................................................................. 13

*In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) ................................................ 13, 14

*In re People's Mojahedin Org. of Iran*, 680 F.3d 832 (D.C. Cir. 2012) .............................................. 13

*In re Pesticide Action Network*, 798 F.3d 809 (9th Cir. 2015) ............................................................ 13

*Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996) ............................. 27

*Kreis v. Sec'y of Air Force*, 406 F.3d 684 (D.C. Cir. 2005) ...................................................... 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................. 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................ 5

*McHugh v. Rubin*, 220 F.3d 53 (2d Cir. 2000) ........................................................................ 10

*MCI Telecomms. Corp. v. F.C.C.*, 627 F.2d 322 (D.C. Cir. 1980) ............................................. 13

*Mental Disability Law Clinic v. Hogan*, 519 F. App'x 714 (2d Cir. 2013) ................................. 6

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................... 17, 18, 27

*N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66 (2d Cir. 2011) ................................. 18

*N.Y. Civil Liberties Union (NYCLU) v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ................... 5

*N.Y. State Citizens' Coalition for Children v. Velez*, No. 10-CV-3485,
    2016 WL 11263164 (E.D.N.Y. Nov. 7, 2016) ................................................................. 6

*Nader v. F.C.C.*, 520 F.2d 182 (D.C. Cir. 1975) ...................................................................... 14

*Natural Res. Def. Council v. U.S. E.P.A.*, 658 F.3d 200 (2d Cir. 2011) ................................... 17

*Natural Res. Def. Council, Inc. v. FAA*, 564 F.3d 549 (2d Cir. 2009) ...................................... 18

*Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71 (2d Cir. 2013) ................... 12

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ........................................................................... 6

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ...................................................... 7

*Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014) .......................................................... 6

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ........................................................................... 18

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018) ................................................. 8

*Telecomms. Research & Action Ctr. v. F.C.C,* 750 F.2d 70 (D.C. Cir. 1984) .............................. passim

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996) ..................................... 18, 20, 23, 27

*United States v. Diapulse Corp.*, 748 F.2d 56 (2d Cir. 1984) .................................................. 23

*W. Watersheds Project v. Bernhardt*, 428 F. Supp. 3d 327 (D. Or. 2019) ................................. 31

**Statutes**

21 U.S.C. § 601(m)(1) ........................................................................................................ 4

21 U.S.C. § 601(m)(3) ........................................................................................................ 4

21 U.S.C. § 602 .................................................................................................................. 4

21 U.S.C. § 602(m)(4) ........................................................................................................ 4

21 U.S.C. § 603(b) .............................................................................................................. 4

21 U.S.C. § 610(b) .............................................................................................................. 4

21 U.S.C. § 621 .................................................................................................................. 4

21 U.S.C. §§ 601–695 ......................................................................................................... 4

5 U.S.C. § 551(13) .............................................................................................................. 5

5 U.S.C. § 553(e) ................................................................................................................ 5

5 U.S.C. § 701(b)(2) ........................................................................................................... 5

5 U.S.C. § 702 .................................................................................................................... 5

5 U.S.C. § 706 .................................................................................................................... 5

5 U.S.C. § 706(1) ......................................................................................................... passim

5 U.S.C. § 706(2) ....................................................................................................... 2, 21, 23

5 U.S.C. § 706(2)(A) .......................................................................................................... 21

7 U.S.C. § 1901 .................................................................................................................. 2

7 U.S.C. § 1902 .................................................................................................................. 3

7 U.S.C. § 1902(a) ............................................................................................................. 11

7 U.S.C. § 1904 .................................................................................................................. 3

7 U.S.C. § 1904(a) .............................................................................................................. 3

7 U.S.C. § 1904(b) .............................................................................................................. 3

7 U.S.C. § 1907(a) ........................................................................................................... 3, 10

7 U.S.C. § 1907(a)-(b) ................................................................................................. 13, 14, 15

7 U.S.C. § 1907(b) .............................................................................................. 10

7 U.S.C. §§ 1901–1907 ........................................................................................ 2

Farm Security and Rural Investment Act of 2002, Pub. L. 107–171, title X, § 10815, 116 Stat. 532
(codified at 7 U.S.C. § 1907 (2002)) ............................................................ 1

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................ 5

**Regulations**

7 C.F.R. § 2.18(a)(1)(ii)(B) ................................................................................ 4

7 C.F.R. § 2.18(a)(1)(ii)(E) ................................................................................ 3

74 Fed Reg. 11,464 .................................................................................... passim

81 Fed. Reg. 46,571 ............................................................................. 24, 28, 31

9 C.F.R. § 309.2(b) ............................................................................................ 23

9 C.F.R. § 309.3(e) ............................................................................... 17, 20, 24

9 C.F.R. § 309.3(n) ............................................................................................ 23

## I.     INTRODUCTION

Plaintiffs challenge Defendants' failure to protect more than 500,000 pigs who arrive annually at slaughterhouses in the United States unable to rise or walk and countless other pigs who become unable to rise or walk after arriving at slaughterhouses. These pigs, referred to as "nonambulatory," "nonambulatory disabled," or "downed," face increased risk of inhumane treatment and are more likely than other pigs to carry foodborne illness.

Plaintiffs are not alone in their concern for nonambulatory pigs:  In 2002, Congress mandated that Defendants investigate and report on nonambulatory livestock, including pigs, and then promulgate regulations to protect pigs if necessary to provide for the "humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers." *See* Farm Security and Rural Investment Act of 2002, Pub. L. 107–171, title X, § 10815, 116 Stat. 532 (codified at 7 U.S.C. § 1907 (2002)).

In the two decades since Congress's mandate, Defendants have promulgated regulations to prohibit the slaughter of nonambulatory cattle and calves, indicating that doing so would ensure humane handling, including removal of producer incentives to hold sick or injured animals for long periods of time until they can inhumanely force them to rise for slaughter. AR01808–AR01811 (cattle); AR02171–AR02178 (calves). At the same time, Defendants completely ignored Congress's mandate that they investigate, report to Congress, and regulate the humane treatment, handling, and disposition of nonambulatory pigs.

Frustrated with Defendants' inaction in the face of ongoing risks to pigs and consumers, in 2014, Plaintiffs petitioned Defendants for a rulemaking to prohibit the slaughter of these animals. AR00001–AR02035 [hereinafter Petition]. Defendants arbitrarily and capriciously denied Plaintiffs' Petition, failing to consider well-documented, voluminous records showing that producers are also incentivized to send weakened pigs to slaughter; more pigs become

2

nonambulatory than other livestock; nonambulatory pigs are often vectors for zoonotic disease and infection in humans; and producers treat nonambulatory pigs in cruel and inhumane ways to force them to slaughter. Defendants unreasonably treated nonambulatory pigs differently from nonambulatory cattle, despite uncontroverted evidence showing that Defendants' justification for their prohibition on slaughter of nonambulatory cattle applies equally to nonambulatory pigs.

Defendants' two-decade delay in investigating, reporting, and regulating nonambulatory pigs, as required by Congress, is agency action unlawfully withheld and unreasonably delayed under Section 706(1) of the Administrative Procedure Act (APA). Defendants' denial of Plaintiffs' Petition was also arbitrary and capricious and contrary to law in violation of Section 706(2) of the APA.

## II.   LEGAL FRAMEWORK

### A.   Humane Methods of Slaughter Act

Originally enacted in 1958, the Humane Methods of Slaughter Act (HMSA), 7 U.S.C. §§ 1901–1907 is based on Congress's determination that the use of humane methods in the slaughter of livestock "prevents needless suffering; results in safer and better working conditions for persons engaged in the slaughtering industry; brings about improvement of products and economies in slaughtering operations; and produces other benefits for producers, processors, and consumers which tend to expedite an orderly flow of livestock and livestock products in interstate and foreign commerce." *Id.* § 1901. Accordingly, "no method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane." *Id.* § 1902.

The HMSA directs the United States Department of Agriculture (USDA) to investigate and determine humane methods of slaughter and handling, and to designate permissible methods of slaughter and handling of livestock that are humane. *Id.* § 1904. The HMSA further directs the

3

agency "to conduct, assist, and foster research, investigation, and experimentation to develop and determine methods of slaughter and the handling of livestock in connection with slaughter which are practicable with reference to the speed and scope of slaughtering operations and humane with reference to other existing methods and then current scientific knowledge." *Id.* § 1904(a). Further, the HMSA directs the agency "to designate methods of slaughter and of handling in connection with slaughter which, with respect to each species of livestock, conform to the policy stated in" the statute or, alternatively, to designate "methods which are not in conformity with such policy." *Id.* § 1904(b).

In 2002, Congress amended the HMSA specifically to address concerns about the humane treatment of nonambulatory animals destined for slaughter, including pigs, by mandating that USDA investigate and submit to Congress a report on:

> (1) the scope of nonambulatory livestock;
> (2) the causes that render livestock nonambulatory;
> (3) the humane treatment of nonambulatory livestock; and
> (4) the extent to which nonambulatory livestock may present handling and disposition problems for stockyards, market agencies, and dealers.

*Id.* § 1907(a). Congress further mandated that, "[b]ased on the findings of the report, if the Secretary determines it necessary, the Secretary shall promulgate regulations to provide for the humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers." *Id.* § 1907(b). USDA's Food Safety and Inspection Service (FSIS) is responsible for implementing these mandates. 7 C.F.R. § 2.18(a)(1)(ii)(E).

## B.     Federal Meat Inspection Act

The Federal Meat Inspection Act (FMIA), 21 U.S.C. §§ 601–695, incorporates the HMSA by reference. *Id.* § 603(b); *see also id.* § 610(b) (making it unlawful to "handle in

connection with slaughter any" pigs "in any manner not in accordance with the" HMSA). The

FMIA declares:

> It is essential in the public interest that the health and welfare of
> consumers be protected by assuring that meat and meat food
> products distributed to them are wholesome [and] not adulterated . .
> . . Unwholesome [or] adulterated . . . meat or meat food products
> impair the effective regulation of meat and meat food products in
> interstate or foreign commerce, are injurious to the public welfare .
> . . and result in . . . injury to consumers.

*Id.* § 602. The FMIA defines "adulterated" meat to include that which "bears or contains any

poisonous or deleterious substance which may render it injurious to health . . . or is for any other

reason unsound, unhealthful, unwholesome, or otherwise unfit for human food," as well as that

which "has been prepared, packed, or held under insanitary conditions whereby it may have

become contaminated with filth, or whereby it may have been rendered injurious to health." *Id.*

§ 601(m)(1), (3), (4). The FMIA further provides that the "Secretary shall . . . make such rules

and regulations as are necessary for [its] efficient execution." *Id.* § 621. The FSIS is responsible

for implementing these mandates. 7 C.F.R. § 2.18(a)(1)(ii)(B).

### C.    Administrative Procedures Act

The APA provides, "Each agency shall give an interested person the right to petition for

the issuance . . . of a rule." 5 U.S.C. § 553(e). The APA grants a right of judicial review to "[a]

person suffering legal wrong because of agency action, or adversely affected or aggrieved by

agency action." *Id.* § 702. The APA defines "agency action" to "include[] the whole or a part of

an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to

act." *Id.* §§ 551(13), 701(b)(2).

Under the APA:

> The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably
> delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

*Id.* § 706.

## III.   STANDARD OF REVIEW

To obtain a summary judgment there must be "no genuine issue as to any material fact" and "the moving party [must be] entitled to a judgment as a matter of law." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing FED. R. CIV. P. 56(c)). Genuine issues of fact are not created by conclusory allegations. *Id.* Summary judgment is proper when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party. *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## IV.   ARGUMENT

### A.   Plaintiffs have standing.

At summary judgment, a plaintiff "must set forth by affidavit or other evidence specific facts" demonstrating standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Standing requires: (1) a "threat of a concrete and particularized injury in fact," (2) "that is fairly traceable to the challenged action of the defendant," and (3) "that a favorable judicial decision will likely prevent or redress." *N.Y. Civil Liberties Union (NYCLU) v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (cleaned up). An organization can have standing to sue in two ways. First, it "can have standing in its own right to seek judicial relief from injury to itself," *NYCLU*, 684 F.3d at 294 (cleaned up), including an impairment of its ability to fulfill its mission, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Second, "[i]t may sue on behalf of its members." *NYCLU*, 684 F.3d at 294. "It is well settled that where multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-

controversy requirement." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citations omitted).

In terms of organizational standing, Defendants' abdication of Congressional mandates and denial of Plaintiffs' Petition impair Plaintiffs' ability to fulfill their animal-protection missions, burden their work, and force them to divert resources to counteract these harms. *See* DKT 16, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (declarations in support of organizational standing): Baur Decl. ¶¶ 25–35; Walden Decl. ¶¶ 12–24; Leahy Decl. ¶¶ 25–29; Jones Decl. ¶¶ 16, 18—33, 35–46; Dreskin Decl. ¶¶ 13–16, 18–21, 23–27; deCoriolis Decl. ¶¶ 13, 15–23; Seber Decl. ¶¶ 13–14, 16–23, 26–27. These are classic injuries under Supreme Court and Second Circuit precedent. DKT 32; *See also Centro de la Comunidad*, 868 F.3d at 110 (organization had standing to challenge ordinance because it had to "divert resources from other of its activities to combat the effects of the Ordinance"); *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (organization had standing to where it diverted resources to investigate and challenge discrimination); *Mental Disability Law Clinic v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (law clinic had standing because it "ha[d] diverted resources from education and training in order to contest the" challenged agency policy); *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (organization had standing to challenge agency policy where it "infrequently" counseled individuals impacted by the policy); *N.Y. State Citizens' Coalition for Children v. Velez*, No. 10-CV-3485, 2016 WL 11263164, at *3 (E.D.N.Y. Nov. 7, 2016) ("[t]he Second Circuit has consistently found injury where an organization expends time and effort responding to the defendant's actions").

Plaintiffs Farm Sanctuary, ALDF, and Farm Forward also allege standing to sue on behalf of their members who are exposed to increased disease risks from Defendants' abdication

of the Congressional mandate and denial of Plaintiffs' Petition. To assert associational standing

on behalf of its members, an organization must show: "(a) its members would otherwise have

standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*,

432 U.S. 333, 343 (1977). Declarations from several members of the Plaintiff organizations

substantiate associational standing. *Id.*; *see also* DKT 16, Plaintiffs' Memorandum of Law in

Opposition to Defendants' Motion to Dismiss; DKT 16, Rudloff Decl. ¶¶ 9–11 (detailing eighty-

two-year old retired magistrate and administrative law judge's concerns about exposure to

potentially fatal and drug-resistant foodborne diseases from eating pork as well as to swine flu

from nearby pig farms and slaughterhouses), Fortino Decl. ¶¶ —-9, Washburn Decl. ¶¶ 7–9, 23-

25, 28, 30 (detailing professional chef's concerns about foodborne disease risks posed by the

presence of downed pigs in the food supply), Lederer Decl. ¶¶ 8–13 (detailing ALDF member

with pre-existing health conditions' concerns about exposure to diseases from consuming pork

from downed pigs), Cochran Decl. ¶¶ 8–13, Guimarais Decl. ¶¶ 8–13.

Thus, Plaintiffs have both organizational and associational standing. *See* DKT 32, p. 31–

32, 37–40.

### B.   Defendants have unlawfully withheld or unreasonably delayed required agency action under section 706(1) of the APA.

A reviewing court must compel agency action if a plaintiff demonstrates that the "agency

failed to take a discrete agency action that it is required to take" and the agency action was

"unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *Benzman v. Whitman*, 523

F.3d 119, 130 (2d Cir. 2008) (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64

(2004)); *see also In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017). A court must issue

8

relief if these two elements are met, though it must also weigh "equitable considerations" if it adjudges agency action to be unreasonably delayed. *See South Carolina v. United States*, 907 F.3d 742, 759 (4th Cir. 2018); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999); *Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43, 51 (S.D.N.Y. 2020).

Defendants' refusal to investigate, report, and regulate the slaughter of nonambulatory pigs directly violates a twenty-year-old Congressional mandate, rendering its failure to act unlawful under section 706(1) of the APA.

> **1.    The HMSA mandates that Defendants take discrete agency actions to investigate, report on, and regulate the slaughter of nonambulatory pigs.**

Twenty years ago, Congress amended the HMSA to provide, "The Secretary of Agriculture shall investigate and submit to Congress a report on—

> (1) the scope of nonambulatory livestock;
> (2) the causes that render livestock nonambulatory;
> (3) the humane treatment of nonambulatory livestock; and
> (4) the extent to which nonambulatory livestock may present handling and disposition problems for stockyards, market agencies, and dealers.

7 U.S.C. § 1907(a). Congress further instructed that, "[b]ased on the findings of the report, if the Secretary determines it necessary, the Secretary shall promulgate regulations to provide for the humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers." *Id*. § 1907(b). The Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. *See Forest Guardians*, 174 F.3d at 1187.

There can be no doubt that Congress's mandate includes pigs. The HMSA explicitly imposes a duty to ensure the humane slaughter of "cattle, calves, horses, mules, sheep, swine, and other livestock." 7 U.S.C. § 1902(a). Pigs, moreover, are slaughtered at the highest rate of

any species regulated under the HMSA. *See* AR01926. Pigs "also have a disproportionate number of [Noncompliance Reports] for inhumane treatment of downer animals." *Id.* Indeed, "the incidence of crippled hogs that are unable to walk is much greater than the incidence of downer cattle." AR00268.

Defendants have always understood Congress's mandate to include something more than cattle. In 2004, for example, USDA sent letters to Congress stating that the "issue of non-ambulatory livestock has grown in importance." AR02549–AR02550. Accordingly, the agency would enhance "its surveillance plans to better determine the number of downer cattle *and other high-risk populations*." *Id.* (emphasis added). In a USDA pamphlet issued the following year titled, "Help America's Livestock Industries: Participate in the National Nonambulatory Livestock Study," USDA detailed its on-farm data collection plans to implement the Section 1907 mandate to investigate and report on nonambulatory cows, sheep, goats, horses, and pigs. AR02563–AR02564. The USDA said data collection would consist of "[i]n depth questions on factors associated with nonambulatory and fatigued pigs" that "will be added to the National Animal Health Monitoring System's Swine 2006 study, which will be conducted in 17 major hog-producing States in summer 2006." AR02564. The National Nonambulatory Livestock Study was intended to provide "the first statistically reliable estimates on the number of nonambulatory cattle, goats, horses, pigs and sheep in the United States, as well as insight as to how these animals are handled on the farm." AR02565. The USDA's announcement further explained that the study would, among other things: "determine the extent of nonambulatory cattle, goats, horses, pigs and sheep on U.S. farms; describe how various livestock industries handle nonambulatory animals; . . . and help evaluate feasible and humane handling practices for managing nonambulatory cattle, goats, horses, pigs, and sheep." AR02565. Ultimately, however,

USDA never collected any data about pigs. Instead, in the spring of 2005, USDA announced that

its data collection effort for cattle, sheep, and goats was "nearly complete." AR02565–AR02577

(data collection results on nonambulatory cows, sheep and goats, and equids). The USDA also

announced that the next phase of its study would focus on the U.S. dairy industry. *Id.* Defendants

never mentioned pigs again. Defendants will not take this mandatory action unless the Court

compels them to do so.

### 2.   Defendants have unlawfully withheld the discrete agency actions required by the HMSA.

Once a party demonstrates that an agency is required to take discrete action, it must show

that the agency unlawfully withheld or unreasonably delayed taking that action. *See* 5 U.S.C.

§ 706(1). If the Court determines that the agency unlawfully withheld a mandatory duty, the

judicial inquiry ends there, and the Court must compel the agency to act. *See Forest Guardians*,

174 F.3d at 1187. Indeed, "[w]hen an administrative agency simply refuses to act upon an

application, the proper remedy—if any—is an order compelling agency action 5 U.S.C. § 706(1)

. . . ." *McHugh v. Rubin*, 220 F.3d 53, 61 (2d Cir. 2000) (Agency's refusal to act on firearm

application was subject to review under § 706(1), not plenary review of the application by the

district court). In violation of Section 706(1) of the APA, Defendants unlawfully withheld the

discrete, mandatory actions of investigating, reporting to Congress, and promulgating necessary

regulation of nonambulatory pigs under the HMSA, 7 U.S.C. § 1907(a)-(b).

Beginning in 2004, Defendants provided updates to Congress regarding their

implementation of the Section 1907 mandate. In early updates, Defendants occasionally

described plans to study pigs at some point in the future. AR02549–AR02562 (March 4, 2004,

USDA Letters to Congress); AR02563-AR02564 (February 2005 Help America's Livestock

Pamphlet); AR02565 (March 11, 2005, APHIS Stakeholders Announcement: USDA Announces

Nonambulatory Livestock Study). However, most of Defendants updates do not mention pigs at all. AR02566–AR02571 (May 5, 2005, NASS Non-Ambulatory Cattle and Calves); AR02572–AR02575 (May 4, 2006, NASS Non-Ambulatory Sheep and Goats); AR02576–AR02577 (November 2006 APHIS Nonambulatory Equids in the United States); AR02578–AR02593 (November 6, 2006, Letters to Congress re NAD Livestock). Defendants had opportunity to produce an administrative record that included data collected from these previously planned studies or that demonstrated compliance with the Congressional mandate as to pigs, but they did not. Apparently, Defendants never studied nonambulatory pigs as represented to Congress in those early planning documents—or if they did, they never made that data available to the public, to this Court as part of the administrative record, or to Congress as required by the HMSA, 7 U.S.C. § 1907(a)-(b).

To confirm this stunning oversight, Plaintiffs made a series of requests for public records in the custody of USDA and FSIS asking for "any reports submitted to Congress on non-ambulatory livestock for the time period beginning June 1, 2002, through" the dates of the requests. AR02594, AR02596, AR02598, AR02600, AR02638. On November 7, 2019, FSIS responded that, "staff in FSIS did not locate any responsive documents." AR02595. On February 14, 2020, USDA's Agricultural Marketing Service responded that its Packers and Stockyard Division, "did not locate any records responsive to [the] request." AR02596. On April 1, 2020, USDA responded that searches of its Office of Congressional Relations, Office of the Executive Secretariat, Enterprise Correspondence Management Module, and FSIS also identified, "no responsive records." AR02600–AR02601.

Later, the USDA supplemented its original response with two sets of letters to Congress. *Id.* In the first letter to Congress, dated March 4, 2004, USDA advised Congress it intended to

12

"determine the number of downer cattle and other high-risk populations." AR02605–AR02607. In the second set of letters to Congress, dated November 6, 2006, the USDA shared the results of its data collection efforts for nonambulatory cows, sheep, and goats. AR02622–AR02637; *see also* AR02578-AR02593. The USDA's National Agricultural Statistics Service produced three supplemental documents, none of which mention pigs: a 2010 report on sheep and goats; a 2006 report on sheep and goats; and a 2005 report on cows and calves. AR02599.

There can be no doubt that nothing Defendants have produced or identified could qualify as an investigation or report of investigation regarding the conditions of nonambulatory pigs, whom Congress unquestionably included in its mandate that USDA investigate the conditions of nonambulatory livestock. 7 U.S.C. § 1907(a)-(b). Yet Defendants apparently believe their job is done. Absent judicial intervention compelling Defendants to act with respect to nonambulatory pigs, Defendants will continue to unlawfully withhold their investigation, report, and any necessary regulations. Defendants have unlawfully withheld the discrete agency actions required of them by 7 U.S.C. § 1907(a)-(b) in violation of Section 706(1) of the APA.

### 3.  Defendants unreasonably delayed action on Congress's mandate by failing to act for twenty years.

Alternatively, Section 706(1) of the APA also requires that a reviewing court compel an agency to act if it has unreasonably delayed a discrete, mandatory duty. 5 U.S.C. § 706(1). In determining whether agency action is unreasonably delayed, courts in the Second Circuit evaluate an agency's inaction under *Telecomms. Research & Action Ctr. v. F.C.C,* 750 F.2d 70 (D.C. Cir. 1984) [hereinafter *TRAC*]. *See generally Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 84 (2d Cir. 2013) (citing *TRAC*, 750 F.2d at 80). The *TRAC* factors are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or

> other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*TRAC*, 750 F.2d at 80.

The first *TRAC* factor provides "'the time agencies take to make decisions' is governed by a 'rule of reason.'" *Fangfang Xu*, 434 F. Supp. 3d at 53 (quoting *TRAC*, 750 F.2d at 80). Under the rule of reason, "reasonable time encompasses months, occasionally a year or two, but not several years or a decade." *MCI Telecomms. Corp. v. F.C.C.*, 627 F.2d 322, 340 (D.C. Cir. 1980). Courts widely consider the "rule of reason" to be the "most important" factor. *See In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012); *In re A Cmty. Voice*, 878 F.3d at 786.

Defendants' twenty-year delay is well beyond the rule of reason. *See, e.g., In re A Cmty. Voice*, 878 F.3d at 783–84 (eight-year delay unreasonable); *In re Pesticide Action Network*, 798 F.3d 809, 815 (9th Cir. 2015) (after eight years and without a "concrete timeline" for action, agency had "stretched the 'rule of reason' beyond its limits."); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (agency's "six-year-plus delay is nothing less than egregious"); *In re Bluewater Network,* 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine-year delay unreasonable); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (six-year delay unreasonable). To be sure, as the D.C. Circuit observed, "Nine years should be enough time for any agency to decide almost any issue." *Nader v. F.C.C.*, 520 F.2d 182, 206 (D.C. Cir.

14

1975). Defendants have withheld and delayed action for two decades, which is well beyond the rule of reason. The first *TRAC* factor weighs in Plaintiffs' favor.

Factor two specifically provides, "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." *TRAC*, 750 F.2d at 80. The second factor is "neutral" if Congress did not establish a timetable for action. *See Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 541 (S.D.N.Y. 2009). Congress imposed no timetable here, so factor two is neutral.

The third *TRAC* factor requires the court to "examine the consequences of the agency's delay." *In re Int'l Chem. Workers Union*, 958 F.2d at 1149. Delays that might be reasonable "in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Factor five similarly requires the court to consider "the nature and extent of the interests prejudiced by delay." *Id*. The slaughter of nonambulatory pigs implicates concerns related to human health and welfare as well as animal health and welfare.

As a matter of human health, evidence in the record shows that nonambulatory pigs have a higher risk than ambulatory pigs of carrying pathogens and disease into the food supply. For example, nonambulatory pigs are susceptible carriers of pathogens, including *Salmonella* spp. and *Yersinia enterocolitica*. AR00010–AR00012, AR00013, AR00033–AR00230. Nonambulatory pigs are also far more likely to harbor zoonotic disease, including swine influenza and airborne H1N1, than ambulatory pigs. AR00012, AR00231–AR00239. Lameness, an abnormality common to nonambulatory pigs, is a clinical symptom of several bacterial and viral diseases, including the bacterial infection that causes *Listeriosis*, which contributes to an estimated 28% of foodborne illness deaths in the United States. AR00012–AR00013, AR00386–

15

AR00405. Defendants' failure to act implicates potential harms to human health and welfare, and prejudices individuals facing those risks.

Because the HMSA requires that defendants ensure humane methods of slaughter, the Court should also consider the grave threats to animal health and welfare implicated by Defendants' twenty-year delay. *See Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 16 (D.D.C. 2003) (considering "serious consequences for [a species'] chances for survival" under the third *TRAC* factor in an Endangered Species Act context); *see also In re American Rivers*, 372 F.3d at 420 (compelling an agency to end its "marathon round of administrative keep-away" and protect an endangered fish from extinction"). When workers handle pigs inhumanely, they may cause painful nonambulatory disability in pigs. AR00014–AR00018. For example, producers may deploy electrical prods to force pigs on or off transport trucks or transport pigs for long distances in overcrowded conditions, both of which cause more pigs to become disabled. AR00015–AR00016; AR02025–AR02032. Once pigs are nonambulatory, they suffer further inhumane treatment. AR00014–AR00015. For example, producers often artificially support ill or injured pigs to pass ante-mortem inspection. AR00014–AR00015. After the animal collapses post-inspection, producers use physical force to make pigs rise. AR00014–AR00015. Pigs are more likely to become nonambulatory due to painful conditions, rendering concerns about pig health and welfare especially important.  AR00268, AR01926.

While all available evidence indicates that humane handling violations documented by FSIS are just the tip of the iceberg, FSIS has documented incidents of inhumane efforts to force nonambulatory pigs to move at dozens of slaughterhouses across the United States in recent years, including: a) numerous incidents of downed pigs being trampled by other animals while crying out in pain and distress; b) a downed pig who squealed out in pain when a worker closed a

grapple fork around her snout and hydraulically squeezed her head; c) a downed pig whose leg became caught while workers were trying to move him, causing part of his hoof to become detached from the bone and tissue; d) a downed pig who was kicked in the stomach and then electro-shocked in an attempt to get her to move; e) a worker striking a nonresponsive, downed pig at least twelve times; f) a downed pig who was panting excessively, falling backwards, and landing on her back after being kneed by a worker in an attempt to get her to move; g) a downed pig who was vocalizing in pain as she was pushed across the floor; h) a downed pig who was dragged over a concrete floor by her hind legs; i) a downed pig who was squealing as she was dragged by a chain that was tied around her front legs; j) a downed pig who was shocked with an electric prod and paddled in an attempt to force her to move, and then dragged twenty feet; k) a downed pig who was repeatedly paddled, electro-shocked in the head, and pushed; l) a downed pig who was found underneath other pigs, vocalizing in distress; m) a worker attempting to electro-shock a downed pig who was panting; n) a downed pig who was trampled by numerous pigs and then struck several times by a worker, causing her to flail; o) a downed pig who was pinched between a loader and a wall, causing her to vocalize loudly; p) a downed pig who had an electric prod run over her back repeatedly, as she flinched and vocalized each time the prod made contact; q) a downed pig who was repeatedly struck in attempts to get her to rise; r) a worker repeatedly prodding and paddling a downed pig in an attempt to get her to move, forcing the animal to drag herself along the ground; s) a worker lifting up a downed pig by her ear; t) a worker raising a ramp that a downed pig was on, causing the animal flip backwards and fall over; and u) a worker forcing a downed pig to drag herself into a pen. *See* AR02345-AR02474. This well-documented suffering continues as the agency endlessly delays compliance with its statutory mandate to study and protect nonambulatory pigs.

17

Under the fourth *TRAC* factor, the Court should "consider the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. But factor six makes clear that, "the court need not find any impropriety lurking behind agency lassitude" to hold that agency action is unreasonably delayed. *See TRAC*, 750 F.2d at 80. Defendants have not identified any activities of a higher or competing priority. Rather, the record demonstrates that Defendants took seriously their duty to investigate, report, and regulate the slaughter of nonambulatory cattle and calves but simply ignored their responsibility to pigs. *See* 9 C.F.R. § 309.3(e) (prohibiting slaughter of nonambulatory cows and calves). Plaintiffs—and Congress—have waited long enough for Defendants to comply with Congress's mandate to protect nonambulatory pigs. The Court must order defendants to comply with the HMSA.

### C.   Defendants arbitrarily and capriciously denied the Petition under section 706(2) of the APA.

Section 706(2) of the APA gives a reviewing court authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although a court may not "substitute its judgment for that of the agency," a court's review nevertheless "must be searching and careful." *Natural Res. Def. Council v. U.S. E.P.A.*, 658 F.3d 200, 215 (2d Cir. 2011). An agency has acted arbitrarily and capriciously if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The reviewing court should not attempt itself to make up for such deficiencies," and therefore "'may not supply a reasoned basis for the agency's action that the

agency itself has not given.'" *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). For a court to uphold the agency action, the record must show that the agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Natural Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009) (quoting *State Farm*, 463 U.S. at 43).

The requirement that an agency provide reasoned explanation for its action "would ordinarily demand that it display awareness that it is changing position." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). An agency may not, for example, "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* "And of course the agency must show that there are good reasons for the new policy." *Id*.; *see also N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.,* 635 F.3d 66, 71 (2d Cir. 2011). Indeed, an agency acts in an arbitrary and capricious manner if the "agency departs from its own precedent without a reasoned explanation." *Borough of Columbia v. Surface Transp. Bd*., 342 F.3d 222, 229 (3d Cir. 2003).

In denying the Petition and refusing to afford nonambulatory pigs the same protection as nonambulatory cows and calves, Defendants violated Section 706(2) of the APA by departing from agency policy and precedent without explanation. *See Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996); *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999). Given Defendants' decision to prohibit the slaughter of nonambulatory cattle, Defendants' denial of the Petition is, moreover, "so implausible that [the agency's rationale cannot] be ascribed to a difference in view or the product of agency expertise." *See State Farm*, 406 F.3d at 687. The Court should, therefore, reverse Defendants' denial and remand the Petition

to FSIS so that Defendants may promulgate the requested regulation prohibiting the slaughter of nonambulatory pigs.

> **1.    Defendants' conclusion that the slaughter of nonambulatory pigs has no impact on public health or food safety was arbitrary and capricious.**

In their Petition, Plaintiffs presented ample evidence that the slaughter of nonambulatory pigs causes adulterated pork to make its way into the food supply. For example, the Petition included a study demonstrating that "ante-mortem contamination is the primary source of *Salmonella spp*. carcass contamination." AR0010. Moreover, "about 70% of all carcass contamination results from the animals themselves being carriers." *Id*. Lairage, or time spent in a holding pen, "is the most cost-effective stage to prevent cross-contamination that leads to rapid infection." AR00011. Nonambulatory pigs endure more time in lairage than other pigs because they are held for as long as it takes to them to rise, either by force or incremental improvement in their condition. *Id.* AR00033–AR00230, AR00231–AR00239. During the time nonambulatory pigs spend on the floor in lairage, the likelihood they will contract an infection or become contaminated with fecal matter and other bacterial sources on the surface of their bodies increases with each hour. *Id.* As a result, nonambulatory pigs are sixteen times more likely to harbor antibiotic-resistant *Camplyobacter* than ambulatory pigs (AR00012), and nonambulatory pigs are especially susceptible to carrying dangerous pathogens and diseases, such as swine influenza, *Listeria monocytogenes, Brucellosis, Porcine spongiform encephalopathy, and Streptococcus suis,* among others. AR00011–AR00013, AR00033–AR00230, AR00231–AR00239.

In response, FSIS acknowledged that "available research indicates that the stress of transportation and the holding of animals in lairage may increase the prevalence of certain pathogens and may be potential sources of pathogen cross-contamination." AR02037–AR02038.

FSIS also admitted that "longer holding times may be associated with pathogen cross-contamination." *Id*. Yet FSIS arbitrarily and capriciously concluded directly to the contrary that neither public health nor food safety would justify a prohibition on the slaughter of nonambulatory pigs. FSIS dismissed Plaintiffs' data regarding the public health risks associated with allowing the slaughter of nonambulatory pigs, stating: "FSIS is not aware of, nor did the petition include data that suggests that products made from [nonambulatory] pigs that have passed ante-mortem and post-mortem inspection present a higher public health risk than products made from ambulatory pigs." AR02038. This wholesale dismissal of Plaintiffs' public health data is contrary to its treatment of similar data collected with respect to nonambulatory cattle and calves. When FSIS amended 9 CFR § 309.3(e) to prohibit the slaughter of nonambulatory cattle, the agency did so in part to "ensure that animals that may be unfit for human food do not proceed to slaughter and to improve the effectiveness and efficiency of the inspection system." *See* AR01808. The agency rejected industry pleas to refrain from the prohibition because "the risk of [bovine spongiform encephalopathy, or BSE] is very low." 74 Fed Reg. 11,464. Even though the risk is low, FSIS reasoned "that this final rule will better ensure more efficient and effective implementation of inspection and humane handling requirements at official establishments." *Id*. FSIS maintained this position when it later prohibited the slaughter of nonambulatory calves, finding, "while cattle younger than 30 months do not present a serious risk of BSE, they are susceptible to other systemic and metabolic diseases, and injury" and regardless, according to Defendants, humane handling concerns alone justified the regulation. *Id*. The agency acted arbitrarily by failing to provide sufficient justification for treating the health risks associated with nonambulatory pigs different from the similar health risks associated with nonambulatory cows. *See Transactive Corp*., 91 F.3d at 237.

Defendants' refusal to regulate nonambulatory pigs as a matter public health and consumer safety is unwarranted by the facts. The Court must reverse Defendants' denial of the Petition and direct the agencies to prohibit the slaughter of nonambulatory pigs to protect human health and consumer safety.

### 2. Defendants arbitrarily and capriciously ignored an important aspect of the problem—that widespread producer practices lead to nonambulatory disability in pigs.

"Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decision-making." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *cert. granted*, 141 S. Ct. 890 (2020). An agency, moreover, cannot "simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *See Fox Television Stations*, 556 U.S. at 537. Defendants denied the Petition, in part, because Defendants claim that pigs do not arrive at slaughter under conditions that increase the risk that they will be inhumanely handled or become nonambulatory. AR02040. This conclusion conflicts with substantial evidence in the record showing that numerous producer practices—many of which are motivated by profit— increase the risk pigs becoming nonambulatory, including, irresponsible breeding and transportation practices, and extensive use of the animal drug ractopamine.

Today's producers breed pigs for "rapid growth, high leanness, and extreme muscularity," physical attributes that makes the pigs "often prone to stress that causes the pig to become nonambulatory, to die during transport and/or preslaughter handling." AR01163. Mother pigs are at increased risk of becoming nonambulatory and inhumane treatment: "Sow condition is declining especially on the largest farms . . . [and s]laughter plant managers have reported that the condition of sows from some farms has become worse." AR01147. This deterioration is

attributed to producers allowing "old, weak, emaciated sows . . . to deteriorate into a weakened condition . . . likely to become downers." AR00268.

Part of this push to grow pigs more rapidly includes the administration of dangerous, growth-inducing drugs like ractopamine. As detailed in Plaintiff Mercy for Animal's supplemental comment to the Petition, 60–80% of U.S. pigs sent to slaughter are fed ractopamine, a growth-promoting drug that is given to pigs in their last days of life right before they are forced onto transport trucks and driven to slaughter. AR02027. Ractopamine has reportedly caused more adverse events in pigs than any other animal drug on the market—this includes many hallmarks of nonambulatory status, including trembling, lameness, broken limbs, reluctance or inability to move, stiffness, hyperactivity, collapse, and death. AR02028. Ractopamine use results in higher rate of pigs becoming nonambulatory in part due to a significantly greater number of front and rear hoof lesions than in pigs not treated with ractopamine. *Id*. Ractopamine also increases levels of stress hormones, which may impair immune function and cause cardiovascular stress, muscular skeletal tremors, increased aggression, acute toxicity, and genotoxicity. AR02029. The FDA mandates that ractopamine carry a warning label stating, "CAUTION: Ractopamine may increase the number of injured and/or fatigued pigs during marketing." AR2027. FDA adverse drug experience reports confirm that on-farm use of ractopamine affects the number of nonambulatory pigs that arrive at slaughterhouses, and the combination of ractopamine and rougher handling results in more nonambulatory pigs. AR02030.

The FDA allows a withdrawal period of "zero days," so this drug may be given to pigs the day they are forced onto transport trucks and driven great distances to slaughter. AR02028. As early as 1961, the USDA observed that more pigs die when trucked long distances. AR01224.

Since then, the industry has only increased long-distance trucking, often trucking pigs from production facilities in Nebraska and Texas to California for slaughter. AR00016. Transporters also continue to overcrowd pigs in trucks, despite research showing that pigs given one more square foot of space are seven times less likely to become nonambulatory. AR01205–AR01206.

Plaintiffs provided an extensive collection of evidence showing that ractopamine use increases the risk of nonambulatory disability and inhumane handling in pigs in their Petition. Defendants dismissed Plaintiffs' concerns, because FSIS believes it can address them by conducting ractopamine residue sampling and testing in meat. AR02040, AR02043. Defendants' explanation is illogical: nonambulatory pigs cannot be protected from inhumane handling once they become meat. It goes without saying that pig flesh comes from an animal who is already dead. Defendants simply ignored inconvenient facts in the record related to producer practices that cause pigs to become nonambulatory and offered absurd, unsupported justifications for their predetermined conclusions. On this basis, their decision to deny the Petition was arbitrary and capricious.

### 3.    Defendants arbitrarily and capriciously discounted evidence documenting producer incentives to handle nonambulatory pigs inhumanely.

Despite strictly prohibiting the slaughter of any nonambulatory cattle, Defendants denied the Petition and continue to allow the slaughter of nonambulatory pigs. 9 C.F.R. § 309.2(b), (n). Agency action is arbitrary when the agency offers "insufficient reasons for treating similar situations differently." *Transactive Corp.*, 91 F.3d at 237. In other words, deference to administrative discretion or expertise is not a license to a regulatory agency to treat like cases differently. *See United States v. Diapulse Corp.*, 748 F.2d 56, 62 (2d Cir. 1984). Defendants decided to treat pigs differently, in part, because pork producers consider "poor animal handling or abuse . . . to be ethically wrong and unacceptable." AR02041. Ignoring evidence of producer

economic incentives to treat nonambulatory pigs inhumanely, Defendants further concluded that the incidence of nonambulatory pigs is minimized by industry self-regulation. AR02041.

The FSIS took a different view when it developed regulations to protect nonambulatory cows and calves. To comply with their statutory mandate to ensure humane handling and protect the beef supply, in 2016, Defendants prohibited the slaughter of any nonambulatory cattle. 9 C.F.R. § 309.3(e). During the comment period for that rulemaking, several "farm bureaus" stated that "the current regulations adequately protect nonambulatory disabled veal calves from inhumane treatment." 81 Fed. Reg. 46,571. These commenters noted, "FSIS has trained personnel in establishments at all times to ensure that calves are humanely handled, and veal producers have too big of a financial incentive to violate the HMSA." *Id*. The FSIS rejected these assurances and decided to prohibit the slaughter of nonambulatory cattle anyway. *Id*. at 46,572. In their rulemaking notice, Defendants explained that the prohibition was necessary to remove market incentives for producers to send weakened animals to slaughter and for slaughterhouses to inhumanely force nonambulatory cows and calves to rise. 74 Fed. Reg. 11,464–65; 81 Fed. Reg. 46,571–72. Defendants also believed the prohibition would eliminate producer incentives to treat calves inhumanely during extended holding times. 81 Fed. Reg. 46,572 (noting 33 incidences in which producers withheld water from nonambulatory calves in holding from 2012-2015).

There can be no doubt that if cattle, calf, and Pig producers have at least as much incentive as cattle producers to treat nonambulatory animals inhumanely. When pig producers use inhumane force to get an animal to rise, the establishment gains the full slaughter value of that animal, no matter the species. AR00254–AR00264. Similar to cattle and calf producers, even if a producer lifts a nonambulatory pig onto the slaughter line, the producer earns at least

70% of her economic value. AR00258. If pork producers were prohibited from slaughtering nonambulatory pigs, they would lose 100% of the economic value of the pigs and incur costs associated with labor, segregation, and disposal costs. AR00259. With these economic incentives, it is easy to understand why, according to the American Meat Institute, 34% of "fatigued" pigs become nonambulatory because they are subject to "aggressive handling with hot shots," a popular tool deployed by slaughterhouse workers to force nonambulatory pigs to rise. AR00285. An additional fifteen percent of "fatigued" pigs who become nonambulatory do so because of "aggressive handling with paddles." *Id.*

The FSIS differentiated the producers' incentives to slaughter nonambulatory cattle and pigs because, according to FSIS, "pigs become nonambulatory for different reasons than mature cattle and veal calves do, and therefore potential incentives that establishments may have to handle [nonambulatory] cattle and [nonambulatory] veal calves inhumanely do not apply to [nonambulatory] pigs." AR02039. According to FSIS, cattle producers—unlike pig producers— hold dairy cows until there are old and weak to "extract as much milk as possible in the hope that cattle will pass ante-mortem inspection before going down." *Id.* "Sending such weakened cattle to slaughter increased the chances that they would go down and then be subject to inhumane conditions." *Id.* Similarly, according to the FSIS, "[v]eal production practices [unlike pork production practices] namely deprivation of colostrum and nutrients to bob veal before slaughter, increase the chance that veal calves will become nonambulatory at the time of slaughter." *Id.*

In reaching this conclusion, Defendants outright ignored the record, which shows that pigs become nonambulatory for reasons nearly identical to those that afflict calves and mature cattle. Just as with dairy cows, breeding sows are likely to become nonambulatory because producers hold them to give birth to extra litters until they become "old, weak, [and] emaciated

sows . . . allowed to deteriorate into a weakened condition before being brought to a livestock market." AR00268. And just as veal production practices debilitate calves, pork producers' production practices debilitate pigs, especially the practices of breeding "lean hybrid pigs [with] terrible leg conformation," "rough handling and electric prod use," and the "indiscriminate use of Paylean," a form of ractopamine. AR01612.

Defendants' other attempt to differentiate nonambulatory pigs from nonambulatory cattle cattle and calves is likewise unsupported by the record. The agency states, "[p]igs often become non-ambulatory because of a temporary metabolic condition characterized by profound fatigue," which is "usually completely reversible after the animals are cooled and rested." AR02040. The industry defines "fatigued" pigs as all non-ambulatory pigs lacking "obvious injury, trauma, or disease." AR01395. The record shows that this is a baseless distinction: both purportedly "fatigued" pigs and sick or injured pigs are suffering. Like illness and injury, moreover, "fatigue" is also caused by producer breeding practices, inhumane handling, lack of space exercise, use of hard concrete flooring, and use of ractopamine. *See* AR00285 (fatigue in pigs brought on 49% by aggressive handling with paddles and electricelectric prods); AR00284 (other factors include animal density, ambient temperature, trucking, facilities, grouping, health, nutrition, genetics); AR01749–AR01753. The record also shows that most "fatigued" pigs display other symptoms of illness, internal injuries, or severe stress: skin discoloration, muscle tremors, and lameness. AR00281.

Further, when industry commenters raised this same argument as to cattle—that they "temporarily bec[o]me too exhausted to move to slaughter"—FSIS maintained that allowing the slaughter of cattle who have become nonambulatory for any reason "created an incentive for establishments to inhumanely force these animals to rise." 74 Fed. Reg. 11,463. Likewise, in

support of its ban on the slaughter of nonambulatory calves, FSIS specifically found that allowing the slaughter of calves who have been rendered "nonambulatory because they are tired or cold" created incentives to inhumanely handle these animals. AR00031. Though fatigued cattle and calves rendered nonambulatory could potentially rise at some point with rest, the agency decided that the prohibition of slaughter was nonetheless warranted. The reasoning also applies to nonambulatory pigs, and the agency has not shown otherwise. *See Transactive Corp.*, 91 F.3d at 237.

Defendants acted arbitrarily by failing to treat these "similar cases" in a "similar manner" without legitimate reason. *See Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996)). Their decision to deny the Petition was arbitrary and capricious.

### 4. Defendants abused their discretion by failing to consider evidence of the high rate of inhumane treatment suffered by nonambulatory pigs under existing regulations.

Defendants' denial of the Petition relies on the unsupported claim that nonambulatory pigs are not "routinely inhumanely handled at slaughter." AR02039. By failing to consider FSIS notices of violation regarding the inhumane handling of nonambulatory pigs and audits documenting FSIS's failure to enforce the HMSA and FMIA, the agency "offered an explanation for its decision that runs counter to the evidence" before it. *State Farm*, 463 U.S. at 43. Moreover, Defendants' conclusion conflicts with FSIS's own records documenting a higher rate of humane handling violations in nonambulatory pigs as well as the agency's prior reliance on similar numbers of incidences of inhumane handling of nonambulatory veal calves to support its ban on slaughter of those animals.

According to an editorial published in the Journal of Sustainable Agriculture, "[i]t is practically impossible to handle and transport downed animals humanely." AR00356. This

intuitive observation is reflected in FSIS's notices of violation for inhumane handling, which demonstrate that inhumane treatment of nonambulatory pigs is at least as severe and pervasive as that of nonambulatory cows and calves. In their Petition, Plaintiffs discussed FSIS's inhumane handling noncompliance reports from 2009 to 2013. AR00016; *see also* AR01923–AR01925. Plaintiffs specifically highlighted a 2013 incident in which FSIS inspectors observed a pig become nonambulatory as workers forced her down an alleyway and drove another pig over her. AR01373–AR01375. At the same establishment sixteen days later, a worker used a captive bolt pistol to puncture a hole in a nonambulatory pig's head. AR01381–AR01384. He then shackled the pig and hung her upside down while she was bleeding and fully conscious. *Id.* The FSIS inspector was present but did not notice the animal was still alive until she was upside down on the slaughter line. *Id.*

In 2010, a Government Accountability Office (GAO) audit concluded that inspectors consistently failed to take enforcement action when faced with humane handling violations. AR01296–AR01361 ("FSIS data suggest that inspectors have not taken consistent actions to enforce HMSA."). That same year, FSIS inspector Dr. Dean Wyatt testified before Congress that slaughter establishments screened off unloading areas to eliminate his view of humane handling violations. AR01362–AR01372; *see also* 81 Fed. Reg. 46,572 ("humane handling violations can occur outside the view of FSIS inspectors"). He explained to lawmakers that FSIS officials repeatedly directed him to refrain from taking enforcement action, including reporting noncompliance, against workers or establishments. *Id.* Dr. Wyatt grew emotional when he described an incident he witnessed involving workers punching a nonambulatory pig in the face and nose up to twelve times. *Id.* Per FSIS direction, Dr. Wyatt did not report the incident as an inhumane handling violation. *Id.*

Then in 2013, the USDA Office of the Inspector General (OIG) reviewed FSIS humane handling noncompliance records and conducted follow up inspections at five slaughterhouse plants. In a report titled, "Inspection and Enforcement Activities at Swine Slaughter Plants," the OIG suggested that FSIS's reporting of violations likely underestimates the scale of humane handling violations. AR01246–AR01295; *see also* 74 Fed. Reg. 11,463 ("FSIS inspection personnel are not always notified when cattle become non-ambulatory disabled after they pass ante-mortem inspection."). In the less-than-thirty minutes that OIG inspectors observed the stunning process at the five slaughterhouses, OIG inspectors witnessed several egregious violations of the HMSA that went unreported by FSIS inspectors. AR01275–AR01276. The OIG also found that FSIS could not ensure humane handling of pigs because inspectors regularly failed to take appropriate enforcement action, including refusing to suspend workers or plants for egregious violations. AR01274–AR01279 ("FSIS [can] not ensure the humane handling of swine.").

When faced with this evidence of inhumane handling and its own under-reporting of violations, FSIS told Plaintiffs not to worry about the OIG 2013 report's findings because the agency has since strengthened its approach to humane handling inspections, making it more "data-driven." AR02040. At the same time, FSIS admitted, "[t]here are no national statistics for the incidence of non-ambulatory hogs at U.S. packing plants currently available." AR01396. FSIS also pointed to its development of a Humane Handling Enforcement Coordinator for pig slaughterhouses, AR02040, but the agency points to no evidence showing that this new role has resulted in any changes. Essentially, Defendants asked Plaintiffs to trust they will do better in the future, while admitting FSIS is not tracking the information needed to improve its enforcement of existing regulations. *See Gresham*, 950 F.3d at 103; *Am. Wild Horse Pres. Campaign v.*

*Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (criticizing agency for "brush[ing] aside critical facts about its past treatment of" the issue). Defendants, apparently, hope to benefit from a purported lack of information that would not exist if Defendants complied with the Congressional mandate at issue in this litigation.

Of the information that does exist, FSIS noncompliance notices document that cruelty to nonambulatory pigs is as severe a problem as cruelty to nonambulatory cattle and calves. In a December 2012 internal report, FSIS Director of Federal State Audit Staff Dr. Keith Gilmore cataloged seventeen instances of unlawful cruelty to nonambulatory pigs, six instances of cruelty to nonambulatory cows, and one instance of cruelty to a nonambulatory calf. AR01926. Considering this, Dr. Gilmore noted: "Although the market hog category has the highest number of animals slaughtered, and most likely the highest percentage of downers from all the classes, they also have a disproportionate number of [noncompliance reports] for inhumane treatment of downer animals." *Id*.

In 2017, OIG repeated its earlier admonishment, finding, "FSIS lacks assurance that inspectors working at slaughter establishments are ensuring that animals are humanely treated." OIG Audit Report 24016-0001-23 (June 2017 OIG Audit Report), at 23 (June 2017), available at: https://www.usda.gov/sites/default/files/24016-0001-23.pdf; see also Declaration of Jessica L. Blome in Support of Plaintiffs' Motion Requesting Judicial Notice of 2017 Office of Inspector General Audit Report 24016-0001-23 (Blome Declaration) ¶¶ 2-3. The OIG further found that 30% of deficiencies identified in its two prior audits regarding humane handling persisted. June 2017 OIG Audit Report at 12; Blome Declaration ¶¶ 2-3. Defendants did not include the June 2017 OIG Audit Report in the administrative record for this case because they arbitrarily did not consider this relevant information it when they denied the Petition in 2019.

Despite the agency's own records showing the rate at which inhumane treatment of nonambulatory pigs exceeds that of nonambulatory cattle and calves, in their denial of Plaintiffs' Petition, Defendants quickly dismissed Plaintiffs' evidence of the high frequency of humane handling violations as "isolated," stating they "do not depict behavior throughout Federally-inspected operations." AR02039. But an agency "may not simply disregard without explanation the facts in the record that do not support [its] chosen outcome." *W. Watersheds Project v. Bernhardt*, 428 F. Supp. 3d 327, 352 (D. Or. 2019); *see Fox*, 556 U.S. at 537; *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered, however, is not a substitute for considering it."). FSIS must provide a reasoned explanation for why these violations are insufficient to show that nonambulatory pigs routinely suffer inhumane treatment.

To be sure, FSIS previously found similar amounts of incidences of inhumane treatment sufficient to prohibit the slaughter of nonambulatory calves. 81 Fed. Reg. 46,571 (need for prohibition on slaughter of nonambulatory calves demonstrated by "HSUS undercover investigation at an official veal slaughter establishment"); 74 Fed. Reg. 11,463 (need for prohibition on slaughter of nonambulatory cattle demonstrated by inhumane handling incidents at "Hallmark/Westland Meat Packing Company"). The agency has not provided any reasoning why its treatment of incidences of inhumane handling of nonambulatory pigs should be any different, particularly absent any agency-generated data on a market-wide basis.

## V.     CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant Plaintiffs summary judgment as to all claims; order Defendants to investigate, report, and regulate the slaughter of nonambulatory cattle as required by the HMSA; and compel Defendants to grant Plaintiffs' Petition to prohibit the slaughter of nonambulatory pigs under the HMSA and FMIA.

Dated: March 18, 2022                    Respectfully submitted,


                                         /s/ Jessica L. Blome
                                         *Counsel for Plaintiffs*


                                         /s/ Holly Bainbridge
                                         *Counsel for Animal Legal Defense Fund*