**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | |
| FARM SANCTUARY, *et al.*,                            ) | |
|                                                       ) | |
|           Plaintiffs,                                 ) | |
|                                                       ) | |
|           v.                                          ) | Case No. 6:20-cv-6081-EAW-MWP |
|                                                       ) | |
| THOMAS VILSACK, in his official capacity             ) | |
| as Secretary of Agriculture, *et al.*,                ) | |
|                                                       ) | |
|           Defendants.                                 ) | |
| _____ ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.      STATUTORY BACKGROUND ...............................................................................2

      A.      A. Federal Meat Inspection Act ................................................................2

      B.      B. Humane Methods of Slaughter Act ....................................................3

II.     FACTUAL BACKGROUND .....................................................................................4

III.    THIS CASE ..............................................................................................................6

LEGAL STANDARDS ...........................................................................................................7

ARGUMENT ..........................................................................................................................8

I.      PLAINTIFFS LACK STANDING ............................................................................9

II.     PLAINTIFFS' CLAIMS OF AGENCY ACTION UNLAWFULLY WITHHELD ARE MERITLESS.....................................................................................................10

      A.      Congressional reporting obligations are not judicially reviewable.................10

      B.      The Agency satisfied the requirements set by Congress in 7 U.S.C. § 1907(a) to investigate and report on "nonambulatory livestock.".............................11

      C.      Congress did not require USDA to regulate the slaughter of nonambulatory pigs.........................................................................................................13

III.    USDA'S DENIAL OF PLAINTIFFS' RULEMAKING PETITION WAS NOT ARBITRARY OR CAPRICIOUS..............................................................................15

      A.      USDA reasonably concluded that allowing the slaughter of nonambulatory pigs would not lead to increased food safety risks. .......................................16

      B.      USDA adequately explained why alleged practices by the pork production industry do not warrant a ban on slaughter of nonambulatory pigs...........20

      C.      USDA was not obligated to treat nonambulatory pigs the same as nonambulatory cattle, and in any event, explained its reasoning for not doing so...........................................................................................................22

      D.      USDA reasonably concluded that allowing the slaughter of nonambulatory pigs would not incentivize inhumane handling by pork processors. ............26

CONCLUSION ......................................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ................................................................................9

*Bondarenko v. Chertoff,*
  No. 07-mc-00002, 2007 WL 2693642 (W.D.N.Y. Sept. 11, 2007) ....................12

*Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski,*
  899 F.2d 151 (2d Cir. 1990) ..............................................................................24

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) ........................................................................................ 1, 7

*Conyers v. Rossides,*
  558 F.3d 137 (2d Cir. 2009) ..............................................................................14

*Cooling Water Intake Structure Coal. v. U.S. EPA,*
  905 F.3d 49 (2d Cir. 2018) ................................................................................24

*Ctr. for Biological Diversity v. Brennan,*
  571 F. Supp. 2d 1105 (N.D. Cal. 2007) ............................................................11

*Defs. of Wildlife v. Gutierrez,*
  532 F.3d 913 (D.C. Cir. 2008) ..........................................................................16

*Flyers Rts. Educ. Fund, Inc. v. FAA,*
  864 F.3d 738 (D.C. Cir. 2017) ..........................................................................16

*Forsyth Cnty. v. U.S. Army Corps of Eng'rs,*
  633 F.3d 1032 (11th Cir. 2011)..........................................................................14

*Fox Television Stations, Inc. v. FCC,*
  280 F.3d 1027 (D.C. Cir. 2002) ........................................................................29

*Guerrero v. Clinton,*
  157 F.3d 1190 (9th Cir. 1998)........................................................................ 10, 11

*Hells Canyon Pres. Council v. U.S. Forest Serv.,*
  593 F.3d 923 (9th Cir. 2010) ............................................................................12

*Massachusetts v. U.S. EPA,*
  549 U.S. 497 (2007) ..........................................................................................16

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................ 7, 15

*Nat. Res. Def. Council, Inc v. FAA,*
    564 F.3d 549 (2d Cir. 2009) ............................................................ 7, 16

*Nat. Res. Def. Council, Inc. v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988) .................................................10, 11, 13

*Nat'l Fair Hous. All. v. Carson,*
    330 F. Supp. 3d 14 (D.D.C. 2018) ............................................................9

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ...........................................................................................2

*New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.,*
    208 F. Supp. 3d 142 (D.D.C. 2016) ............................................................9

*New York Legal Assistance Grp. v. DeVos,*
    527 F. Supp. 3d 593 (S.D.N.Y. 2021) ............................................................7

*New York v. U.S. Nuclear Regul. Comm'n,*
    589 F.3d 551 (2d Cir. 2009) .................................................................*passim*

*New York v. United States Dep't of Health & Hum. Servs.,*
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................................7

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) .......................................................................8, 12, 13, 14

*Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    510 F. Supp. 3d 29 (S.D.N.Y. 2020) ..........................................................23

*Roberts v. United States,*
    883 F. Supp. 2d 56 (D.D.C. 2012) ............................................................7

*Seife v. U.S. Dep't of Health & Human Servs.,*
    440 F. Supp. 3d 254 (S.D.N.Y. 2020) ............................................................7

*Taylor Bay Protective Ass'n v. Adm'r, U.S. E.P.A.,*
    884 F.2d 1073 (8th Cir. 1989) ..........................................................11

*Transactive Corp. v. United States,*
    91 F.3d 39  (D.C.Cir. 1996) ........................................................... 22, 26

*WildEarth Guardians v. U.S.EPA,*
    751 F.3d 649 (D.C. Cir. 2014) ..........................................................16

**Statutes**

5 U.S.C. § 551 ...................................................................................................................6

5 U.S.C. § 701 .................................................................................................................14

5 U.S.C. § 706 ............................................................................................................ 6, 13

7 U.S.C. § 1902 .................................................................................................................3

7 U.S.C. § 1907 ........................................................................................................*passim*

16 U.S.C. § 460d ............................................................................................................14

21 U.S.C. § 601 ....................................................................................................... 2, 3, 17

21 U.S.C. § 602 .................................................................................................................2

21 U.S.C. § 603 ....................................................................................................... 2, 3, 17

21 U.S.C. § 604 ......................................................................................................... 3, 18

21 U.S.C. § 610 .................................................................................................................3

21 U.S.C. § 621 ............................................................................................................ 2, 3

49 U.S.C. § 44935 ...........................................................................................................14

**Federal Rules**

Federal Rule of Civil Procedure 56 ...............................................................................7

**Federal Regulations**

9 C.F.R. § 300.2.................................................................................................................2

9 C.F.R. § 309.2........................................................................................................*passim*

9 C.F.R. § 309.3....................................................................................................... 19, 22

9 C.F.R. § 310.5...............................................................................................................18

9 C.F.R. § 310.7...............................................................................................................18

9 C.F.R. § 310.10.............................................................................................................18

9 C.F.R. § 310.12 .................................................................................................................... 18

9 C.F.R. § 310.18 .................................................................................................................... 18

9 C.F.R. § 311.1 ...................................................................................................................... 18

9 C.F.R. § 311.25 .................................................................................................................... 18

**Federal Register Notices**

Prohibition of the Use of Specified Risk Materials for Human Food and Requirements
    for the Disposition of Non-Ambulatory Disabled Cattle,
    69 Fed. Reg. 1862 (Jan 4, 2004) ..................................................................................... 19

Prohibition of the Use of Specified Risk Materials for Human Food and Requirements
    for the Disposition of Non-Ambulatory Disabled Cattle; Prohibition of the Use of
    Certain Stunning Devices Used To Immobilize Cattle During Slaughter,
    72 Fed. Reg. 38,700 .............................................................................................. 19, 23

Requirements for the Disposition of Cattle that Become Non-Ambulatory Disabled
    Following Ante-Mortem Inspection,
    74 Fed. Reg. 11463 ............................................................................... 19, 22, 25, 26

Requirements for the Disposition of Non-Ambulatory Disabled Veal Calves,
    81 Fed. Reg. 46570 ................................................................................................ 19, 23

## INTRODUCTION

Plaintiffs, a collection of animal welfare groups, would have this Court order the U.S. Department of Agriculture to initiate a rulemaking to prohibit the slaughter of nonambulatory pigs, despite the Department's decision that such a rule was unnecessary in light of existing regulatory protocols and practices that protect the food supply and prevent inhumane handling.  Disappointed that neither Congress nor USDA had banned the slaughter of pigs that are unable to walk or rise from a recumbent position, Plaintiffs submitted a petition asking USDA to promulgate a rule that would do just that.  USDA carefully reviewed the petition and the evidence that accompanied it and, in a detailed response letter, denied the request.  Plaintiffs would now have this Court substitute its own judgment for USDA's expertise, and impose the policy outcome which Plaintiffs prefer.  But the Administrative Procedure Act does not permit such a result.  In reviewing an agency's decision on a rulemaking petition, which entails a complicated balancing of agency resources, the standard is "highly deferential"; indeed it is "akin to non-reviewability."  *New York v. U.S. Nuclear Regul. Comm'n*, 589 F.3d 551, 554 (2d Cir. 2009).  As is true in all judicial review of agency action, the court must not "substitute its judgment for that of the agency," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), and "need do no more than assure itself that [the Agency's] decision was 'reasoned,'" *New York*, 589 F.3d at 554 (citation omitted).  Because USDA's decision to deny Plaintiffs' rulemaking petition was, at minimum, a "reasoned" one, it must be sustained, and summary judgment granted for Defendants.

Summary judgment is also warranted for Defendants on Plaintiffs' claims that USDA (1) ignored a statutory requirement to report to Congress on nonambulatory pigs, and (2) ignored a purported congressional command to regulate the slaughter of nonambulatory pigs.  As an initial matter, claims that a federal agency has not fulfilled a congressional reporting requirement are not judicially reviewable—rather, Congress, the intended beneficiary of such requirements is more than capable of looking after its own interests if it finds compliance lacking.  Even if Plaintiffs' claims were reviewable, the statute in question requires only that USDA report on nonambulatory "livestock," which the agency unquestionably did in both 2004 and 2006.  Since USDA complied with the congressional directive at issue, there is nothing further for the Court to compel.  And, insofar as

Plaintiffs contend that Congress required USDA to regulate the slaughter of nonambulatory pigs, Congress required such regulation only "if" the Secretary of Agriculture determined it necessary, which he has not done (as evinced by USDA's denial of Plaintiffs' rulemaking petition).  Even assuming Plaintiffs can overcome the threshold deficiencies in their claims, because USDA reported on nonambulatory livestock, and because Congress never required USDA to promulgate regulations, USDA is entitled to summary judgment.

## BACKGROUND

## I.   STATUTORY BACKGROUND

Relevant to Plaintiffs' claims in this case are two federal statutes: the Federal Meat Inspection Act (FMIA) and the Humane Methods of Slaughter Act (HMSA).

### A.   Federal Meat Inspection Act

Congress found that it is in the public interest to protect consumers' health by "assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602.  Based on this finding, Congress enacted the FMIA, *see id.*, and charged USDA with administering it, *see id.* §§ 601(a), 621; 9 C.F.R. § 300.2(b)(1).  Pursuant to that directive, USDA administers the FMIA "to promote its dual goals of safe meat and humane slaughter." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 456 (2012).  The FMIA requirements apply to hogs that are slaughtered for human consumption. *See* 21 U.S.C. §§ 602, 603(a).

Under the FMIA, and through its Food Safety and Inspection Service (FSIS), USDA-appointed inspectors perform what's called ante-mortem inspection.  That is, they examine and inspect all hogs that are offered for slaughter before those hogs enter the slaughterhouse.  *See id.* § 603(a).  Any hogs showing signs of abnormalities or of disease are set apart. *See id.*  A USDA veterinarian then examines those hogs set apart to see if they may be offered for slaughter.  9 C.F.R. § 309.2. Nonambulatory hogs, that is, those which can neither walk nor rise from a recumbent position, are among the animals that must be set apart on ante-mortem inspection. *Id.* § 309.2(b).  Accordingly, slaughterhouse employees or USDA inspectors identify nonambulatory hogs that must be segregated

from the others, and the nonambulatory hogs that pass ante-mortem inspection are slaughtered separately from the general hog population.[1]  *See id.* § 309.2(b), (n).

Also, under the FMIA, federal inspectors perform a post-mortem inspection of all hog carcasses and parts that are offered for human consumption.  21 U.S.C. § 604.  Any carcass or part that might be harmful to human health or otherwise adulterated is set aside and condemned so that it does not enter the human food supply.  *See id.* §§ 601(m), 604.  Under current regulations—which are the subject of Plaintiffs' rulemaking petition—so long as nonambulatory hogs pass ante-mortem and their carcasses pass post-mortem inspection, the meat from these animals may be offered for human consumption.  *See* 9 C.F.R. § 309.2(a)-(b).

Finally, on top of performing inspections of live animals and carcasses, federal inspectors examine the "sanitary conditions" of hog slaughterhouses.  21 U.S.C. § 621.

### B.      Humane Methods of Slaughter Act

The HMSA is incorporated into the FMIA, *see id.* §§ 603(b), 610(b), and it also governs the methods of hog slaughter, *see* 7 U.S.C. § 1902(a).  Under the HMSA, "No method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane."  *Id.* § 1902.

In 2002, Congress amended the HMSA and directed the Secretary of Agriculture to "investigate and submit to Congress a report on": (1) "the scope of nonambulatory livestock," (2) "the causes that render livestock nonambulatory," (3) "the humane treatment of nonambulatory livestock," and (4) "the extent to which nonambulatory livestock may present handling and disposition problems for stockyards, market agencies, and dealers."  *Id.* § 1907(a).  Then, "[b]ased on the findings of the

---

[1] Under certain conditions, establishments that slaughter market classes of swine are permitted to voluntarily segregate those animals showing abnormalities or signs of disease, including non-ambulatory hogs, from the other animals so that these animals may be inspected by a USDA veterinarian. Under the applicable FSIS directive, *see* AR02204-21, if a slaughterhouse does not have voluntary segregation procedures, USDA inspectors identify animals showing abnormalities or signs of disease, including nonambulatory hogs, and instruct the slaughterhouse employees to segregate them from the others, *AR02209.*

report," the statute directed the Secretary—"*if* the Secretary determines it necessary"—to "promulgate regulations to provide for the humane treatment, handling, and disposition of nonambulatory livestock." *Id.* § 1907(b) (emphasis added). In this 2002 amendment, Congress made no specific mention of hogs or, for that matter, any other individual species of livestock.

To fulfill its statutory obligation, USDA reported to Congress on nonambulatory livestock in 2004 and 2006. AR02608-16.[2] Its 2006 report included the results of data collection by USDA's Animal and Plant Health Inspection Service on the number of nonambulatory cattle and calves, sheep and lambs, and goats and kids, relative to the general populations of those animals. Following receipt of these reports, Congress made no further requests of USDA pursuant to the 2002 HMSA amendment.

## II.    FACTUAL BACKGROUND

USDA regulations define nonambulatory livestock as "livestock that cannot rise from a recumbent position or that cannot walk, including, but not limited to, those with broken appendages, severed tendons or ligaments, nerve paralysis, fractured vertebral column, or metabolic conditions." 9 C.F.R. § 309.2(b). In neither the FMIA, the HMSA, nor in any other statute, has Congress prohibited the slaughter of any species of nonambulatory livestock. And in its regulations, USDA does not prohibit, and has never prohibited, the slaughter of nonambulatory pigs that pass federal inspection. *See id.* § 309.2(a)-(b), (n). Dissatisfied with these policies, Plaintiffs in June 2014 submitted a petition for rulemaking and asked USDA to amend its regulations to ban the slaughter of nonambulatory pigs. AR00001-30; First Am. Compl. ¶ 160, ECF No. 13. To support their request, Plaintiffs cited a mixture of food-safety and humane-handling concerns. *See id.* ¶¶ 102, 110, 160.

In September 2019, USDA denied the petition, concluding that current regulations and inspection procedures are effective in preventing diseased animals from entering the food supply and ensuring that nonambulatory pigs are handled humanely. AR02037-44. First, USDA addressed Plaintiffs' concern that nonambulatory pigs might be more likely to carry certain pathogens. AR02038.

---

[2] "AR_____" citations are to the certified administrative record filed December 9, 2021. *See* ECF No. 40.

USDA explained that this concern did not threaten food safety because it is unaware of data—and Plaintiffs did not offer any—suggesting that pork products made from nonambulatory pigs present a higher health safety risk than products from other pigs. *Id.* For example, looking to data from 1999 to 2017, USDA explained that it is aware of just "one swine slaughter establishment implicated in an illness outbreak linked to raw pork products contaminated with *Salmonella*." *Id.* After investigating this lone outbreak, USDA did not identify products derived from nonambulatory hogs as a contributing factor. *See id.* USDA also pointed to data showing that outbreaks linked to raw pork products contaminated with other pathogens are "rare," and the prevalence of certain pathogens in raw pork products is "very low." *See id.* Thus, USDA concluded that establishments—including those that handle nonambulatory pigs—are effectively controlling pathogens through the existing regulatory requirements and inspection procedures. *Id.*

Second, USDA considered Plaintiffs' claim that nonambulatory pigs are more likely to have swine flu and other diseases that cause lameness. *Id.* USDA explained that this concern did not threaten food safety because nonambulatory pigs with those cited diseases typically have identifiable signs and symptoms. *See* AR02038-39. Thus, USDA explained, federal inspectors are able to identify pigs that may be carrying those diseases during ante-mortem inspection, even if those pigs are nonambulatory. *See id.* USDA further pointed out that, unlike cattle, lameness in pigs is associated with conditions such as "disuse atrophy and arthroses of a joint." AR02039.

Third, USDA reviewed the relevant data and inspectors' noncompliance reports and concluded that nonambulatory pigs are not routinely handled in an inhumane fashion. *Id.* USDA determined that incidents of inhumane handling are instead isolated and not consistent with how nonambulatory pigs are treated across all federally-inspected establishments. *Id.*

Fourth, USDA distinguished its reasons for banning the slaughter of nonambulatory cattle while continuing to permit the slaughter of nonambulatory pigs that pass federal inspection. AR02039-40. USDA pointed to multiple studies showing that, unlike mature cattle and calves, pigs become nonambulatory "because of a temporary metabolic condition characterized by profound fatigue." AR02040. It cited studies showing that allowing nonambulatory pigs a period of time to

recover from the stress of being transported to the slaughter establishment returns them to their pre-transport physiological state.  *Id.*

Fifth, USDA refuted Plaintiffs' claim that pork industry producers have financial incentives to abuse pigs and render them nonambulatory.  AR02040-41.  USDA pointed to industry quality assurance programs that "promote food safety and minimize the non-ambulatory pigs."  AR02041.  Further, USDA noted that throughout the pork processing industry, there are financial costs, rather than incentives, to increased numbers of nonambulatory pigs—for example, nonambulatory pigs decrease efficiency, slow production, and increase labor costs and, if they are mistreated, regulatory enforcement actions can impose substantial costs on slaughter establishments.  *Id.*

Sixth, USDA rejected Plaintiffs' claim, advanced in a supplement to the petition, that the slaughter of nonambulatory hogs incentivized pork producers to misuse the drug Ractopamine in pigs.  AR02043-44.  USDA explained that its residue sampling and testing on affected animals prevented excessive levels of Ractopamine and similar drugs, according to tolerance levels set by the Food and Drug Administration, from entering the human food supply.  AR02043.

## III.   THIS CASE

Plaintiffs, seven animal-welfare advocacy organizations, filed suit in this Court on February 6, 2020.  On April 20, 2020, they filed the First Amended Complaint, which is the operative pleading.  *See* ECF No. 13.  In that Complaint, Plaintiffs assert three causes of action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*  *See id.* ¶¶ 170-82.  First, they claim that USDA violated the HMSA by allegedly failing to investigate and report to Congress on nonambulatory pigs, claiming that the purported failure to report amounts to "agency action unlawfully withheld and unreasonably delayed."  *Id.* ¶ 173.  Second, Plaintiffs claim that the HMSA obligated USDA to determine that regulations were necessary to ensure the humane treatment of nonambulatory hogs, and to promulgate such regulations.  *See id.* ¶¶ 176-77.  Plaintiffs assert that the lack of any such regulations "constitutes agency action unlawfully withheld and unreasonably delayed."  *Id.* ¶ 178.  Third, Plaintiffs claim that USDA's decision to deny their 2014 petition for rulemaking was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* ¶ 181 (quoting 5 U.S.C. § 706(2)(A)).

On June 28, 2021, this Court denied Defendants' motion to dismiss for lack of standing. *See* ECF No. 32. The Court concluded that Plaintiffs had sufficiently alleged standing because they had alleged a need to "shift their resources away from [services beyond mere issue advocacy] to oppose the slaughter of downed pigs." *Id.* at 37. The Court noted that its ruling "does not mean that Plaintiffs will ultimately be successful in establishing standing." *Id.* at 39. On March 18, 2022, Plaintiff moved for summary judgment. *See* Pls.' Mot. for Summ. J. (Pls.' MSJ), ECF No. 52.

## LEGAL STANDARDS

"Where a party seeks review of agency action under the APA, 'the entire case on review is a question of law.'" *New York Legal Assistance Grp. v. DeVos*, 527 F. Supp. 3d 593, 599 (S.D.N.Y. 2021) (quoting *Seife v. U.S. Dep't of Health & Human Servs.*, 440 F. Supp. 3d 254, 271 (S.D.N.Y. 2020). "While the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply in such cases, summary judgment [as a remedy] nonetheless is generally appropriate because courts 'address legal questions in deciding whether the agency acted arbitrarily, capriciously or in some other way that violates the APA." *Id.* (quotations omitted). "After the agency resolves factual issues and develops the administrative record, the district court 'determine[s] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 517 (S.D.N.Y. 2019) (quoting *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012)), *appeal docketed*, No. 20-41 (2d Cir. Jan. 3, 2020).

In reviewing agency action, a court cannot "substitute its judgment for that of the agency," *Overton Park*, 401 U.S. at 416, and should sustain the agency action if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" and identified a "rational connection between the facts found and the choices made," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). *See also Nat. Res. Def. Council v. U.S. EPA*, 658 F.3d 200, 215 (2d Cir. 2011); *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009).

In considering a claim that an agency has unlawfully withheld agency action, as in Plaintiffs' first two causes of action, the plaintiff must show "that an agency failed to take a *discrete* agency action

that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 64 (2004). Where, as in Plaintiffs' third cause of action, the agency action at issue is the denial of a rulemaking petition, the court's review is "extremely limited and highly deferential," a standard "akin to non-reviewability." *New York*, 589 F.3d at 554. A court "need do no more than assure itself that [the Agency's] decision was 'reasoned,' meaning that it considered the relevant factors." *Id.* (citation omitted).

## ARGUMENT

USDA is entitled to summary judgment on all three of Plaintiffs' causes of action. First, USDA respectfully renews and preserves its argument that Plaintiffs have failed to demonstrate Article III standing. But even if this Court again disagrees, summary judgment is nonetheless warranted for Defendants on all of Plaintiffs' claims. Plaintiffs' first cause of action—that USDA failed to issue a required report to Congress—fails at its outset because such congressional reporting requirements are not judicially reviewable. Even on its merits, however, the claim still fails because Congress never required USDA to report specifically on "nonambulatory pigs" as Plaintiffs maintain, but rather required USDA to report on "nonambulatory livestock" more generally, which USDA indisputably did in both 2004 and 2006. Equally unavailing is Plaintiffs' second cause of action—that USDA has failed an obligation to regulate the slaughter of nonambulatory pigs. The statutory provision on which Plaintiffs rely for this claim, 7 U.S.C. § 1907(b), requires regulation of "the humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers" (not of nonambulatory pigs by slaughter establishments), and even then only "if the Secretary determines it necessary." It is undisputed that there has been no such determination of necessity, and thus there is no obligation to promulgate such regulations. Finally, Plaintiffs' third cause of action, seeking to have this Court overturn USDA's denial of Plaintiffs' rulemaking petition, likewise fails. When it responded to the petition, USDA considered the relevant factors and provided a reasoned explanation for why it was denying Plaintiffs' request to ban the slaughter of nonambulatory pigs. The extraordinarily deferential standard for petition claims requires no more. USDA is therefore entitled to summary judgment on all claims.

## I.    PLAINTIFFS LACK STANDING.

Although this Court denied USDA's motion to dismiss by concluding that Plaintiffs had sufficiently alleged organizational standing, it noted that this ruling "does not mean that Plaintiffs will ultimately be successful in establishing standing."  ECF No. 32 at 39.  Now, at summary judgment, Plaintiffs rely on the same evidence they presented at that earlier stage to attempt to demonstrate both organizational and associational standing.  Defendants will not here belabor Article III standing in light of the Court's ruling on the motion to dismiss, but they respectfully submit that Plaintiffs' declarations are not sufficient to establish at summary judgment the requisite injury-in-fact.

For example, Plaintiffs lack organizational standing because USDA's denial of their rulemaking petition and its reporting to Congress on nonambulatory livestock do not impede Plaintiffs' ability to fulfill their missions, but instead constitute a setback to their abstract interests.  *See* Defs.' Mot. to Dismiss (Defs.' MTD), ECF No. 15 at 7-13; *see also, e.g.*, *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016) ("complaining that the organization's ultimate goal has been made more difficult is not sufficient" to show standing).  Indeed, insofar as USDA's conduct has led Plaintiffs to continue to advocate against the slaughter of nonambulatory pigs, that conduct has *contributed* to Plaintiffs' fulfillment of their everyday missions.  Because Plaintiffs are unable to show a harm to their mission-critical activities (as opposed to an abstract interest in protecting pigs), they are likewise unable to demonstrate a diversion of resources sufficient to qualify as injury-in-fact.  *See, e.g.*, *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 44, 44 (D.D.C. 2018) ("plaintiffs' diversion of resources . . . cannot, on its own, satisfy the standing requirements" because the challenged conduct did not "'perceptibly impair[] a non-abstract interest' of the plaintiffs" (citation omitted)). The same goes for Plaintiffs' claim of associational standing based on their members' alleged exposure to allegedly increased disease risks.  Merely stating "concerns" about the prospect of illness from potentially contaminated pork is not sufficient.  *See* Defs. MTD at 14-20; *see also Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003).

Because Plaintiffs have not demonstrated Article III standing, summary judgment should be granted for Defendants.

## II.   PLAINTIFFS' CLAIMS OF AGENCY ACTION UNLAWFULLY WITHHELD ARE MERITLESS.

Plaintiffs allege that USDA failed to report to Congress, as required by the 2002 amendment to the HMSA, but that assertion is readily disproven by the record.  In both 2004 and 2006, USDA reported to Congress on nonambulatory livestock.  Its 2006 report followed data collection on nonambulatory cattle and calves, sheep and goats, and horses procured by the National Agricultural Statistics Services and random samplings of domestic cattle producers.  AR02563-75.  Contrary to Plaintiffs' claim, USDA did not fail to act on its statutory obligation under 7 U.S.C. § 1907(a); rather, Plaintiffs merely take issue with the nature of USDA's report, and the fact that it did not include data on nonambulatory pigs.  But this type of claim—where a private plaintiff challenges the sufficiency of a federal agency's reporting to Congress—is not judicially reviewable.  Even if it were judicially reviewable, USDA plainly satisfied Congress's requirement that it investigate and report to Congress on "nonambulatory livestock."  7 U.S.C. § 1907(a).  Although Plaintiffs strain to read into the statute an express requirement that USDA investigate nonambulatory pigs, the statute nowhere mentions pigs specifically.  It was accordingly in USDA's discretion to determine which "livestock" species warranted investigation and reporting—a determination to which Congress notably never objected.

### A.   Congressional reporting obligations are not judicially reviewable.

As a threshold matter, Plaintiffs' claim that USDA failed to meet its reporting obligation to Congress is not subject to judicial review.  "Executive responses to congressional reporting requirements . . . represent . . . an entirely different sort of agency action" from "the prototypical exercise of agency power."  *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).  When, as here, the reporting statute "lack[s] a provision for judicial review," the reporting requirement "by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements."  *Id.*  Thus, when confronted with a claim that a federal agency has not fulfilled a statutory obligation to report to Congress, the general "presumption of reviewability of agency action is woefully inapposite."  *Id.* at 319; *see also, e.g., Guerrero v. Clinton*, 157 F.3d 1190, 1196 (9th Cir. 1998) (absent a provision for judicial review in the reporting statute, "'it is Congress's role to determine the adequacy of the study and report, not the courts'"

(*quoting Hodel*, 865 F.2d at 319)); *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1118 (N.D. Cal. 2007) (explaining that obligations under "statutes requiring only reporting to Congress . . . . are not judicially reviewable").

Of course, this is not a case where the agency simply failed to provide any report to Congress: it is undisputed that USDA reported, on two occasions, on nonambulatory livestock. Plaintiffs instead dispute the sufficiency of those reports, in that they do not discuss nonambulatory pigs specifically. Pls.' MSJ at 13. But the Judicial Branch is "ill-equipped to review the results of these reporting statutes." *Taylor Bay Protective Ass'n v. Adm'r, U.S. E.P.A.*, 884 F.2d 1073, 1081 (8th Cir. 1989). Had Congress intended for USDA to investigate and report on nonambulatory pigs specifically, it very well could have fashioned the statute to say so. Or, alternatively, if Congress after receiving the Agency's report agreed with Plaintiffs that information on hogs should have been included, Congress very well could have demanded that the Agency report such additional information. Congress did neither of these things. *See Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988) ("If the Secretary's response has indeed been deemed inadequate (in the statutory sense of 'insufficiently detailed') by its recipient, then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action. It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives."). "Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Guerrero*, 157 F.3d at 1195.

For all of these reasons, Plaintiffs' claim that USDA has unlawfully withheld (or unreasonably delayed) from Congress information on nonambulatory pigs is not judicially reviewable. Defendants are entitled to summary judgment on this claim.

**B.**    **The Agency satisfied the requirements set by Congress in 7 U.S.C. § 1907(a) to investigate and report on "nonambulatory livestock."**

Even if USDA's congressional reporting obligation under § 1907(a) is judicially reviewable (which it is not), Defendants are still entitled to summary judgment because the Agency has done what Congress directed it to do. Contrary to Plaintiffs' repeated contention that § 1907(a)'s mandate

"unquestionably" "includ[es] pigs," Pls.' MSJ at 4, 9, 13, the plain text of the statute contains no requirement that the Agency investigate and report on any particular species at all, and nowhere does it reference pigs specifically. Instead, Congress required that the Secretary investigate and report to Congress on "nonambulatory livestock" generally. 7 U.S.C. § 1907(a). Because USDA indisputably did report to Congress on nonambulatory livestock in its 2004 and 2006 letters, it took the only "discrete agency action" that Congress required of it, and Plaintiffs' claim fails on its merits. *SUWA*, 542 U.S. at 64.

It is axiomatic that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take*." *Bondarenko v. Chertoff*, No. 07-mc-00002, 2007 WL 2693642, at *3 (W.D.N.Y. Sept. 11, 2007) (citing *SUWA*, 542 U.S. at 64) (emphasis in original). Here, the only "discrete action" that USDA was "required to take" in § 1907(a) was to submit a report on various aspects of "nonambulatory livestock." In 2004 and 2006, as Plaintiffs conceded, *see* Pls.' MSJ at 12-13, USDA did just that by sending letters to Congress reporting on a variety of different livestock species. And while Plaintiffs argue that USDA is in violation of § 1907(a) by declining to include reporting on nonambulatory pigs, "the only agency action that can be compelled under the APA is action legally *required*." *SUWA*, 542 U.S. at 63; *see also Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (court's "ability to 'compel agency action' [under § 706(1)] is carefully circumscribed to situations where an agency has ignored a specific legislative command"). Notwithstanding Plaintiffs' attempts to locate a reference in § 1907(a) to pigs when there is none, there is no statutory requirement for USDA to do anything other than report on nonambulatory livestock, which it has indisputably done. There is accordingly nothing for the Court to compel under the APA, and Plaintiffs' claim fails on its merits.

Plaintiffs point to statements in a 2005 USDA pamphlet that the Agency intended to study nonambulatory pigs, among other species, as part of a national study of nonambulatory livestock. *See* Pls.' MSJ at 10 (citing AR02563-64). Yet these statements of USDA's anticipated study areas do not establish that Congress explicitly required the agency to investigate nonambulatory pigs, as Plaintiffs contend. Rather, they are simply indicia of USDA's intentions, and the 2005 pamphlet upon which

Plaintiffs rely nowhere mentions the HMSA, let alone the 2002 amendment that led to enactment of § 1907, or any supposed requirement in that section to report on pigs.  AR02563-64.

What Plaintiffs evidently take issue with is the scope and substance of USDA's reports to Congress—namely, that USDA did not report specifically on nonambulatory pigs.  As noted above, however, that alleged shortcoming of the report is for Congress, if it thinks warranted, to take up directly with the agency, and not for Plaintiffs to attempt to remediate via third-party litigation in this Court.  *See Hodel*, 865 F.2d at 318-19.  In any event, even if judicial review were available to Plaintiffs, they have not in this case brought a claim under 5 U.S.C. § 706(2) to challenge USDA's congressional reports as somehow deficient.  Instead, they have sought to compel further agency action in response to a directive that Congress did not impose, and their § 706(1) claim thus fails.

Assuming USDA's action is reviewable at all, there is no agency action for the Court to compel since USDA fulfilled its statutory obligation when it reported to Congress on nonambulatory livestock in both 2004 and 2006.  Whether for threshold reasons of non-reviewability or on the merits, Defendants are entitled to summary judgment on Plaintiffs' first cause of action.[3]

### C.    Congress did not require USDA to regulate the slaughter of nonambulatory pigs.

Finally, Plaintiffs are also wrong in their second cause of action that Congress required USDA to regulate the slaughter of nonambulatory pigs.  *See* Pls.' MSJ at 9, 11; Am Compl. ¶¶ 176-78.  Rather, Congress provided that "*if* the Secretary determines it *necessary*, the Secretary shall promulgate regulations to provide for the humane treatment, handling, and disposition of nonambulatory livestock by stockyards, market agencies, and dealers."  7 U.S.C. § 1907(b) (emphasis added).

---

[3] Plaintiffs also contend that USDA has "unreasonably delayed" agency action by not reporting to Congress under § 1907(b) "for twenty years."  Pls.' MSJ at 13-18.  But USDA fulfilled the only "*discrete* agency action" Congress required of it by no later than 2006 when it provided the report on nonambulatory livestock, and there was thus nothing for USDA to delay.  *SUWA*, 542 U.S. at 64.  Plaintiffs' unreasonable delay claim thus fails for the same reasons as its claim that USDA unlawfully withheld agency action—assuming it is judicially reviewable at all.  *See Hodel*, 865 F.2d at 318.  As explained above, there is no statutory requirement that USDA report to Congress on nonambulatory pigs specifically, and USDA therefore cannot have "delayed" what Congress never required it to do in the first place.

First and foremost, this language imposes no "*discrete* agency action that [the Agency] is *required to take*." *SUWA*, 542 U.S. at 64. Instead, by conditioning any regulatory action on a determination by the Secretary, Congress expressly reserved to the Agency's discretion whether to promulgate regulations. This is a classic example of agency action being "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and Congress thereby precluding judicial review under the APA. *See, e.g., Conyers v. Rossides*, 558 F.3d 137, 148 (2d Cir. 2009) (judicial review of failure-to-hire claim precluded when statute authorized hiring "'for such a number of individuals as the [TSA Administrator] *determines to be necessary* to carry out the screening functions'" (quoting 49 U.S.C. § 44935 note) (emphasis added)); *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1041 (11th Cir. 2011) (judicial review precluded when statute "grants the Secretary broad discretion to award leases 'for such periods, and upon such terms and for such purposes *as he may deem reasonable* in the public interest'" (quoting 16 U.S.C. § 460d) (emphasis added)). In their Prayer for Relief, Plaintiffs themselves recognize this limitation, and ask the Court to order the Secretary to promulgate regulations only if the Secretary "determine[s] [such regulations] *are necessary*." Am. Compl. at 39, Prayer for Relief ¶ 4 (emphasis added).

Second, even if judicial review of this claim were not precluded, Congress did not purport to require USDA to regulate the "slaughter" of nonambulatory pigs, as Plaintiffs maintain. Pls.' MSJ at 9 (Plaintiffs arguing that the Agency's "refusal to . . . regulate the slaughter of nonambulatory pigs directly violates a twenty-year-old Congressional mandate"). Instead, upon a Secretarial determination of necessity, Congress directed the agency to promulgate regulations for "the humane treatment, handling, and disposition of nonambulatory livestock by *stockyards, market agencies, and dealers*." 7 U.S.C. § 1907(b) (emphasis added). Conspicuously absent from this requirement is any reference to slaughter establishments, which, had Congress intended for USDA to regulate slaughter of nonambulatory livestock (as Plaintiffs claim), surely would have been included. Instead, the entities which were to be regulated—assuming hypothetically a determination of necessity by USDA—are those which are not involved in the slaughter process and which handle pigs exclusively prior to their arrival at a slaughter establishment. Thus, even setting aside that the predicate for regulatory action—a determination of

necessity by the Secretary—is lacking, Plaintiffs have mischaracterized the specific action that they erroneously maintain USDA must perform.

Third, as USDA's denial of Plaintiffs' rulemaking petition clearly reflects, the Secretary has not determined it "necessary" to regulate the slaughter of nonambulatory pigs.  Because the express statutory precondition to promulgating regulations has therefore not been met, USDA was never obligated to take the action Plaintiffs demand, and this Court therefore has no basis to compel it to do so.

USDA is entitled to summary judgment on Plaintiffs' second cause of action.

## III.  USDA'S DENIAL OF PLAINTIFFS' RULEMAKING PETITION WAS NOT ARBITRARY OR CAPRICIOUS.

Following a thorough review of Plaintiffs' rulemaking petition, including all of the materials submitted with the petition, USDA concluded that "existing regulations and inspection procedures are sufficient and effective in ensuring that [nonambulatory] pigs are handled humanely at slaughter and in preventing diseased animals from entering the human food supply."  AR02037.  Based on this conclusion, USDA denied the petition in a letter providing detailed explanations for the denial.  AR02037-44.  In their third cause of action, Plaintiffs now invite this Court to second-guess USDA's conclusions on a number of issues raised by their petition.  Plaintiffs maintain that banning the slaughter of nonambulatory pigs is necessary to promote food safety, to maintain consistency with USDA's treatment of nonambulatory cattle, and to eliminate inhumane handling.  Yet, as the record shows, USDA's decision to deny the petition and permit the slaughter of nonambulatory pigs which pass ante-mortem and post-mortem inspection was both reasonable and thoroughly explained by USDA.

As noted above, this Court's role in reviewing the denial of a rulemaking petition is far narrower than Plaintiffs intimate.  Indeed, Plaintiffs fail entirely to acknowledge the applicable standard when the challenge is to this type of agency denial, citing instead the case law which applies when a plaintiff challenges the reasonableness of, for example, agency rescissions of promulgated rules, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Aut. Ins. Co.*, 463 U.S. 29, 34 (1983), or agency

approval orders, *see Nat. Res. Def. Council v. FAA*, 564 F.3d 549, 554 (2d Cir. 2009). *See* Pls.' MSJ at 18-19. The actual standard which applies to an agency's denial of a rulemaking petition, however, is far more deferential than Plaintiffs care to acknowledge.

The Second Circuit has observed that a court's "extremely limited and highly deferential" review of such a denial is "akin to non-reviewability." *New York*, 589 F.3d at 554 (citation omitted). To sustain the Agency's denial of Plaintiffs' petition, the court "need do no more than assure itself that [the Agency's] decision was 'reasoned,' meaning that it considered the relevant factors." *Id.* (citation omitted). This narrow scope of review stems from the fact that "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," *WildEarth Guardians v. U.S.EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014) (quoting *Massachusetts v. U.S. EPA*, 549 U.S. 497, 527 (2007)). Courts recognize that "the timing and priorities of [an agency's] regulatory agenda" are within that agency's own discretion to determine, and therefore a more deferential level of scrutiny is warranted than in the mine run of APA cases reviewing more common types of agency action. *Id.*

So long as "the agency adequately explained the facts and policy concerns it relied on," and so long as "those facts have some basis in the record," the agency's decision must be upheld. *Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743, 747 n.4 (D.C. Cir. 2017); *see also id.* 744 (denial of rulemaking petition to be overturned "only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency" (citation omitted)). As the below analysis makes clear, USDA satisfied this standard, which is applied "at the high end of the range of levels of deference." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (citation omitted).

### A.   USDA reasonably concluded that allowing the slaughter of nonambulatory pigs would not lead to increased food safety risks.

Contrary to Plaintiffs' contentions in the petition, USDA reasonably concluded that permitting the slaughter of nonambulatory pigs would not lead to increased food safety risks. AR02037-39. Plaintiffs' primary argument to the contrary is that because nonambulatory pigs spend more time than

ambulatory pigs in lairage, where, Plaintiffs argue, there is greater exposure to feces and harmful bacteria, nonambulatory pigs are at an increased risk of being a carrier for "dangerous pathogens and diseases." Pls.' MSJ at 20. In denying Plaintiffs' petition, USDA acknowledged that "the stress of transportation and the holding of animals in lairage may increase the prevalence of certain pathogens and may be potential sources of pathogen cross-contamination" and that "longer holding times may be associated with pathogen cross-contamination." AR02037-38. Yet, even granting this cross-contamination premise, USDA could identify no evidence that pork products made from nonambulatory pigs that had passed the requisite ante-mortem and post-mortem inspections posed a higher public health risk than products from ambulatory pigs. AR02038. Nor have Plaintiffs offered any such evidence, either in their petition or in their motion for summary judgment. It was thus reasonable for USDA to conclude that because of the agency's existing regulations and inspection procedures, any additional food safety risk from slaughtering nonambulatory pigs was not substantiated by the available evidence, and that rulemaking designed to prohibit the practice was not warranted.

While Plaintiffs in their motion allege an increased incidence of pathogens and diseases in nonambulatory pigs, Pls.' MSJ at 20, they fail to account for the role that FSIS inspection plays in identifying and detecting animals which are not fit for processing. Ante-mortem inspections entail examination of all pigs before they enter the slaughterhouse, and the setting apart and subsequent veterinary examination of any pigs which show symptoms of disease. *See* 21 U.S.C. § 603(a); 9 C.F.R. § 309.2. Nonambulatory pigs that pass ante-mortem inspection are set apart and slaughtered separately, and post-mortem inspections of the carcasses of nonambulatory pigs are, by rule, performed by USDA veterinarians. 9 C.F.R. §§ 309.2(b), 311.1(a) ("The veterinary medical officer shall exercise his judgment regarding the disposition of all carcasses or parts of carcasses under this part in a manner which will insure that only wholesome, unadulterated product is passed for human food."). The post-mortem inspection process likewise protects food safety by requiring that any pig carcass or part offered for consumption, but that might be harmful to health or otherwise adulterated, be set aside and condemned so that it will not enter the food supply. *See* 21 U.S.C. §§ 601(m), 604; 9

C.F.R. §§ 310.5 (Condemned carcasses and parts to be so marked), 311.1 (Disposal of diseased or otherwise adulterated carcasses and parts; general).  As USDA observed when it denied the petition, FSIS inspection regimes are fully capable of detecting conditions such as swine flu, *Brucella suis*, and *Erysipelothrix rhusiopathiae* because those diseases present with evident and identifiable symptoms, such that affected animals can be segregated during the inspection process.  AR02038-39.  Plaintiffs offer nothing to contradict that conclusion.

There was thus no "wholesale dismissal" by USDA of Plaintiffs' public health data, as Plaintiffs erroneously maintain, Pls.' MSJ at 21; rather USDA considered Plaintiffs' theory of cross-contamination due to lairage, and, indeed, acknowledged its plausibility.  AR02037-38.  What USDA did not find, however—and what Plaintiffs did not offer in their petition—is conclusive evidence that nonambulatory pigs present greater health risks than ambulatory pigs based on conditions or diseases that elude detection during the ante-mortem and post-mortem inspection process.

Although Plaintiffs raise the prospect of harm from *Salmonella*, *Campylobacter*, and *Y. entercolitica*, they point to no evidence of actual outbreaks in the food supply owing to the presence of these pathogens in nonambulatory pigs.  AR02038; *see also* AR02157-64; AR02165-66; AR02167-68.  With respect to *Salmonella*, USDA did not identify any instances of contamination where nonambulatory pigs were the, or even a, contributing factor to the outbreak.  AR02038 ("FSIS's investigation of [the only Salmonella illness outbreak identified from 1999-2017] did not identify consumption of products derived from NAD pigs as a contributing factor.").  USDA had also taken steps to issue guidelines to control the food safety risks from *Salmonella* for market hogs.  *See* AR02038 at n.1 (citing AR02109-50 (FSIS Compliance Guideline for Controlling Salmonella in Market Hogs, Dec. 2013)).[4]  Moreover, as USDA noted, regulations already require establishments to implement pathogen control measures, and the fact that that from 1999 to 2017, USDA was aware of only one swine slaughter establishment

---

[4] These guidelines provide information on best practices that may be used by inspected hog slaughter establishments to prevent, eliminate, or reduce levels of *Salmonella* on market hogs from pre-harvest through slaughter.  The guidelines do not have the force and effect of law, but instead provide clarity regarding existing requirements under 9 C.F.R. §§ 310.7, 310.10 310.12, 310.18, 310.25, Part 416, and Part 417.

implicated in an outbreak linked to pork products contaminated with *Salmonella* supports the conclusion that those regulatory requirements are effectively reducing risk to food safety.  AR02038; *see* 9 C.F.R., Part 417 (requiring inspected slaughter establishments to identify food safety hazards and implement a plan to control such hazards).

Finally, Plaintiffs attempt to liken the alleged food safety risks from nonambulatory pigs to the health risks USDA identified when it banned the slaughter of nonambulatory cattle.  Pls.' MSJ at 21; *see* 9 C.F.R. § 309.3(e).[5]  Plaintiffs contend that USDA found "similar health risks" in nonambulatory cattle as in nonambulatory pigs.  Pls.' MSJ at 21.  But when USDA initially banned the slaughter of nonambulatory cattle in 2004, it found that "cattle that can not rise from a recumbent position . . . have a greater incidence of BSE [Bovine Spongiform Encephalopathy, or Mad Cow Disease] than healthy slaughter cattle" and "that the typical clinical signs associated with BSE cannot always be observed in non-ambulatory cattle infected with BSE because the signs of BSE often cannot be differentiated from the typical clinical signs of the many other diseases and conditions affecting non-ambulatory cattle."  69 Fed. Reg. 1,862, 1,870 (Jan. 12, 2004).  That finding stands in contrast to both (1) USDA's conclusion, based on available data, that products made from nonambulatory pigs do not present a higher public health risk than products made from ambulatory ones, and (2) its finding that, unlike BSE in cattle, the signs of diseases that may be present in nonambulatory pigs can be identified during the inspection process.  The same goes for Plaintiffs' reference to USDA's finding that nonambulatory calves were susceptible to certain "systemic and metabolic diseases."  74 Fed. Reg.

---

[5] In January 2004, to minimize human exposure to the agent for Bovine Spongiform Encephalopathy (BSE or Mad Cow Disease), USDA issued an interim final rule prohibiting the slaughter of nonambulatory cattle for human food.  *See* 69 Fed. Reg. 1,862 (Jan. 12, 2004).  That rule was based on data indicating that nonambulatory cattle were among cattle with greater incidence of BSE, and that the typical signs of BSE often cannot be distinguished from the signs of other diseases and conditions that affect nonambulatory cattle.  In July 2007, USDA issued a final rule affirming its prohibition on the slaughter of nonambulatory cattle.  72 Fed. Reg. 38,700 (July 13, 2007).  In March 2009, USDA clarified by final rule that its ban on the slaughter of nonambulatory cattle extended to cattle that become nonambulatory after passing ante-mortem inspection, although veal calves that appeared to be merely cold or tired were still allowed a chance to rise under FSIS supervision.  74 Fed. Reg. 11,463 (Mar. 18, 2009).  In 2016, USDA prohibited the slaughter of nonambulatory veal calves.  81 Fed. Reg. 46,570 (July 18, 2016).

11,464.  Again, USDA has made no comparable finding that nonambulatory pigs have greater susceptibility to diseases whose signs may not be detected on ante-mortem inspection than ambulatory pigs.  It was accordingly not unreasonable for USDA to treat nonambulatory pigs differently than nonambulatory cattle.

Certainly, Plaintiffs disagree with USDA's conclusion in the petition response that the current inspection regime is adequate to protect against the potential threat to food safety.  But that disagreement does not establish a violation of the APA.  USDA thoroughly evaluated Plaintiffs' concerns and produced a reasoned decision that acknowledged that certain risks may be associated with longer holding times in lairage, but explained why a complete ban on slaughter of nonambulatory pigs was unwarranted.  No more is required.  *See New York*, 589 F.3d at 554.

> **B.   USDA adequately explained why alleged practices by the pork production industry do not warrant a ban on slaughter of nonambulatory pigs.**

Plaintiffs argue that breeding and transportation practices and the use of animal drugs within the pork industry increase risks that pigs will become nonambulatory, such that a ban on the slaughter of nonambulatory pigs is necessary.  Pls. MSJ at 22-24.  While Plaintiffs contend that Defendants "ignored" and "disregarded" these practices, the record flatly contradicts that claim.  In a dedicated section of its response to the petition, USDA directly addressed Plaintiffs' claims that producer "handling practices at production, transport, and slaughter contribute to pigs becoming non-ambulatory."  AR02040-41.  Indeed, USDA noted that "the swine industry recognizes that inhumane handling can contribute to increased numbers of non-ambulatory pigs."  AR02041.  USDA found, however, that the industry had responded to the risk of inhumane handling by implementing two quality assurance programs "designed to help pig farmers and their employees use best animal handling practices to promote food safety and minimize the non-ambulatory pigs."  AR02041.  These programs, which USDA explained "rely on experts in agriculture and veterinary medicine," reduce producer incentives for inhumane handling "because slaughter establishments require current certifications [under these industry quality assurance programs] as a purchase specification."  *Id.*

Furthermore, USDA refuted Plaintiffs' claim that producers had financial incentives to continue inhumane practices; to the contrary, "[e]ach segment of the industry incurs costs associated with [nonambulatory] pigs," including producers, transporters, and slaughter establishments.  *Id.* USDA provided ample explanation for how existing market factors throughout all phases of the pork industry, such as financial penalties, lost time and inefficiencies, and reduced employee morale, cut against adopting inhumane practices that lead to nonambulatory pigs.  *Id.*  USDA also pointed out that its regulatory enforcement regime provided additional financial incentives against inhumane treatment:  inhumane handling can lead to "immediate suspension" by USDA and ensuing "[c]osts to the establishment associated with such a suspension can exceed thousands of dollars per hour."  *Id.*

Finally, USDA also adequately addressed Plaintiffs' complaints about the use of ractopamine in the pork processing industry.  Pls.' MSJ at 22-24.  Notably, Plaintiffs' petition was not an effort to ban the use of ractopamine in pork processing, and the connection between ractopamine use and permitting the slaughter of nonambulatory pigs is explained only loosely, if at all, in Plaintiffs' briefing. Plaintiffs' argument appears to be that permitting the slaughter of nonambulatory pigs incentivizes producers to misuse ractopamine in pigs.  Setting aside the fact that Plaintiffs cite no direct evidence substantiating their incentives argument—for example, Plaintiffs offer no evidence that a particular pig producer would *not* use ractopamine if slaughter the of nonambulatory pigs were disallowed— USDA reasonably concluded that Plaintiffs' health safety concerns over ractopamine were misplaced. AR02043-44.

Like USDA's response to Plaintiffs' financial incentives argument, the agency devoted an entire section to Plaintiffs' ractopamine allegations.  *See* AR02043-44.  USDA explained that animals showing symptoms associated with ractopamine use are tested by residue sampling against applicable Food and Drug Administration tolerance levels, and "[c]arcasses found to contain violative levels of these substances are adulterated and prohibited for use as human food."  AR02043.  USDA explained that existing regulations require slaughter establishments to monitor the likelihood of residues, and that establishments which lack adequate residue monitoring programs are subject to enforcement action.  Finally, USDA stated its finding that "residues in market hogs [for violative substances] are

historically very low." AR02044. While Plaintiffs may disagree that ractopamine use should be allowed, they have not demonstrated how its use should have required USDA to ban the slaughter of nonambulatory pigs, or shown that USDA's response to Plaintiffs' stated concerns about ractopamine was somehow unreasonable.

USDA's denial of Plaintiffs' petition gave a reasoned explanation for why the alleged existence of financial incentives to mistreat pigs did not warrant a ban on the slaughter of nonambulatory pigs.

### C.   USDA was not obligated to treat nonambulatory pigs the same as nonambulatory cattle, and in any event, explained its reasoning for not doing so.

Plaintiffs also argue that it was arbitrary and capricious for USDA to deny their petition because USDA has previously banned the slaughter of nonambulatory cattle and calves. Pls.' MSJ at 24-28. Plaintiffs argue that USDA "offer[ed] 'insufficient reasons for treating similar situations differently.'" *Id.* at 24 (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). In drawing the comparison to cattle, Plaintiffs place particular focus on the alleged incentives for pig producers to treat nonambulatory pigs inhumanely, contending that when USDA banned slaughter of nonambulatory cattle, it took into account the same type of incentives for inhumane treatment. Pls.' MSJ at 25-28. Plaintiffs' contentions ignore the extensive analysis that USDA devoted to this issue in its petition response, which easily satisfies the deferential standard for a petition response.

As USDA explained when it denied the petition, "pigs become non-ambulatory for different reasons than mature cattle and veal calves do, and therefore, potential incentives that establishments may have to handle NAD cattle and NAD veal calves inhumanely do not apply to NAD pigs." AR02039. USDA explained that cattle producers possessed strong incentives to hold dairy cattle to produce milk for as long as possible, and then send them to slaughter in a weakened condition "in the hope that cattle would pass ante-mortem inspection before going down." AR 02039. To avoid the inhumane conditions that could ensue from such practices, USDA's ban on the slaughter of cattle included cattle which became non-ambulatory *after* ante-mortem inspection. *See* 74 Fed. Reg. 11,463; C.F.R. § 309.3(e). For veal calves, meanwhile, USDA determined that the veal-specific practices of depriving colostrum and nutrients to young calves increased the likelihood that those calves would

become nonambulatory at the time of slaughter.  AR02040.  USDA accordingly banned the slaughter of nonambulatory calves, based in part on concerns over these practices.  *See* 72 Fed. Reg. 38,700 (July 13, 2007); 81 Fed. Reg. 46,570.

Pigs, on the other hand, USDA concluded, are "not subject to these same practices prior to slaughter."  AR02040.  That is because unlike for dairy cows, pork producers do not "extract as much milk as possible" from female sows "in the hope that [they] would pass ante-mortem inspection before going down."  AR02039.  And the practices employed with calves are exclusive to "veal production practices," without an equivalent analog for young pigs.  AR02040.  In reaching those findings, to which this Court should defer, *see, e.g.*, *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 46 (S.D.N.Y. 2020) ("[T]he Court defer[s] to an agency's factual findings and expert judgments" (quotation omitted)), USDA again provided an extensive analysis of its reasoning.  First, USDA explained that, in its experience, "pigs become non-ambulatory for different reasons than mature cattle and veal do, and therefore, potential incentives that establishments may have to handle NAD cattle and NAD veal calves inhumanely do not apply to NAD pigs."  AR02039.  USDA then went on to explain the dairy- and veal-specific practices that are absent from the pork production industry:  "Market swine are not subject to these same practices prior to slaughter and thus do not arrive at slaughter under conditions that increase the risk that they will become non-ambulatory or be inhumanely handled."  AR02040.

Second, USDA explained that "[p]igs often become non-ambulatory because of a temporary metabolic condition characterized by profound fatigue," AR02040, and that permitting fatigued pigs time to rest and recover from transport stress returns them to an ambulatory state, AR02040.  For example, researchers have found that for transported pigs, "[s]ix hours in lairage with access to food and water allowed most of the physiological parameters to return to pretransport levels," AR02151, and that "[a] period of rest in lairage allowed the pigs to recover from transport and the associated handling and the recovery appeared to be complete within two to three hours," AR02180; *see also* AR02183 (same).

23

Plaintiffs take issue with both findings by USDA, arguing that USDA "outright ignored the record," Ps.' MSJ at 26.   But of course that bald assertion is contradicted by the petition response and the evidence on which it relied.   What Plaintiffs characterize as "ignor[ing] the record" is in fact no more than a subjective disagreement with USDA's conclusion and the evidence that supports it.   The mere fact that Plaintiffs have cherry-picked evidence in the record that purportedly supports their position while ignoring the evidence that contradicts it does not demonstrate a violation of the APA; it (at most) demonstrates only why courts must defer to agencies when there is a dispute among experts over how best to approach a particular problem.   *See Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski*, 899 F.2d 151, 160 (2d Cir. 1990) ("Courts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise. Deference is desirable."), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *see also Cooling Water Intake Structure Coal. v. U.S. EPA*, 905 F.3d 49, 65 (2d Cir. 2018) ("Because we lack the [agencies'] expertise when it comes to scientific or technical matters, we look only to see whether the agency examined the relevant data and articulated a satisfactory explanation for its action, and whether there is a rational connection between the facts found and the choice made." (quotations and citations omitted)).   USDA expressly recognized the wealth of scientific evidence on these issues before concluding that it ultimately "support[ed] FSIS's current policy."   AR02040; *see also id.* ("There is a great deal of research and literature from Dr. Temple Grandin and others on the science of handling pigs to reduce stress.").

As noted above, research indicates that anywhere from two to six hours in lairage with access to food and water allows transported pigs to recover and for their physiological parameters to return to pretransport levels.   *See* AR02151; AR02180 (explaining that "a period of rest in lairage allowed pigs to recover from transport and the associated handling and the recovery appeared to be complete within two to three hours"); *see also* AR02183 (same).   Against this research, Plaintiffs reference factors that allegedly cause fatigue in pigs, Pls.' MSJ at 27 (citing AR00281, AR00284-85, AR01749-53), but identifying such causal factors is a far cry from demonstrating that USDA's findings regarding fatigued

pigs and their ability to recover are somehow deficient.  Ultimately, the upshot of Plaintiffs' apparent disagreement with USDA is difficult to discern.

In any event, USDA's extensive analysis of the scientific literature on these issues is sufficient to demonstrate that it arrived at a reasoned decision in deciding that it was not required to treat swine, cattle, and veal calves identically.   But a more detailed review of Plaintiffs' selected arguments and evidence does not support a different conclusion.  For instance, Plaintiffs assert that breeding sows are held by producers for as long as possible, such that they arrive in an "old, weak, [and] emaciated" condition—presumably Plaintiffs here are attempting to draw an analogy to treatment of dairy cows. Pls.' MSJ at 26 (citing AR00268).  But the document on which Plaintiffs base this claim says no such thing.  Indeed, that document, a 1998 paper by Dr. Temple Grandin, simply observes that sows that arrive at a livestock market in a weakened condition are, in her view, "likely to become downers." AR00268.  This paper does not purport to establish that holding breeding sows until they reach that condition is a widespread industry practice akin to the prolonged holding of dairy cows under the incentives that USDA found existed in the cattle industry.

Meanwhile, Plaintiffs' selected reference to a 2009 article by Dr. Grandin identifying various pig production practices that, in Plaintiffs' view, "debilitate pigs" is a non-sequitur.  Pls' MSJ at 27. The article in question does not purport to assert that these practices are uniform or widespread throughout the pork industry, and indeed the article (from 2009) states that "pork packing plants have greatly improved their handling practices over the last three years."  AR01612.  Moreover, this article does not link these practices with the purported incentive to slaughter nonambulatory pigs—the gist of Plaintiffs' argument.

Plaintiffs do contend that USDA's treatment of fatigue in nonambulatory cattle and calves is inconsistent with its treatment of pigs.  Pls.' MSJ at 27-28.  When USDA banned the slaughter of nonambulatory cattle and calves, it pointed out, among other reasons, that permitting slaughter of these animals could incentivize establishments to use inhumane methods to force them to rise.  74 Fed. Reg. 11,463; AR00031.   Yet Plaintiffs do not identify any evidence that pig slaughter establishments, as a matter of routine, inhumanely force pigs to rise when they are fatigued (a point

discussed further *infra*).  This is in contrast to USDA's findings with respect to cattle, where an investigation "highlighted a vulnerability in [its] inspection system and . . . disclosed instances where cattle had been inhumanely handled," and that accordingly necessitated regulatory changes "to ensure that animals that may be unfit for human food do not proceed to slaughter, and to improve the effectiveness and efficiency of [UDSA's] inspection program."  74 Fed. Reg. at 11,463.  Just because Plaintiffs maintain that the same *potential* for abuse may exist in both cattle and pigs does not require USDA to ban the slaughter of nonambulatory pigs, particularly when USDA has identified important distinctions between nonambulatory cattle and nonambulatory pigs.

To be clear, USDA has never changed its policy regarding the slaughter of nonambulatory pigs.  And, again, Congress has never opted to prohibit the slaughter of any species of nonambulatory livestock, including pigs.  Plaintiffs' argument is instead that USDA had some heightened obligation with respect to nonambulatory pigs because it had at an earlier point decided to ban the slaughter of nonambulatory cattle.  But, even granting Plaintiffs' premise that the two animal species present "similar situations," all the APA requires is that the agency provide a "reasoned analysis" for a different policy approach.  *Transactive Corp.*, 91 F.3d at 237.  There is no question, particularly under the "extremely limited and highly deferential" standard of review applicable here, that USDA's denial of Plaintiffs' petition reasonably explained why it had reached a different conclusion for nonambulatory pigs than it had for nonambulatory cattle.  *New York*, 589 F.3d at, 554; AR02039-40.

### D. USDA reasonably concluded that allowing the slaughter of nonambulatory pigs would not incentivize inhumane handling by pork processors.

Finally, and beyond comparing nonambulatory pigs to nonambulatory cattle, Plaintiffs argue that nonambulatory pigs suffer pervasive inhumane handling prior to slaughter, and that USDA ignored the evidence supporting that claim.  Pls.' MSJ at 28-32.  Although not completely spelled out, Plaintiffs' argument appears to be that the permissibility of slaughtering nonambulatory pigs creates an incentive for inhumane treatment prior to slaughter.  But USDA again analyzed this argument extensively in its response to Plaintiffs' petition and provided a reasoned decision why it did not justify banning the slaughter of nonambulatory pigs.

26

At first, Plaintiffs contend that inhumane handling of nonambulatory pigs is "severe and pervasive." Pls.' MSJ at 29.  To support that contention, Plaintiffs cite two 2013 incidents, drawn from USDA non-compliance records, of mistreatment of nonambulatory pigs, Pls.' MSJ at 29; AR01373-75; AR01381-84, and one other incident described in their petition, AR00017.  USDA reviewed the very same evidence Plaintiffs referenced in their petition, *as well as* additional non-compliance records that post-dated the petition, and found that Plaintiffs' claim of "severe" and "pervasive" mistreatment was unfounded: "[USDA] disagrees with the petition's conclusion that NAD pigs are routinely inhumanely handled at slaughter.  In FSIS's experience, the incidents are isolated and do not depict behavior throughout Federally-inspected operations." AR02039.  Based on its own review of the evidence, USDA's conclusion was reasonable, and Plaintiffs' reliance on a handful of isolated examples is inadequate to undermine it.[6]

Plaintiffs also assert that FSIS inspectors do not take sufficient enforcement action "when faced with humane handling violations." Pls.' MSJ at 29.  To support that claim they rely on a 2010 Government Accountability Office (GAO) audit, 2010 congressional testimony from a FSIS inspector, and 2013 and 2017 reports from the USDA Office of Inspector General (OIG).  *Id.* at 29-31.  The GAO's 2010 report—*i.e.*, that inspectors "have not taken consistent actions to enforce HMSA," AR01297—may be a critique of FSIS inspection efficacy but Plaintiffs nowhere explain how GAO's more generalized findings about inspection protocols have any specific connection with mistreatment of nonambulatory pigs.  The same goes for Plaintiffs' invocation of FSIS employee Dr. Dean Wyatt's 2010 congressional testimony.  AR01362-72.  While Dr. Wyatt testified that enforcement of food-safety and humane-slaughter laws "has been willfully ignored by well-paid public

---

[6] Plaintiffs also cite a 2012 internal FSIS email describing seventeen noncompliance reports for inhumane treatment of nonambulatory pigs in the prior year.  *See* AR01926; Pls.' MSJ at 31.  This is not evidence which Plaintiffs presented in their petition and therefore was not addressed in USDA's response.  Moreover, this email discussed noncompliance records over a limited time period, compared very small numbers of noncompliance records for nonambulatory pigs and nonambulatory veal calves, and did not conclude that humane handling violations for nonambulatory pigs occur at a higher rate than for nonambulatory cattle or other nonambulatory livestock.  In any event, Plaintiffs offer no reason to extrapolate from this internal email any conclusion different from what USDA observed when it denied the petition—*i.e.*, that such reports "are isolated and do not depict behavior throughout Federally-inspected operations." AR02039.

officials," AR01363, that testimony is a rebuke of the manner in which agency employees *enforce* established inspection protocols and practices, not evidence, or even an argument, that those protocols are themselves deficient.

Plaintiffs also invoke a 2013 OIG report to argue that USDA was not adequately enforcing food safety regulations.  Pls. MSJ at 30 (citing AR01246-95).  But that report—and Plaintiffs' arguments relying on it—again address FSIS inspection practices as a general matter.  Plaintiffs draw no connection between the findings of the report and any purported incentives to mistreat nonambulatory pigs (or incentives to mistreat pigs in a manner that renders them nonambulatory), nor do Plaintiffs assert that this report shows routine inhumane treatment of nonambulatory pigs.

In any event, when USDA denied Plaintiffs' petition, it detailed various measures it had implemented following the 2013 OIG report to "strengthen[] its approach to humane handling," including "improv[ing] the inspectors' objective analysis when enforcing the humane handling regulations" and "reduc[ing] subjective interpretation of inhumane events and their regulatory outcome."  AR02040.  Plaintiffs readily acknowledge that USDA made these improvements, but nonetheless chide USDA for OIG's findings.  *See* Pls.' MSJ at 30.  It is unclear, however, how Plaintiffs' evident disagreement with USDA's response to the OIG report supports their underlying claim that it was unlawful to deny their petition.  As noted above, USDA also pointed out in its response to the petition that the pork industry had implemented two quality assurance programs "designed to help pig farmers and their employees use best animal handling practices to promote food safety and minimize the non-ambulatory pigs."  AR02041.  The existence of these programs, USDA observed, reduces the incentives for inhumane handling "because slaughter establishments require current certifications [under these industry quality assurance programs] as a purchase specification."  *Id.*

Contrary to Plaintiffs' assertion, USDA did not "brush aside critical facts" from the various government watchdog agencies and third-party testimony they cite, but rather considered those

findings when it reviewed the rulemaking petition.  That consideration is evident from USDA's letter denying the petition.[7]

*        *        *

Plaintiffs have failed to show that USDA's denial of their rulemaking petition was not "reasoned" and, under the "extremely limited and highly deferential" standard to be applied, this Court should grant summary judgment to USDA on Plaintiffs' third cause of action.  *New York*, 589 F.3d at 554.

Even if the Court were to disagree and conclude that USDA's denial of Plaintiffs' petition was in some way deficient, it cannot, as Plaintiffs request, "compel Defendants to grant Plaintiffs' Petition to prohibit the slaughter of nonambulatory pigs."  Pls.' MSJ at 32.  Rather, "when an agency arbitrarily and capriciously denies a petition for rulemaking the proper remedy is typically to remand the case for reconsideration," *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1047 (D.C. Cir. 2002), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002), not to compel USDA to embark on a rulemaking process that Congress has never required.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter summary judgment in favor of Defendants on all claims asserted by Plaintiffs.

Dated: June 7, 2022                                    Respectfully submitted,

                                                                    BRIAN M. BOYNTON
                                                                    Principal Deputy Assistant Attorney General

---

[7] Plaintiffs also rely on a 2017 OIG report that was not included with their petition to argue that FSIS's inspections for humane treatment remain deficient.  Pls.' MSJ at 31.  USDA has already explained why the Court should not consider this extra-record evidence.  *See* Defs.' Opp'n to Pls.' Mot. for Judicial Notice, ECF No. 54.  Even if the Court does take the 2017 OIG report into account, however, it does not address FSIS inspections as they relate to nonambulatory pigs, and Plaintiffs do not attempt to argue otherwise.  Again, although Plaintiffs may take issue with FSIS inspection practices more broadly, merely citing evidence that a government watchdog agency identified deficiencies does nothing to advance their underlying APA claim.

ERIC R. WOMACK
Assistant Branch Director

*/s/ M. Andrew Zee*
M. ANDREW ZEE (CA 272510)
Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
Tel: (415) 436-6646
Email: m.andrew.zee@usdoj.gov

*Counsel for Defendants*